# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK



|  |  |
|---|---|
| SCOTT FAPPIANO,<br>ROSE FAPPIANO,<br><br>    Plaintiffs,<br><br>       v.<br><br>THE CITY OF NEW YORK,<br>HELENE GOTTLIEB, GERALD DONOHUE,<br>CLYDE DUNBAR, CHESTER STOYECK,<br>EDWARD MASON, JOHN ULSAMER,<br>JOHN AND JANE DOE POLICE OFFICERS<br>#1-10, RICHARD AND RHONDA ROE<br>NEW YORK CITY EMPLOYEES #1-10,<br><br>    Defendants. | CV 07   2476<br><br>FILED<br>IN CLERKS OFFICE<br>U.S. DISTRICT COURT E.D.N.Y<br>★ JUN 20 2007 ★<br>BROOKLYN OFFICE<br><br>TOWNES, J.<br><br>GOLD, M.J. |

## COMPLAINT AND JURY DEMAND

Plaintiffs Scott Fappiano and Rose Fappiano by and through their attorneys, the law firm of Cochran Neufeld & Scheck, LLP, state as follows:

### INTRODUCTION

1. Scott Fappiano spent over twenty-one years in prison for a rape he did not commit. This tragedy was no unfortunate accident, but the result of a series of unconstitutional and tortious actions by defendants designed to subvert the judicial process and ensure Mr. Fappiano's conviction and continued imprisonment at all costs.

2. Not only was there no hard evidence – no fingerprints, serology, or physical evidence of any kind – connecting Mr. Fappiano to the rape, but the serology evidence at the time of his prosecution *excluded* Mr. Fappiano as the perpetrator. Mr. Fappiano was only convicted because

1

the individual defendants conducted unduly suggestive identification procedures and/or used direct suggestion to obtain the identifications of Mr. Fappiano, fabricated inculpatory evidence, committed perjury, withheld and/or destroyed exculpatory evidence, and otherwise conspired to have Mr. Fappiano arrested and prosecuted without probable cause.  These actions of the individual police defendants were in turn the direct result of the conduct of police supervisors and policymakers, who condoned and facilitated the use of such unconstitutional investigative techniques.

3.  The defendants' misconduct did not end at Scott Fappiano's conviction.  Mr. Fappiano continued to assert his innocence and sought to prove it through post-conviction DNA testing when it first became available, in 1988.  Most of the evidence was reported lost or destroyed at that point, although there was no documentation to support that claim, and the one item remaining – the sweat pants the victim had donned after the rape – had insufficient biological matter to produce a DNA profile given the then state of science.  When Mr. Fappiano later sought additional testing as the methods of DNA testing improved, all of the biological evidence within the custody of the City of New York was reported as lost or destroyed, although once again there was no documentation to support that claim.  Mr. Fappiano was only able to prove his innocence in 2006 because the initial DNA testing company had preserved the DNA extract on which it first conducted testing in 1989.  If Mr. Fappiano had to rely on the City of New York for access to this evidence, he would still be in prison today.  Unfortunately, Mr. Fappiano's frustration in seeking access to exonerating evidence is not unique.  The bad faith withholding or destruction of such biological evidence has been a hallmark of the police and other responsible agencies of the City of New York, beginning before Mr. Fappiano's arrest and

2

prosecution and continuing to the present.

## JURISDICTION

4.  This Court has federal question jurisdiction, pursuant to 28 U.S.C. § 1331, over claims arising under 42 U.S.C. § 1983.

5.  Supplemental jurisdiction over Mr. Fappiano's pendent state law claims exists pursuant to 28 U.S.C. § 1367(a).

6.  Plaintiffs have complied with the requirements of New York General Municipal Law Section 50-i by making and serving a notice of claim on the Comptroller of the City of New York on November 20, 2006, within the time required by New York General Municipal Law Section 50-e.  More than thirty days have elapsed since the service of that notice, and no offer of settlement has been made.

7.  At the request of the City of New York, Plaintiff Scott Fappiano submitted to a hearing pursuant to New York General Municipal Law Section 50-h.

## VENUE

8.  Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Eastern District of New York, the judicial district in which the claims arose.

## JURY DEMAND

9.  Pursuant to the Seventh Amendment of the United States Constitution, Plaintiffs request a jury trial on all issues and claims set forth in this Complaint.

## PARTIES

10.  Plaintiff Scott Fappiano is and was at all times relevant to this Complaint a citizen and resident of the State of New York.  He currently lives in Brooklyn, New York.

3

11.  Plaintiff Rose Fappiano is and was at all times relevant to this Complaint a citizen and resident of the State of New York.  Rose Fappiano is Scott Fappiano's mother, and currently lives with Scott Fappiano in Brooklyn, New York.

12.  Defendant Helene Gottlieb at all times relevant to this Complaint was a duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of law and in her individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

13.  Defendant Gerald Donohue at all times relevant to this Complaint was a duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

14.  Defendant Clyde Dunbar at all times relevant to this Complaint was a duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

15.  Defendant Chester Stoyeck at all times relevant to this Complaint was a duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

16.  Defendant Edward Mason at all times relevant to this Complaint was a duly appointed and acting police officer of the NYPD with the rank of detective, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes,

ordinances, regulations, policies, customs, and usage of the City and State of New York.

17. Defendant John Ulsamer at all times relevant to this Complaint was a duly appointed and acting police officer of the NYPD with the rank of sergeant, acting under color of law and in his individual capacity within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

18. Defendants John and Jane Doe Police Officers #1-10, whose actual names plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "John and Jane Doe" and who include individual officers, direct supervisors and command-level supervisors within the NYPD, were at all times relevant to this Complaint duly appointed and acting police officers of the NYPD and include officers with responsibilities over the hiring, training, and supervision of NYPD officers, including the individual defendants named herein, acting under color of law and in their individual capacities within the scope of employment pursuant to the statutes, ordinances, regulations, policies, customs, and usage of the City and State of New York.

19. Defendants Richard and Rhonda Roe New York City Employees #1-10, whose actual names plaintiffs have been unable to ascertain notwithstanding reasonable efforts to do so, but who are sued herein by the fictitious designation "Richard and Rhonda Roe," include both individual employees and supervisors responsible for the monitoring and maintaining of evidence connected to criminal investigations and prosecutions that is within the custody of the City of New York during the time period relevant to this Complaint.

20. Defendant City of New York is a municipality that is a political subdivision of the State of New York, was the employer of the individual defendants, and is and was at all times

5

relevant to this Complaint responsible for the policies, practices, and customs of the New York City Police Department ("NYPD"), including the NYPD Crime Lab.  Defendant City of New York also is and was at all times relevant to this Complaint responsible for the relevant policies, practices and customs of the various city agencies with custody of the relevant biological evidence.

## FACTS

### The Crime

21.  On December 1, 1983, at approximately 1:00 a.m., a man broke into the Brooklyn apartment of New York City Police officer F.S. and his wife T.S.[1] while they were asleep in bed.

22.  The assailant immediately tied up F.S. with the cord from the kitchen telephone and placed F.S. facing the wall.

23.  F.S. never saw the assailant's face well enough to identify him.

24.  The assailant next repeatedly raped and sodomized T.S. at gunpoint over a period of approximately forty minutes.

25.  During the attack, the assailant roamed freely throughout the apartment, ungloved, touching many objects and speaking constantly.

26.  At one point, the assailant took a Molson's beer from the refrigerator, opened it, and drank from it.

27.  The assailant also took a cigarette from a pack, lit it, smoked it, and put it out in the ashtray near the bed.

---

[1]  In an attempt to protect the privacy of the victims, they are referred to throughout this Complaint by their initials.

28. During the attack, the assailant ejaculated twice, once on T.S.'s face and a second time inside her as he vaginally raped her on the bed. At another point, the assailant made T.S. put on a bra and then sucked on her breast through the bra.

29. After approximately half an hour, T.S. convinced the assailant to let her use the bathroom. She then wrapped herself in a towel and ran out the front door of her apartment, where she banged on the apartment door of her superintendent and yelled that she had been raped.

30. When the assailant saw that T.S. had left the apartment, he ran out himself, carrying his jacket and the beer he had been drinking. The assailant threw the beer at T.S. as he ran out to the street.

31. After the assailant had left, F.S. ran to the apartment door, naked and with his hands still tied behind his back. Once T.S. helped untie him, F.S. put on jogging pants and grabbed his gun. He asked T.S. "What did he look like and which way did he go?" F.S. then ran out to look for the assailant.

32. Back in her apartment, T.S. dressed in white jogging pants and a terry-cloth shirt.

33. In the meantime, a 1013 call – indicating an officer in need of assistance – was placed to the police. In response to this call, received at approximately 1:40 a.m., a large number of police officers responded to F.S. and T.S.'s apartment.

34. T.S. gave an initial description of her assailant to responding Officer Boody. In particular, T.S. described her attacker as 5'10", which she determined by comparing her assailant's height to that of responding officers Boody, who was 5'8", and Dunbar, who was 6'1".

35. Scott Fappiano is 5'5".

7

36. A full scale investigation then ensued.  A crime scene was established at F.S. and T.S.'s apartment pursuant to policy and practice.

37. T.S. was taken to Lutheran Medical Center, where a Vitullo rape kit was collected.

38. Night shift Detective Clyde Dunbar responded to Lutheran Medical Center, went to the crime scene and interviewed T.S. in the early morning hours of December 1, 1983.

### Identification

39. Detective Helene Gottlieb was assigned as lead detective and took over the case from Night Detective Dunbar.

40. Gottlieb spent nearly two hours interviewing T.S. on the morning of December 1, 1983. T.S. gave Gottlieb a very detailed account of the attack and the potential items left at the scene that could contain relevant forensic evidence.

41. On December 1, 1983, T.S. was shown multiple photographs of Scott Fappiano.  She failed to identify at least some of these photographs of Scott Fappiano as her assailant and/or identified persons other than Scott Fappiano as her assailant.  The photographs T.S. viewed and selected were not produced to the prosecution or the defense.

42. During the photographic identification procedures on December 1, Gottlieb and/or other defendants used direct or indirect suggestion to induce T.S. to select Fappiano's photograph.

43. Gottlieb fabricated a police report in which she indicated that T.S. had independently and positively identified Scott Fappiano as her assailant and had identified no other photographs.

44. Neither Gottlieb nor any of the other defendants ever disclosed to the prosecutor or defense the suggestiveness of the photographic identification procedures or that T.S. had failed

8

to select some photographs of Scott Fappiano that she had viewed and/or had identified photographs of other suspects as the assailant. Rather, Gottlieb and the other defendants affirmatively misrepresented the nature of the identification procedures to the prosecution and the defense, both in their communications before trial and in their pretrial and trial testimony.

45. On December 5, 1983, Gottlieb showed photo arrays to both T.S. and F.S. separately.

46. F.S. had never clearly seen the assailant's face and later testified that he could not have identified the assailant. Nevertheless, Gottlieb showed F.S. a photo array that included a photograph of Scott Fappiano. Because Gottlieb knew that F.S. was not capable of making an appropriate identification, this procedure was conducted for the purpose of using improper suggestion.

47. Indeed, Gottlieb used direct or indirect suggestion to induce F.S. to identify Fappiano from the photo array she showed him. Gottlieb reported that F.S. identified Fappiano in the photo array, but never disclosed to the prosecutor or defense that this identification was the result of her suggestion.

48. Gottlieb reported that the arrays shown to F.S. and T.S. were different, and that the array shown to T.S. did not include Fappiano's picture. Gottlieb reported that T.S. did not identify anyone in the array she was shown.

49. On December 6, 1983, Gottlieb conducted a live six person line-up for first T.S. and then F.S. Present at the line-up were Scott Fappiano, five police officers who served as fillers, Detective Gottlieb, Sergeant Ulsamer, Assistant District Attorney Susan Melendez and Assistant District Attorney Bohdan Ozaruk. Neither Fappiano's attorney nor any civilian witnesses were present during the line-up.

9

50.  During T.S.'s line-up, Fappiano was in seat #4.  T.S. identified Fappiano as her assailant.

51.  After T.S. identified Fappiano, and before F.S.'s line-up, A.D.A. Ozaruk went to the room where the line-up participants were seated and spoke to Scott Fappiano.  Fappiano expressed concern that F.S. would be tipped off to his seat location by T.S. or one of the police officers.  A.D.A. Ozaruk told Fappiano that he could switch places in the line-up and/or switch his clothing with one of the fillers before F.S. viewed the line-up.

52.  Fappiano gave his black shirt and gold chain to the filler then occupying seat #6.  He then switched seat locations with this filler, so that when F.S. viewed the line-up Fappiano was in seat #6.

53.  In between T.S.'s line-up and F.S.'s line-up, Gottlieb and/or the other defendants either informed F.S. of Fappiano's seat number or allowed T.S. to do so.

54.  F.S. positively identified the filler in seat #4 as the assailant.  Gottlieb initially accurately recorded that F.S. had selected the filler in seat #4 as the assailant on the line-up card, but then crossed out the #4 and replaced it with a #5, to inaccurately indicate that F.S. had selected the filler in seat #5.

55.  This doctored line-up card was later recklessly lost or intentionally destroyed.

56.  Immediately after the line-up on December 6, 1983, Fappiano was arrested.  He had just turned twenty-two years old.

57.  After the morning of December 1, Gottlieb and/or the other defendants learned that Mr. Fappiano has ten-inch distinctive tattoos on his lower legs, including one spelling out his name.  T.S.'s failure to notice such tattoos during the incident or report about the tattoos during

10

her two-hour interview with Gottlieb on the morning of December 1 would be powerful

exculpatory evidence tending to undermine T.S.'s identification of Mr. Fappiano.

58. In order to explain away this failure to notice such a distinctive marking, Gottlieb

and/or other defendants fabricated a statement from T.S. that the assailant was careful to never

lower his pants below his hips, so that the tattoos would never be visible, and encouraged T.S. to

adopt that version.  Neither Gottlieb nor any of the other defendants ever informed the

prosecution or the defense that this evidence was a fabrication.  Rather, the defendants

affirmatively misrepresented to the prosecution and defense that T.S. had always stated that her

assailant never lowered his pants below his hips in their communications before trial and

testimony in pretrial hearings and at trial, where this statement was presented as affirmative

evidence of Fappiano's guilt.

### Forensic Evidence

59. Crime Scene Unit detectives Chester Stoyeck and John Moran processed the

apartment of T.S. and F.S. at approximately 3:30 a.m. on December 1, 1983.  Stoyeck and Moran

photographed the apartment, dusted the apartment for fingerprints and vouchered the telephone

cord that had been used to bind F.S.

60. Later that day, at approximately 2:00 p.m., Detectives Donohue and Kuhn did a

second processing of the apartment.  Donohue and Kuhn took photographs of the crime scene

and lifted fingerprints.

61. During the assault, the assailant had smoked a cigarette and put it out in the ashtray

near the bed.  T.S. and F.S. communicated this fact to the police, and as a result Donohue also

collected the five cigarette butts from the ashtray near the bed and gave them to Detective Frank

11

Sciallo for vouchering.

62.  At approximately 3:00 p.m. on December 1, 1983, Detective Gottlieb went with T.S.,
F.S. and Sergeant Ulsamer to the apartment of T.S. and F.S.

63.  Gottlieb relied on her detailed interview with T.S., her inspection of the apartment
with T.S., as well as her experience as a sex crimes investigator, to collect and voucher physical
evidence from the apartment that she deemed relevant, including:

    a.    the sheets from the bed where T.S. had been raped;

    b.    the white jogging pants T.S. had put on after the rape;

    c.    the brown towel T.S. testified she had wrapped herself in after the rape;

    d.    the bra the assailant had made T.S. put on during the attack;

    e.    a white, semen-stained towel found at the crime scene that F.S. and/or T.S. told the police had been used by the assailant;

    f.    the bottle cap from the beer bottle assailant drank from;

    g.    the bottle opener used to open this beer bottle.

64.  T.S. and F.S. had both described the assailant as roaming through the apartment,
ungloved, throughout the attack, touching many items.  The police obtained 12 latent fingerprints
and one palm print of value from the apartment.  Although the latent prints were compared to
those of at least 30 people, including T.S., F.S., family members, friends, suspects and
investigating police officers, the source of the palm print and 10 of the fingerprints was never
identified.

65.  Scott Fappiano was eliminated as the source of *all* of these latent prints.

66.  The police sent to the NYPD Crime Lab for forensic testing:

    a.     the Vitullo rape kit collected from T.S.;

    b.     the sheets from the bed where T.S. had been raped;

    c.     the white jogging pants T.S. had put on after the rape;

    d.     the brown towel T.S. testified she had wrapped herself in after the rape;

    e.     the bra the assailant had made T.S. put on during the attack;

    f.     the white, semen-stained towel found at the crime scene that F.S. and/or T.S. told the police had been used by the assailant;

    g.     the five cigarettes taken from the ashtray next to the bed and which included a cigarette T.S. and F.S. had told the police was smoked by the assailant.

67.  The NYPD Crime Lab tested the sheets, bra, two towels, jogging pants and rape kit for the presence of semen.  The sheets, brown towel, bra and oral slides and swab from the rape kit tested negative for the presence of semen.  The jogging pants, white towel, and vaginal and cervical slides and swabs from the rape kit tested positive for the presence of semen.

68.  The evidence was then sent to the Office of the Chief Medical Examiner for ABO testing.

69.  Forensic laboratories can determine the ABO type of a blood sample by the presence of different antigens.  Type A blood shows A and H antigens, type O blood shows only H antigens.  For people known as secretors, these blood markers are present in their other bodily fluids, such as saliva and semen; non-secretors do not display these antigens in non-blood bodily fluids.  T.S. is a blood-type A non-secretor; F.S. is a blood-type A secretor; Scott Fappiano is a type O secretor.

70.  The jogging pants, white towel, and cigarettes were submitted for ABO testing.  The jogging pants had insufficient genetic evidence to provide an ABO profile given the then state of science.

71.  The semen-stained white towel had A and H antigens, meaning the semen came from a type A secretor, presumptively excluding Mr. Fappiano as the rapist.

72.  All five cigarettes – including the one that had been smoked by the perpetrator – showed the presence of A and H antigens, meaning every cigarette had been smoked by a type A secretor, which excludes Mr. Fappiano as the cigarette-smoking assailant.

73.  To negate the clearly exculpatory evidence of these serology results, the defendants fabricated evidence that the crime scene had been contaminated, and therefore that in particular the cigarettes that had all been smoked by a type A secretor did not have any evidentiary value.

74.  There had actually been no major irregularities in the evidence collection process at the crime scene.

75.  There was never any evidence that the cigarette smoked by the perpetrator had been removed from the crime scene and no reason to believe that the evidentiary value of the cigarettes had been diminished.

76.  The defendants also acted to negate the clearly exculpatory evidence of the semen-stained white towel found at the crime scene and which serology tests also indicated had come from a type A secretor.  The defendants fabricated evidence and encouraged F.S. and T.S. to adopt the false statements that the towel had been left not by the assailant but by F.S. several days earlier when, after having sexual intercourse with T.S., he had used the towel as part of the withdrawal method of birth control.

14

77. Mr. Fappiano sought ABO testing of the contents of the rape kit to demonstrate his innocence. However, pursuant to the custom, pattern and practice of the NYPD Crime Lab, Detective Edward Mason had submerged the entire vaginal, cervical and oral swabs from the rape kit in a stain solution, ostensibly to check each swab for the presence of semen. By submerging the entire swabs in the stain solution, Mason recklessly or intentionally and in bad faith made it impossible to do ABO testing on the rape kit. As the officers and supervisors of the NYPD Crime Lab knew, the practice of submerging the entire swab, rather than merely a small portion of the swab, in the stain solution served no valid scientific purpose and was contrary to the standard practices in crime labs nationwide. Nevertheless, the NYPD Crime Lab persisted in the custom, pattern and practice of destroying the rape kit for ABO testing, in bad faith and in deliberate indifference to the rights of criminal suspects, like Mr. Fappiano, who sought ABO testing of the rape kit to prove their innocence.

78. If Detective Mason and the NYPD Crime Lab had not thus destroyed the contents of the rape kit, ABO testing of the rape kit would have conclusively demonstrated Mr. Fappiano's innocence before he was ever put on trial.

### The Prosecution

79. Mr. Fappiano was first tried for this crime in November, 1984. At trial, F.S. and T.S. testified as to the details of the rape. The only evidence implicating Mr. Fappiano was the identification of him by T.S.

80. There was no forensic or other physical evidence linking Fappiano to the crime. Although there were 12 latent fingerprints and one palm print of value found in the apartment, and the origin of the palm print and 10 of the fingerprints was never identified, none came from

15

Fappiano.

81.  Rather, the forensic evidence from the scene – the ABO testing from the semen-stained white towel that T.S. and/or F.S. had told the police had been used by the perpetrator, and the five cigarettes from the ashtray next to the bed, which included one cigarette T.S. and F.S. had told the police was smoked by the perpetrator – *excluded* Fappiano.  These consistently came from a type-A secretor, while Fappiano is a type-O secretor.

82.  To counter this, defendants offered fabricated evidence, consistent with their pretrial reporting to prosecutors, intended to explain away the powerful forensic results excluding Mr. Fappiano as the source of the semen on the white towel and the saliva on the five cigarettes.

83.  At trial, Gottlieb testified, consistently with her misleading pretrial reports to prosecutors and pretrial testimony, concerning T.S. and F.S.'s initial descriptions of the assailant, the line-ups viewed by F.S. and T.S., and her gathering of evidence at the crime scene. Gottlieb was cross-examined on the basis of the obviously doctored line-up card she had created after F.S. viewed the line-up, in which she had initially indicated he selected the person in seat #4, then crossed that out and wrote in he had selected the person in seat #5.

84.  Stoyeck and Donohue perjuriously testified at trial – consistent with their pretrial reports to the prosecution – that the crime scene had been contaminated before any of the biological evidence was collected, thereby indicating that the presumptively exculpatory biological evidence could not be trusted.  Dunbar testified to T.S.'s initial description of her assailant.

85.  Detective Mason testified that the rape kit had tested positive for the presence of semen.  Mr. Fappiano was not able to present ABO testing results of the rape kit – which would

16

have excluded him as the perpetrator – because Detective Mason had destroyed the rape kit for

ABO testing.

86. The jury deliberated for two days but found itself at a deadlock and eventually a

mistrial was declared.  At that point, the jury was 11 to 1 for acquittal.

87. After the mistrial was declared, Judge Lagana commented on the insufficiency of the

evidence presented:

> It is lucky, in my opinion, it is lucky that this case went as long as it did and held
> the jury out as long as it did with the kind of evidence that was presented here.
> Sure I might agree with you as a lay person that when somebody hears a woman
> looks at a guy for 40 minutes or 45 minutes out of an hour that would be enough
> but how do you explain all this other stuff that happened?  How do you explain
> that they lifted no prints?  How do you explain that there was no sperm, no
> testing, nothing?  Nothing put this guy into that apartment. . . .  How do you
> explain that?

88. Despite this, Fappiano was put on trial a second time beginning August 6, 1985.

This time the proceedings were before Judge Julius Vinik.

89. The evidence at the second trial mirrored that at the first, with one notable exception.

The defendants negligently or recklessly lost or intentionally destroyed the doctored line-up card

– which had been used to effectively cross-examine Gottlieb at the first trial – before the second

trial.  When Mr. Fappiano's attorney at the second trial attempted to cross-examine Gottlieb

about the line-up card, she disclaimed any memory of having written and crossed out that F.S.

selected #4.  Without the visual evidence, Mr. Fappiano's attorney could not demonstrate to the

jury that Gottlieb had doctored the line-up card in that manner.

90. The jury at this second trial also initially found itself at a deadlock.  However, after

an *Allen* charge and a total of 2 ½ days of deliberation, the jury convicted Mr. Fappiano on

17

August 15, 1985 of five counts of Rape (Penal Law § 130.35 [1]), two counts of Sodomy (Penal

Law § 130.50 [1]), one count of Burglary (Penal Law § 140.30 [1]) and one count of Sexual

Abuse (Penal Law § 130.65 [1]).

91.   On September 11, 1985, Fappiano was sentenced to indeterminate terms of

imprisonment of 12 ½ to 25 years on the burglary conviction, and to a consecutive term of 8 1/3

to 25 years for the rape and sodomy convictions, for a total of 20 and 5/6 to 50 years

imprisonment.

### Obstruction of Post-Conviction DNA Testing

92.   Mr. Fappiano, who has always maintained his innocence, first sought DNA testing in

July 1988, when the technology initially became available.  He requested testing of all biological

evidence collected in his case, including the Vitullo rape kit, the semen-stained white towel, the

cigarette butts and the jogging pants T.S. put on after the attack.

93.   In 1989, Mr. Fappiano received a court order for post-conviction DNA testing of

biological evidence from his case.  The City of New York, police and other city employees who

had custody of the physical evidence did not produce the following pieces of evidence, even

though there were no records that this evidence had been destroyed:

> a.   the white, semen-stained towel found at the crime scene that F.S. and/or
>
> T.S. told the police had been used by the assailant and which serology
>
> tests indicated had come from a type A secretor;
>
> b.   the five cigarettes taken from the ashtray next to the bed, which included
>
> one cigarette F.S. and T.S. told the police had been smoked by the
>
> assailant, and which serology tests indicated had all been smoked by a

type A secretor;

c. the brown towel T.S. testified she had wrapped herself in after the rape;

d. the bra the assailant made T.S. put on during the attack and which had the assailant's saliva on it; and

e. the sheets from the bed where T.S. had been raped.

94.  Defendants either negligently or recklessly lost or intentionally destroyed these missing items.

95.  The District Attorney's Office did produce the rape kit and the semen-stained sweat pants T.S. had put on after the rape, and which there was no dispute contained biological evidence from the rapist.  These were both sent to LifeCodes, a private DNA laboratory.

96.  When LifeCodes opened the rape kit to perform testing, it discovered that the containers for the original swabs were all empty, and the original swabs were all missing.

97.  Defendants either negligently or recklessly lost or intentionally destroyed the contents of the rape kit.

98. LifeCodes tested the semen stain on the sweat pants using the then available technology.  LifeCodes extracted DNA from the semen but found the quantity insufficient to provide an interpretable DNA profile given the nascent state of the science.  The sweat pants and partially empty rape kit were then returned to the DA's Office.  Consistent with its protocol, LifeCodes maintained the DNA extract upon which it had performed testing stored in its freezer.

99.  Over time as DNA testing methods improved, Mr. Fappiano sought renewed access to the sweat pants and other biological evidence to conduct more advanced DNA testing.  From 1989 on, the City of New York failed to produce any of the biological evidence from Mr.

19

Fappiano's case, although there were no records indicating that the items had been destroyed.

100.  Defendants either negligently or recklessly lost or intentionally destroyed the remaining biological evidence in Mr. Fappiano's case.

101.  Defendants also negligently or recklessly lost or intentionally destroyed other evidence from Mr. Fappiano's case, including the fingerprints taken from the crime scene.

102.  In 2005, DNA evidence from the 1989 LifeCodes DNA extract was located at Orchid Cellmark, a private DNA laboratory that had inherited LifeCodes's storage materials after LifeCodes ceased operations.  Subsequent DNA testing of this evidence established that the DNA extract included DNA from one male and one female, that the female portion came from T.S. and that the male portion came neither from F.S. nor from Scott Fappiano.  This testing conclusively proved that Fappiano could not have been the perpetrator.

103.  On October 6, 2006, on the basis of this exonerating evidence, the District Attorney consented to Mr. Fappiano's motion to vacate his conviction.  After more than twenty-one years of illegal incarceration, Mr. Fappiano's judgment and conviction were vacated and the indictment against him was dismissed.  He was finally released from prison that day.

### Pattern and Practice of Withholding DNA evidence

104.  Mr. Fappiano was not the only prisoner to find his access to biological evidence within the custody of the City of New York impeded by the NYPD and other responsible city agencies.  Beginning before the investigation into Mr. Fappiano and continuing to the present, many other inmates who proclaim their innocence and seek access to evidence in the control of the City of New York, which, if subjected to DNA testing, could prove their innocence and wrongful imprisonment, have been obstructed in their efforts.

20

105. For example, Alan Newton was wrongfully convicted of rape in 1985 in the Bronx. He first requested postconviction DNA testing on August 16, 1994. The court denied his request on November 3, 1994, because New York City officials reported to the court that the rape kit could not be located and was presumed destroyed. Newton continued to press for access to this evidence, and in November 2005, the rape kit was found after a physical search of the NYPD Pearson Place, Queens warehouse. Despite the representations that the evidence had been lost or destroyed, the search of the evidence barrels at Pearson Place found the evidence in the exact barrel that was indicated on the evidence voucher. DNA testing of this evidence proved Newton's innocence, and he was released from prison in June 2006, after 21 years of wrongful imprisonment, nearly 12 of them after he first sought to establish his innocence through DNA testing.

106. At the time of Mr. Fappiano's release, there were more than 20 other cases where the City of New York had not produced evidence in their custody to inmates proclaiming their innocence and seeking such evidence to subject to DNA testing.

### Damages

107. The actions of the defendants deprived Plaintiff Scott Fappiano of his civil rights under the Fourth, Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, and the laws of New York.

108. The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Scott Fappiano to be falsely arrested and imprisoned, unfairly tried, wrongfully convicted, and forced to serve over twenty-one years in jail and prison for a crime he did not commit.

21

109.  The unlawful, intentional, willful, deliberately indifferent, reckless, and/or bad-faith acts and omissions of the defendants caused Mr. Fappiano specific emotional and physical damage due to the details of the crime for which he was wrongfully accused and convicted: the rape of a police officer's wife.  Mr. Fappiano received specific threats against his life and his family from both prison guards and fellow inmates, was subjected to physical abuse, including beatings and stabbings which caused severe physical injury throughout his incarceration, and consistently feared for his safety during his time in prison.

110.  In addition, Scott Fappiano suffered the following injuries and damages as a result of defendants' actions, which continue to date and will continue into the future:  personal injuries; pain and suffering; severe mental anguish; emotional distress; loss of family relationships; severe psychological damage; damage to business and property; legal expenses; loss of income; infliction of physical illness; inadequate medical care; humiliation, indignities and embarrassment; degradation; permanent loss of natural psychological development; and restrictions on all forms of personal freedom including but not limited to diet, sleep, personal contact, educational opportunity, vocational opportunity, athletic opportunity, personal fulfillment, sexual activity, family relations, reading, television, movies, travel, enjoyment, and expression, for which he is entitled to monetary relief.

111.  During the first trial, Scott Fappiano's father passed away.  Police officers watching the trial ridiculed Mr. Fappiano and repeatedly insulted his father.

112.  On August 14, 1985, during the jury deliberations at the second trial, Mr. Fappiano was again harassed by police officers watching the trial.  As a result of an altercation instigated by these police officers, Mr. Fappiano's bail was revoked and he was taken into custody.

22

113.  Additionally, Mr. Fappiano and his family incurred significant out-of-pocket expenses throughout the criminal process, including, without limitation, paying substantial fees for his legal representation.

114.  As a direct and proximate result of the acts of the defendants, and the resulting unlawful incarceration of Mr. Fappiano, plaintiff Rose Fappiano suffered pecuniary and non-pecuniary damages in that she was deprived of those benefits one would normally derive from the presence of her son, Mr. Fappiano.  Before his wrongful conviction, Mr. Fappiano had lived at home with his mother his entire life, including at the time of his trials.  Mr. Fappiano's father died during the first trial, and Mr. Fappiano became the primary companion for his mother at that time.  After his release from prison, more than twenty-one years later, Mr. Fappiano returned to live with his mother at his childhood home.  As the result of her son's twenty-one year absence, Rose Fappiano suffered loss of society, companionship, advice, moral support, family services, attention, protection and financial support.  She also suffered from mental anguish, bereavement, and the stigma of being the mother of a man who was tried and convicted of the reprehensible crime of brutally raping a new mother in the presence of her husband.

115.  Mrs. Fappiano also incurred significant out-of-pocket expenses throughout the criminal process, including, without limitation, legal expenses, visiting expenses, and substantial expenses for providing basic provisions to Mr. Fappiano while he was incarcerated.

116.  All the acts and omissions committed by the defendants described herein for which liability is claimed were done intentionally, unlawfully, maliciously, wantonly, recklessly, negligently and/or with bad faith, and said acts meet all of the standards for imposition of punitive damages.

## COUNT I
### 42 U.S.C. § 1983 4th and 14th Amendment Malicious Prosecution, False Arrest and False Imprisonment

117.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

118.  Defendants Gottlieb, Donohue, Dunbar, Stoyeck, Ulsamer and John and Jane Doe police officers, with malice and knowing that probable cause did not exist to arrest Mr. Fappiano and prosecute him for the rape of T.S., acting individually and in concert caused Mr. Fappiano to be arrested, charged, and prosecuted for that crime, thereby violating Mr. Fappiano's clearly established right, under the Fourth and Fourteenth Amendments of the United States Constitution, to be free of unreasonable searches and seizures.

119.  Specifically, the defendants, acting individually and in concert, fabricated evidence and intentionally withheld from and misrepresented to prosecutors and the grand jury exculpatory facts that vitiated probable cause against Mr. Fappiano, including but not limited to the fact that the identifications of Mr. Fappiano were the product of unduly suggestive identification procedures and/or direct suggestion, that the forensic evidence excluded Mr. Fappiano and was neither contaminated nor explained away, and that the police had fabricated inculpatory evidence, and withheld and/or destroyed exculpatory evidence.  The defendants also failed to conduct a constitutionally adequate investigation in light of clear evidence pointing to other suspects.

120.  The defendants performed the above-described acts under color of state law, intentionally, with reckless disregard for the truth, and with deliberate indifference to Mr. Fappiano's clearly established constitutional rights.  No reasonable officer in 1983 would have

24

believed this conduct was lawful.

121.   As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.

122.   As a direct and proximate result of defendants' actions Mr. Fappiano was wrongly convicted and imprisoned for over twenty-one years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT II
### 42 U.S.C. § 1983 14th Amendment Deprivation of Liberty Without Due Process of Law and Denial of a Fair Trial by Fabricating Evidence, Conducting Unduly Suggestive Identification Procedures, Withholding and Destroying Material Exculpatory and Impeachment Evidence, and Deliberately Failing to Conduct a Constitutionally Adequate Investigation

123.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

124.   Defendants Gottlieb, Donohue, Dunbar, Stoyeck, Ulsamer and John and Jane Doe police officers, acting individually and in concert deprived Mr. Fappiano of his clearly established constitutional right, under the Fourteenth Amendment of the United States Constitution, to a fair trial by:

  a.     intentionally using unduly suggestive identification procedures and/or direct suggestion to obtain witness identifications; and/or

  b.     fabricating inculpatory evidence; and/or

  c.     withholding material exculpatory and impeachment evidence from prosecutors; and/or

25

d.      deliberately failing to conduct a constitutionally adequate investigation.

125.  The defendants committed these acts under color of state law, intentionally, with reckless disregard for the truth and with deliberate indifference to Mr. Fappiano's clearly established constitutional rights.  No reasonable officer in 1983 would have believed this conduct was lawful.

126.  As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.

127.  As a direct and proximate result of defendants' actions Mr. Fappiano was wrongly convicted and imprisoned for over twenty-one years and suffered the other grievous and continuing damages and injuries set forth above.

**COUNT III**
**42 U.S.C. § 1983 Failure to Intercede**

128.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

129.  By their conduct and under color of state law, defendants Gottlieb, Donohue, Dunbar, Stoyeck, Ulsamer and John and Jane Doe police officers had opportunities to intercede on behalf of Mr. Fappiano to prevent his false arrest, malicious prosecution, false imprisonment, and deprivation of liberty without due process of law, but, due to their intentional conduct and/or reckless or deliberate indifference, declined or refused to do so.

130.  The defendants' failures to intercede violated Mr. Fappiano's clearly established constitutional right to be free from unreasonable search and seizure and not to be deprived of

26

liberty without due process of law as guaranteed by the Fourth and Fourteenth Amendments. No reasonable police officer in 1983 would have believed that failing to intercede to prevent the defendants from fabricating inculpatory evidence, conducting unduly suggestive identification procedures and/or using direct suggestion to procure identifications, withholding and/or destroying material, exculpatory evidence, deliberately failing to conduct a constitutionally adequate investigation, and causing Mr. Fappiano to be arrested and prosecuted without probable cause were lawful.

131. As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape. The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.

132. As a direct and proximate result of the defendants' failures to intercede Mr. Fappiano was wrongly convicted and imprisoned for over twenty-one years, and suffered the other grievous and continuing injuries and damages as set forth above.

## <u>COUNT IV</u>
### 42 U.S.C. § 1983 Civil Rights Conspiracy

133. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

134. Defendants Gottlieb, Donohue, Dunbar, Stoyeck, Ulsamer and John and Jane Doe police officers, acting within the scope of their employment and under color of state law, agreed among themselves and with other individuals to act in concert in order to deprive Mr. Fappiano of his clearly established Fourth and Fourteenth Amendment rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of

liberty without due process of law, and to a fair trial.

135.  In furtherance of the conspiracy each defendant engaged in and facilitated numerous overt acts, including, without limitation, the following:

  a.  Falsely arresting and imprisoning Mr. Fappiano, knowing that they lacked probable cause;

  b.  Fabricating inculpatory evidence in reports and pretrial communications with the prosecution, including the identifications of Mr. Fappiano and evidence falsely negating the exculpatory value of the forensic evidence found at the crime scene;

  c.  Committing perjury during hearings and trials; and

  d.  Intentionally or with deliberate indifference failing to comply with their duty to disclose Brady material during the pendency of the case, including by destroying material exculpatory evidence.

136.  As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.

137.  As a direct and proximate result of defendants' conspiracy and actions in furtherance of the conspiracy, Mr. Fappiano was wrongly convicted and imprisoned for over twenty-one years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT V
### 42 U.S.C. § 1983 Supervisory Liability – Malicious Prosecution and Denial of a Fair Trial

138.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

139.  The individual defendant police officers, Gottlieb, Donohue, Dunbar and Stoyeck and John and Jane Doe police officers, acted with impunity in an environment in which they were not adequately trained, supervised, or disciplined by defendants John Ulsamer and John and Jane Doe supervisors, in this case and as a matter of practice.

140. Defendants John Ulsamer and John and Jane Doe supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the defendant police officers, and thereby caused the individual defendant police officers to deprive Mr. Fappiano of his clearly established constitutional rights, including his rights to be free from unreasonable searches and seizures, false arrest, false imprisonment, malicious prosecution, and deprivation of liberty without due process of law, and to a fair trial.

141.  Had Defendants John Ulsamer and John and Jane Doe supervisors not provided grossly inadequate training, supervision, and discipline of the defendant officers, the defendants would not have conducted unduly suggestive identification procedures and/or used direct suggestion to obtain the identifications of Mr. Fappiano, fabricated inculpatory evidence, committed perjury, withheld and/or destroyed exculpatory evidence, and intentionally and maliciously caused Mr. Fappiano to be arrested and prosecuted without probable cause. Defendants Ulsamer and John and Jane Doe supervisors were directly involved in the investigation of Fappiano and directly supervised the specific investigative acts taken by the

individual officer defendants in this case.

142. The grossly negligent, reckless, and/or deliberately indifferent conduct of Defendants John Ulsamer and John and Jane Doe supervisors under color of state law violated their clearly established duty, in 1983, to supervise defendants Gottlieb, Donohue, Dunbar and Stoyeck and John and Jane Doe police officers, and no reasonable police supervisor in 1983 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinate officers was lawful.

143. As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.

144. As a direct and proximate result of defendants' failure to supervise, Mr. Fappiano was wrongly convicted and imprisoned for over twenty-one years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VI
### 42 U.S.C. § 1983 14th Amendment Deprivation of Liberty Without Due Process of Law Bad Faith Withholding and Destruction of Material Exculpatory Evidence

145. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

146. Detective Mason intentionally and/or recklessly and in bad faith, and in a manner that shocks the conscience, submerged the entirety of each of the rape kit swabs collected from T.S. in a stain solution, destroying the rape kit for ABO testing and thereby depriving Mr.

Fappiano of his clearly established constitutional rights, under the Fifth and Fourteenth Amendments, to a fair trial, due process of law and access to the courts.

147.  Mr. Fappiano sought ABO testing of the rape kit before his trial.  If Detective Mason and the NYPD Crime Lab had not thus destroyed the contents of the rape kit, ABO testing of the rape kit would have conclusively demonstrated Mr. Fappiano's innocence before he was ever put on trial.

148.  Defendant committed these acts under color of state law, intentionally, and with deliberate indifference to Mr. Fappiano's clearly established constitutional rights.  No reasonable person in 1983 would have believed this conduct was lawful.

149.  Additionally, Defendants Richard and Rhonda Roe Employees #1-10 intentionally and/or recklessly and in bad faith, and in a manner that shocks the conscience, withheld and/or destroyed biological evidence that Mr. Fappiano sought to submit to DNA testing to prove his innocence and which a court had ordered produced, thereby depriving Mr. Fappiano of his clearly established constitutional rights, under the Fifth and Fourteenth Amendments, to due process of law and access to the courts.

150.  Defendants Richard and Rhonda Roe Employees #1-10 knew or had reason to know that testing of this evidence would conclusively establish Mr. Fappiano's innocence.

151.  Specifically, Mr. Fappiano first sought DNA testing in 1988, when the technology first became available.  He received an order to test biological evidence in 1989, but the Roe defendants failed to produce almost all the biological evidence pursuant to the court order for this testing.

152.  The one item with biological material that was produced to LifeCodes for testing --

the sweatpants T.S. had worn after the rape – had insufficient DNA material to provide an interpretable profile at the infancy of the science.  While the box containing the rape kit was also produced to LifeCodes, the swabs were all missing.

153.  Once the sweatpants and mostly empty rape kit were returned to the custody of the City, those, too, were recklessly lost or intentionally destroyed by the Roe defendants.  Even though the state of DNA testing improved, and therefore less biological material was required to produce a result, Mr. Fappiano was not able to procure new testing results because he was deprived of access to this evidence.

154.  Defendants lied to the courts, hid their misconduct, and are still hiding it to this day.

155.  Defendants committed these acts under color of state law, intentionally, and with deliberate indifference to Mr. Fappiano's clearly established constitutional rights.  No reasonable person in 1988 would have believed this conduct was lawful.

156.  Mr. Fappiano was only able to submit biological evidence from his case to DNA testing because Orchid Cellmark, the private DNA laboratory that had inherited LifeCodes's storage materials after LifeCodes ceased operations, preserved the vials LifeCodes had used for the initial testing in 1989.  If Mr. Fappiano had to rely on the defendants for access to the evidence necessary to prove his innocence, he would still be in prison today.

157.  As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The 2006 DNA testing of the biological evidence found at Orchid Cellmark conclusively established Mr. Fappiano's innocence.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.

32

158.  As a direct and proximate result of defendants' actions, Mr. Fappiano was wrongly imprisoned for over 21 years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT VII
### 42 U.S.C. § 1983 *Monell* and Supervisory Liability
### Bad Faith Withholding and Destruction of Material Exculpatory Evidence

159.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

160.  The City of New York, by and through its final policymakers, maintained a custom, practice and policy at the NYPD Crime Lab of submerging the entirety of each of the rape kit swabs in a stain solution, destroying the rape kit for ABO testing.  As the Richard and Rhonda Roe officers, supervisors and final policymakers of the NYPD Crime Lab knew or should have known, the practice of submerging each swab in the stain solution served no valid scientific purpose and was contrary to the standard practices in crime labs nationwide.  The Richard and Rhonda Roe officers, supervisors and final policymakers of the NYPD Crime Lab also knew or should have known that, as a result of this practice, they would destroy material exculpatory evidence.  Nevertheless, the NYPD Crime Lab, through the actions of the Richard and Rhonda Roe officers, supervisors and final policymakers, persisted in the custom, pattern and practice of destroying the rape kit for ABO testing, in bad faith and in deliberate indifference to the rights of criminal suspects, like Mr. Fappiano, who sought ABO testing of the rape kit to prove their innocence.

161.  The City of New York, by and through its final policymakers, also maintained a custom, policy or practice of failing to train and supervise its employees at the NYPD Crime Lab

who were conducting testing on rape kits on how to preserve such evidence for ABO testing.

162. Additionally, the City of New York, by and through its final policymakers, maintained a custom, policy, or practice of withholding or destroying biological evidence sought by inmates for post-conviction DNA testing.

163. The City of New York, by and through its final policymakers, also maintained a custom, policy or practice of failing to train and supervise its employees who were custodians of biological evidence sought by inmates for post-conviction DNA testing on how to maintain such evidence.

164. These customs, policies or practices were the moving force behind the violation of Mr. Fappiano's Fifth and Fourteenth Amendment rights to a fair trial, not to be deprived of liberty without due process of law, and of access to the courts.

165. The individual employees of the City of New York acted with impunity in an environment in which they were not trained, supervised, or disciplined by defendants Richard and Rhonda Roe supervisors.

166. Defendants Richard and Rhonda Roe supervisors acted with gross negligence, recklessness, and/or deliberate indifference to the constitutional rights of citizens by failing to provide adequate training, supervision, and discipline of the individual employees, and thereby caused the individual employees to deprive Mr. Fappiano of his clearly established constitutional rights under the Fifth and Fourteenth Amendments, to a fair trial, due process of law and access to the courts. Had Defendants Richard and Rhonda Roe supervisors not provided grossly inadequate training, supervision, and discipline of the defendant employees, the defendants would not have intentionally and/or recklessly and in bad faith, and in a manner that shocks the

conscience, withheld and/or destroyed biological evidence that Mr. Fappiano sought to submit first to ABO testing and later to DNA testing to prove his innocence.

167.  The grossly negligent, reckless, and/or deliberately indifferent conduct of the Roe supervisory defendants under color of state law violated their clearly established duty, in 1983, to supervise their employees, and no reasonable supervisor in 1983 would have believed that grossly negligent, reckless, and/or deliberately indifferent supervision in the face of actual or constructive notice of misconduct by their subordinates was lawful.

168.  As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.

169.  As a direct and proximate result of the City of New York's customs, practices or policies, as well as the Roe defendants' failure to supervise, Mr. Fappiano was wrongly imprisoned for over 21 years and suffered the other grievous and continuing damages and injuries set forth above.

### COUNT VIII
### 42 U.S.C. § 1983 1st and 14th Amendment Loss of Familial Association

170.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

171.  Defendants, through their misconduct against Scott Fappiano, recklessly or deliberately violated Rose Fappiano's First and Fourteenth Amendment rights to be free from unwarranted government interference with her familial relationship to her son, Scott Fappiano, without due process of law.

172.  These acts caused Rose Fappiano to suffer the damages set forth above.

## COUNT IX
**State Law False Arrest, Malicious Prosecution, and False Imprisonment**

173.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

174.  Defendants Gottlieb, Donohue, Dunbar, Stoyeck, Ulsamer and John and Jane Doe police officers, despite knowing that probable cause did not exist to arrest and prosecute Mr. Fappiano for the rape of T.S., intentionally, recklessly, and with malice caused Mr. Fappiano to be arrested, prosecuted, and convicted for the rape of T.S.  Furthermore, the defendants intentionally withheld from and misrepresented to prosecutors and the grand jury facts that further vitiated probable cause against Mr. Fappiano, including but not limited to the facts that the identifications of Mr. Fappiano were the product of unduly suggestive identification procedures and/or direct suggestion, that the forensic evidence excluded Mr. Fappiano, and that the police had fabricated inculpatory evidence and withheld and/or destroyed exculpatory evidence.

175.  As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.  Mr. Fappiano was released from the custody of New York State on that day.  The defendants concealed from Mr. Fappiano – and still are concealing to this day – the facts vitiating probable cause to arrest and prosecute Mr. Fappiano.

176. As a direct and proximate result of defendants' actions, Mr. Fappiano was wrongly prosecuted, convicted and imprisoned for over twenty-one years and suffered the other grievous and continuing damages and injuries set forth above.

## COUNT X
### State Law Negligence and Negligent Misrepresentation

177. Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

178. Defendants Gottlieb, Donohue, Dunbar, Stoyeck, Mason, Ulsamer and John and Jane Doe police officers, acting within the scope of their employment of the Defendant City of New York and in the completion of a ministerial task, were at least negligent in their loss or destruction of evidence from his criminal case.

179. Specifically, these defendants breached their duty to Mr. Fappiano, as the subject of a criminal prosecution for the T.S. rape, to maintain evidence he needed to demonstrate his innocence. These defendants knew or should have known how crucial this evidence was and that Mr. Fappiano was forced to rely on their maintenance of the evidence that was in their custody. Nevertheless, these defendants lost the evidence in their custody, and/or destroyed the evidence, and/or despite affirmatively promising to search for the evidence, did not search or did not exercise due care in their search.

180. Alternatively, these defendants knew or should have known that Mr. Fappiano sought information about the whereabouts and condition of the physical evidence from his case for a serious purpose, that he would rely and act upon their representation to him about the condition and location of such evidence, and that a false representation would injure Mr. Fappiano in person and property. In morals and good conscience Mr. Fappiano had the right to

37

rely upon these employees for information regarding the location and condition of the physical evidence in their custody, and the employees giving the information owed a duty to give such information with care.  Nevertheless, these employees falsely represented to Mr. Fappiano that the evidence was lost or destroyed.

181.  By failing to locate the evidence, and/or by falsely representing that the evidence was lost or destroyed when they did not conduct an adequate search, these defendants breached their duty to Mr. Fappiano.  This breach deprived Mr. Fappiano of access to evidence necessary for his defense.

182.  Additionally, Richard and Rhonda Roe Employees #1-10 of the Defendant City of New York, acting within the scope of their employment and in the completion of a ministerial task, were at least negligent in their post-conviction loss or destruction of the biological evidence from his criminal case which he sought to subject to DNA testing to prove his innocence.

183.  Specifically, these employees breached their duty to Mr. Fappiano, who had specifically requested this evidence in 1988 to prove his innocence, and who had received a court order to test the evidence in 1989.  These employees knew or should have known how crucial this evidence was and that Mr. Fappiano was forced to rely on their search for the evidence that was in their custody.  Nevertheless, these employees lost the evidence in their custody, and/or destroyed the evidence, and/or despite affirmatively promising to search for the evidence, did not search or did not exercise due care in their search.

184.  Alternatively, these employees knew or should have known that Mr. Fappiano sought information about the whereabouts and condition of the biological evidence from his case for a serious purpose, that he would rely and act upon their representation to him about the

condition and location of such evidence, and that a false representation would injure Mr. Fappiano in person and property. In morals and good conscience Mr. Fappiano had the right to rely upon these employees for information regarding the location and condition of the biological evidence in their custody, and the employees giving the information owed a duty to give such information with care. Nevertheless, these employees falsely represented to Mr. Fappiano that the evidence was lost or destroyed.

185. By failing to locate the evidence, and/or by falsely representing that the evidence was lost or destroyed when they did not conduct an adequate search, these employees breached their duty to Mr. Fappiano. This breach deprived Mr. Fappiano of access to this biological evidence and his subsequent ability to subject it to testing to prove his innocence and allow his release from prison.

186. As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape. The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.

187. As a direct and proximate result of defendants' actions, Mr. Fappiano was wrongly imprisoned for over 21 years and suffered the other grievous and continuing damages and injuries set forth above.

188. Defendant City of New York is liable under respondeat superior for the actions of its employees within the scope of employment.

## COUNT XI
### State Law Negligent Supervision

189.   Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

190.   Defendants Richard and Rhonda Roe Supervisors were grossly negligent and negligent in the training, supervision, and discipline of the individual employees responsible for the monitoring and maintaining of evidence connected to criminal investigations and prosecutions that is within the custody of the City of New York during the time period relevant to this Complaint.

191. Defendants Richard and Rhonda Roe Supervisors knew or, but for their grossly negligent and negligent training, supervision, and discipline, should have known that the individual employees lost or destroyed the evidence in their custody, and/or despite affirmatively promising to search for the evidence, did not search or did not exercise due care in their search, and/or falsely represented to Mr. Fappiano that the evidence was lost or destroyed, all in breach of their duty to Mr. Fappiano to safeguard this evidence.

192.   As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.  Mr. Fappiano was released from the custody of New York State on that day.

193.   As a direct and proximate result of defendants' actions, Mr. Fappiano was wrongly imprisoned for over twenty-one years and suffered the other grievous and continuing damages and injuries set forth above.

194.  Defendant City of New York is liable under respondeat superior for the actions of its employees within the scope of employment.

## COUNT XII
### New York State Constitution

195.  Plaintiffs hereby incorporate by reference all of the foregoing paragraphs and further allege as follows:

196.  Defendants' conduct, described above, also violated Mr. Fappiano's rights under the New York State Constitution, Article I, §§ 6 and 12, to due process of law and to be free from unreasonable searches and seizures.

197.  As Mr. Fappiano has always stated, from the time of his arrest and throughout twenty-one years of wrongful incarceration, he is innocent of the T.S. rape.  The prosecution finally terminated in Mr. Fappiano's favor on October 6, 2006, when the conviction was vacated and the indictment dismissed.  Mr. Fappiano was released from the custody of New York State on that day.

198.  As a direct and proximate result of defendants' actions, Mr. Fappiano was wrongly imprisoned for over twenty-one years and suffered the other grievous and continuing damages and injuries set forth above.

199.  Defendant City of New York is liable under respondeat superior for the actions of its employees within the scope of employment.

**WHEREFORE**, Scott Fappiano and Rose Fappiano pray as follows:

A.   That the Court award compensatory damages to them and against the defendants, jointly and severally, in an amount to be determined at trial;

B.  That the Court award punitive damages to them, and against all individual defendants, in an amount to be determined at trial, that will deter such conduct by defendants in the future;

C.  For a trial by jury;

D.  For pre-judgment and post-judgment interest and recovery of their costs, including reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 for all 42 U.S.C. § 1983 claims; and

E.  For any and all other relief to which they may be entitled.

Respectfully submitted,

Peter Neufeld
Nick Brustin (NB0605)
Anna Benvenutti Hoffmann (AH4008)
Cochran Neufeld & Scheck, LLP
99 Hudson Street, 8th Floor
New York, New York 10013
(212) 965-9081
Attorneys for Plaintiffs Scott Fappiano and
Rose Fappiano