UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK
---------------------------------------------------------------------- x

SCOTT FAPPIANO,

                              Plaintiff,        **DEFENDANTS'
RESPONSE TO
PLAINTIFF'S
        -against-                   STATEMENT OF
ADDITIONAL
MATERIAL FACTS**

THE CITY OF NEW YORK, HELENE GOTTLIEB,
GERALD DONOHUE, CLYDE DUNBAR, CHESTER       CV-07-2476 (SLT) (SMG)
STOYECK, EDWARD MASIN ,

                         Defendants.

---------------------------------------------------------------------- x

        Pursuant to the court's order of January 26, 2012, docketed on January 27, 2012,

defendants, as and for their Response to Plaintiff's Statement of Additional Material Disputed

Facts Pursuant to Local Civil Rule 56.1 (the "Statement"), for purposes of this summary

judgment motion only and no other purpose, including trial of this matter, state as follows.

        At the outset, defendants object to the Statement on two separate grounds.  <u>First</u>,

the Statement contravenes Local Civil Rule 56.1(b) because it contains lengthy argument, and

repeats many of the same contentions set forth in plaintiff's Response to Defendant's Statement

Pursuant to Local Civil Rule 56.1 (DE 90).  The Local Rule requires "a separate, short and

concise statement of additional material facts," and does not contemplate argument or

unnecessary repetition in the non-movant's Statement.  Because plaintiff has included argument

in his statement, we respond with argument where necessary although we have endeavored not to

repeat the arguments made in our reply brief.  <u>Second</u>, most, if not all, of the paragraphs include

more than one purported "fact," again in contravention of the Local Rules which require a

statement containing individual, separately numbered paragraphs.  We respectfully submit that

the court should strike the Statement on these grounds alone. We respond below to each

individual paragraph in the Statement.

1.       On December 1, 1983, T.S. and her husband, F.S.—a police officer assigned to the 5th
         precinct—were a married couple living together with their first baby at 124 Parrott Place
         in Brooklyn, New York. *See* T.S. Trial 1 testimony excerpts, attached as Exhibit 1 at
         544:9-545:20[1]; F.S. Trial 1 testimony excerpts, attached as Exhibit 2 at 38:13-22. At
         approximately 12:30 a.m. that morning, a lone armed male perpetrator broke into the
         couples' apartment, tied up F.S., and raped T.S. five times. *See* Complaint Follow-Up
         Report (Boody 12/1/93), attached as Exhibit 3; Ex. 2 at 42:24-45:19; Complaint Follow-
         Up Report (Gottlieb 12/1/93), attached as Exhibit 31. During the rapes, the perpetrator
         ejaculated at least once inside T.S. *See* Ex. 1 at 578:14-23.

         **RESPONSE:** Admit, except state that the assailant broke into the apartment sometime

after midnight. (DE 87 [Rule 56.1 Stmt.], ¶ 1, citing Exhibit A [TT. 132-33])[2]

2.       On December 6, Officer Helene Gottlieb arrested Scott Fappiano for the rapes of T.S. *See*
         Complaint Follow-Up Report (Gottlieb 12/1/83), attached as Exhibit 4. Mr. Fappiano
         was tried before a jury in November 1984. The only evidence presented against him was
         the identification by T.S., and the jury hung 11-to-1 in Mr. Fappiano's favor. *See* Steven
         Schwartz deposition excerpts, attached as Exhibit 5 at 36:15-19; 37:11-14; Bonnie Orden
         deposition excerpts, attached as Exhibit 19 at 50:3-9. Following the jury's verdict, the
         trial judge stated on the record: "It is lucky, in my opinion, it is lucky that this case went
         as long as it did and held the jury out as long as it did with the kind of evidence that was
         presented here….Nothing put this guy into that apartment.. How do you explain that?"
         *See* Excerpts from Trial 1 Proceedings, attached as Exhibit 6 at 919:23-920:12.

         **RESPONSE:** Admit, except deny that the jury deadlocked 11-1 in favor of acquittal, on

the grounds that the evidence offered to support that assertion is hearsay. Defendants refer the

court to the transcript of proceedings (PX-6), for a complete statement of the trial judge's

remarks, but deny the materiality or admissibility of those remarks.

---

[1]       All trial testimony cites refer to the page number at the top right hand corners of the exhibits.

[2]       References in defendants' responses are to (i) the first trial transcript ("T") or second trial transcript ("TT"),
followed by the page number, (ii) depositions of witnesses (name followed by page and/or page and line number),
(iii) exhibits to the declaration of Arthur G. Larkin, dated July 8, 2010, or the reply declaration, dated December 13,
2010, submitted in support of this motion, or (iv) defendants' Statement Pursuant to Local Civil Rule 56.1 ("Rule
56.1 Stmt., ¶ ___"), submitted in support of their motion. Transcript and deposition pages are annexed as exhibits to
the declarations, as indicated herein. The victim and her husband are referred to by their initials, "T.S." and "F.S."
respectively. References to plaintiff's exhibits in opposition to the motion appear as "PX-___".

3.      Mr. Fappiano was retried before a jury in August 1985.  After two-and-a-half days of
        deliberation during which time the jury was given an *Allen* charge, Mr. Fappiano was
        convicted of burglary and rape and sentenced to a total of 20 5/6 to 50 years
        imprisonment.  *See* Excerpts from Fappiano Sentencing, attached as Exhibit 7 at 26-31;
        Excerpts from Trial 2 Proceedings, attached as Exhibit 8 at 1164-1167.

        **RESPONSE:**  Admit.

4.      In 1989, Mr. Fappiano won a motion compelling the NYPD to produce certain items of
        physical evidence to a private laboratory called the LifeCodes Corporation for DNA
        testing.  *See* Order Granting Motion to Produce Physical Evidence to LifeCodes, attached
        as Exhibit 90.  LifeCodes observed sperm on the crotch of the jogging pants that T.S. had
        worn immediately after the rapes and extracted DNA from that stain; however, LifeCodes
        was unable to obtain a DNA profile from the extract because of an insufficient amount of
        DNA given the technology LifeCodes used at the time.  *See* LifeCodes Evidence Receipt
        and Results from DNA testing, attached as Exhibit 9; Affidavit of Joanne Sgueglia,
        attached as Exhibit 10; Helen Rafaniello deposition exhibits, attached as Exhibit 11 at
        18:16-20:15.  LifeCodes preserved that DNA extract.  *See* People v. Fappiano, 10/06/06
        Joint Motion to Vacate Judgment, attached as Exhibit 12 at 18.

        **RESPONSE:**  Admit.

5.      In August 2005, Mr. Fappiano's attorneys located the preserved extract from the jogging
        pants.  *Id.*  The Kings' County District Attorney's Office consented to have the sample
        re-tested using more sophisticated techniques.  *See* Ex. 12 at 16-17.

        **RESPONSE:**  Admit.

6.      Using a more sensitive form of DNA testing that is able to generate results from a smaller
        sample, the New York City Office of the Medical Examiner retested the extract from the
        jogging pants in 2006.  *See* Ex. 11 at 18:16-20:15; 30:13-19.  Through that testing,
        OCME determined that two individual profiles—one female, and one male—were
        present in the extract; that the female profile belonged to T.S.; and that her profile can be
        expected to be found in only one-in-one-trillion members of the population.  *See* Ex. 11
        at 35:9-36:2.

        **RESPONSE:**  Admit.

7.      OCME then compared the male profile in the sample to both F.S. and Scott Fappiano,
        and found that both F.S. and Scott Fappiano were excluded as the source of the male
        profile.  *See* Ex. 11 at 38:13-39:16; D.E. 72.

        **RESPONSE:**  Admit.

8.       The Kings County District Attorney's Office determined that the DNA testing results established Mr. Fappiano's actual innocence and joined an immediate motion for post-conviction relief on Mr. Fappiano's behalf.  *See* Nina Morrison deposition excerpts, attached as Exhibit 13 at 36:20-37:10; 38:23-39:5.  On October 6, 2006, the Court granted Mr. Fappiano's motion to vacate his conviction and dismissed all indictments against him.  Mr. Fappiano was fully exonerated and released from prison that day.  *See* Ex. 12; 09/29/08 Court Order, attached as Exhibit 14.

**RESPONSE**:  Admit, except state that the People did not formally concede plaintiff's

"actual innocence," but rather consented to vacate the conviction and dismiss the indictment on

the grounds that plaintiff had satisfied the test for such relief under CPL § 440.10(g), viz., that

the DNA test results are "of such character as to create a probability that had such evidence been

received at the trial the verdict would have been more favorable to the defendant" (PX-12, at 9).

9.       Proper chain of custody and integrity were maintained at all times for the reference samples from T.S., F.S., and Mr. Fappiano.  D.E. 72.  The male profile extracted from the jogging pants was not the result of contamination.  *Id.*  There is no evidence anywhere in the record nor has any party ever alleged that T.S. had any consensual sexual partners other than her husband, let alone that the semen found on the victim's clothing worn immediately after the rapes came from anyone but the rapist.

**RESPONSE**:  Admit, and further state that at this time, defendants are not aware of any

evidence suggesting that the victim, T.S., had any consensual partners other than her husband

prior to December 1, 1983, the date of the crime.

10.      During this civil litigation, the City's own expert—the Assistant Director of the Department of Forensic Biology at the Office of the Chief Medical Examiner—reviewed the DNA testing results and confirmed that, based on those results, F.S. and Mr. Fappiano were both excluded as the male components of the mixture found on the white jogging pants.  *See* Ex. 11 at 40:1-4.

**RESPONSE**:  Admit, except deny that the witness to whom plaintiff refers (Helen Rafa

Rapaniello) will testify for defendants as a Rule 26 "expert" at any trial in this matter.

**THE IDENTIFICATION PROCEDURES**

11.      In December 1983, Defendant Clyde Dunbar was an NYPD Detective assigned to the Brooklyn Nightwatch Squad.  *See* Clyde Dunbar 01/21/09 deposition excerpts, attached as Exhibit 15 at 27:19-28:3.  Dunbar was the lead detective on the S. rape investigation

from approximately 3 a.m. on the morning of December 1 until approximately 7:30 a.m. that morning.  *See* Ex. 15, at 131:9-132:11

**RESPONSE:**  Admit, except deny that Dunbar was ever the "lead" detective on the case.

Rather, Dunbar's job was to obtain preliminary information before the assigned detective took

over the case.  (DE 87 [Rule 56.1 Stmt.], ¶ 48)

12.    Around that time, Helene Gottlieb, a uniform police officer with the Brooklyn Sex
       Crimes Unit, took over the investigation.  *Id*.  She remained the sole assigned lead
       investigator throughout the investigation and both trials.  *See* Helene Gottlieb deposition
       excerpts, attached as Exhibit 16 at 18:21-19:21

**RESPONSE:**  Admit, except deny any suggestion that Gottlieb was the "sole"

investigator on the case, because the record makes clear that other detectives and "investigators"

worked on the case.  (*E.g*., DE 87 [Rule 56.1 Stmt.], ¶¶ 40 (Officer Lee Boody), 45 (Masin), 117

(Stoyeck), 119 (Donohue) 143 (Dr. Robert Shaler)).

**Dunbar's 12/1/83 undocumented, undisclosed photo showings**

*Photo Showing 1*

13.    Dunbar also showed T.S. photographs in the precinct early that morning.  *See* Internal
       Affairs Bureau Report, attached as Exhibit 18 at ¶20.  In a sworn statement given to
       Internal Affairs *only after* Mr. Fappiano was convicted, Dunbar reported that he "showed
       photos of suspects to Mrs.  [S.] in the 68 PDU, but claimed the defendant's photo was not
       among them.  She failed to identify anyone, but did direct Det. Dunbar's attention to an
       individual photo and said that person resembled the suspect." *Id*.  Dunbar made that
       statement under oath and pursuant to Patrol Guide 118-10 ("G0-15").  *Id*.

**RESPONSE:**  Admit that after Fappiano was convicted, Dunbar told IAD under oath that

he showed photos to T.S., and admit the contents of the IAD memo as quoted.

14.    Dunbar omitted this identification procedure from his official reports contrary to policy
       and procedure, and it was never disclosed to the prosecution or to the defense.  *See*
       Complaint Follow-Up Report (Dunbar 12/1/83), attached as Exhibit 17; Bonnie Orden
       deposition excerpts, attached as Exhibit 19 at 99:3-4; Ex. 5 at 186:13-187:17; Anthony
       Fusco deposition excerpts, attached as Exhibit 20 at 44:14-21; Luther Williams
       deposition excerpts, attached as Exhibit 21 at 29:15-19.

**RESPONSE:**  Admit that Dunbar did not inform anyone, including the ADA's who

prosecuted Fappiano, that he showed photos to T.S.

15.    Dunbar never maintained or documented which photographs he had shown T.S., the
       source of those photos, or whether Scott Fappiano's photographs was included, nor did
       he document which photograph she selected as resembling the suspect.  *See* Ex. 17.
       When asked at trial to describe his involvement in this case, Dunbar specifically did not
       report showing photographs to the victim.  *See* Clyde Dunbar Trial 1 testimony excerpts,
       attached as Exhibit 22 at 371:17-377:12; Clyde Dunbar Trial 2 testimony excerpts,
       attached as Exhibit 23 at 719:14-725:18.

**RESPONSE:**  Admit that Dunbar did not prepare documentation concerning any

purported photo viewing by T.S., nor did he testify at either of the trials that he showed photos to

her at any time.  Defendants further state that, at the criminal trials, Dunbar would have been

prohibited from testifying to any photo identification procedures on direct examination because,

under state law, the prosecution may not introduce photo identification procedures on its case-in-

chief.  *See People v. Grajales*, 8 N.Y.3d 861, 862 (2007) (citing *People v. Coiffi*, 1 N.Y.2d 70

(1956)).

16.    Only After Mr. Fappiano's conviction, Dunbar admitted to the undocumented,
       undisclosed photo showing in an interview with Internal Affairs.  *See* Ex. 18, at ¶20.
       Sergeant Mary Della Rocca conducted the Internal Affairs interview with Dunbar and
       drafted the report.  *See* Mary Della Rocca deposition excerpts, attached as Exhibit 24 at
       77:13-79:10; *See* Ex. 18, at ¶1.  Sergeant Della Rocca, an experienced twenty-one year
       veteran of the NYPD, testified that Internal Affairs taped each interview in its entirety,
       that she listened to every tape at least once while drafting her final report to make sure
       the information in her report was accurate, and that if she had any reason to believe an
       officer was unclear, uncertain or mistaken, she would have included that in her final
       report.  *See* Ex. 24 at 43:17-44:4; 44:18-23.  In the ten years Sergeant Della Rocca was
       assigned to Internal Affairs, no one ever accused her of inaccurately reporting statements
       by a witness.  *See* Ex. 24 at 3 6:3-8.

**RESPONSE:**  Admit that after Fappiano was convicted, Dunbar told IAD that he showed

photos to T.S., and deny the characterizations of Mary Della Roca's deposition testimony on the

grounds that the witness did not affirmatively testify to the "facts" set forth, but rather such

"facts" were elicited improperly through leading questions as the transcript makes clear.  Deny

the materiality or admissibility of the statement that "[i]n the ten years Sergeant Della Rocca was assigned to Internal Affairs, no one ever accused her of inaccurately reporting statements by a witness."

17.　　At his January 2009 deposition, Dunbar testified that he never showed photographs to T.S. and never told Internal Affairs that he had.  *See* Ex. 15 at 119:3-120-6.  He further testified that he was never interviewed pursuant to patrol guide G0-15, and he was never interviewed by Internal Affairs at all in connection with this case.  *See* Ex. 15 at 108:24-110:19; Clyde Dunbar 01/27/09 deposition excerpts, attached as Exhibit 25 at 14:23-15:7. As a former Internal Affairs field investigator Dunbar has seen hundreds of Internal Affairs reports, and this is the only one he has ever seen that he claims misrepresents what was stated and by whom during a G0-15 interview.  *See* Ex. 25 at 86:6-87:8.

　　**RESPONSE:**  Admit the substance of Dunbar's testimony as summarized.

### *Photo Showing 2*

18.　　Also early on the morning of December 1, Detective Frank Sciallo showed T.S. photographs from a file cabinet full of mug shots kept in the 68th precinct detective unit. Frank Sciallo deposition excerpts, attached as Exhibit 26 at 30:20-31:11.  That file cabinet contained at least one photograph of Scott Fappiano.  *See* Ex. 26 at 37:13-39:1 8.[3] T.S. looked through the photographs and did not identify anyone.  *See* Ex. 26 at 36:8-14.

　　**RESPONSE:**  Admit that Sciallo claims he showed photos to T.S. and that Fappiano's photo was included in the photos he showed her.

19.　　Sciallo told Dunbar that morning that he had shown photographs to T.S. and that she had not picked anybody out.  *See* Ex. 26 at 63:19-22.  Sciallo testified that detectives did not always document investigative steps in cases they were not assigned to because "you're assuming the other detective would put down exactly what you told him, this way you don't get involved in the case at all.  You don't have to testify.  You don't want to get involved in people's cases."  *See* Ex. 26 at 64:10-18.  Pursuant to that practice, Sciallo expected that based on what he told Dunbar, Dunbar would indicate on his report that T.S. had not made any hits on the photographs she viewed in the 68th precinct.  *See* Ex. 26 at 63:16-65:4.  Dunbar admitted at his deposition that he would sometimes draft DD5s for detectives who were not assigned to a case but had done some work in that case.  *See* Ex. 15 at 198:9-19.

---

[3]　　In the early 1980s, if an individual was arrested in the 68th precinct at any time, his or her photograph would be put in the file cabinet in the precinct. *See* Ex. 26 at 31:18-24; Ex. 19 at 93:20-24. Prior to 1983, Scott Fappiano was arrested in the 68th precinct. *See* Ex. 26 at 38:8-19.

**RESPONSE:**  Deny.  In or about 1987, many years before Fappiano was released or commenced this lawsuit, Sciallo told IAD, under oath, that he did <u>not</u> tell any other police personnel about the alleged photo viewing by T.S.  (Exhibit I, at 11)  He admits making the statement to IAD, and offers contradictory explanations for why he made it.  He has testified, in the alternative, that he "probably forgot" that he had told Dunbar about the photo viewing; or that he "didn't recall" doing so; that "maybe [he] didn't recall" doing so; that he "never thought of it"; that he "do[esn't] even think [he] was asked that question"; and that he does not know why he did not say that he told Dunbar about the photo viewing.  (Exhibit SS [Sciallo Dep.], at 66-67, Exhibit L [Sciallo Dep.], at 146-48)

Defendants also deny that "Dunbar admitted at his deposition that he would sometimes draft DD5's for detectives who were not assigned to a case but had done some work in that case," on the ground that the cited testimony does not support the statement, but rather, supports the opposite inference (*see* PX-15, at 97-98).  Defendants deny that Dunbar's testimony confirms any purported NYPD "practice" described by Sciallo, whereby a detective who showed photos to a witness would tell another detective to include that information in his/her DD5, rather than creating his own DD5:  As plaintiff acknowledges, "NYPD policy and procedure in 1983 required a required an investigator to create a DD5 report for every photographic identification procedure shown" (*see* ¶ 22, below).

20.    Neither of the reports Dunbar created during this investigation reflect his photo showing with T.S. (Photo Showing 1) or Sciallo's photo showing with T.S. (Photo Showing 2). *See* Ex. 17; Complaint Follow-Up Report (Dunbar 12/1/83), attached as Exhibit 27.

**RESPONSE:**  Admit that neither of Dunbar's reports reflects any photo viewings by T.S.

21.    In contrast to Dunbar's testimony at his deposition that no one ever criticized his report writing or his written communications, *see* Ex. 15 at 183:5-25, Dunbar's performance evaluation for 1984—the year of the first trial—states "written communications are limited and require constant monitoring," and recommends transfer to a command with more supervision. *See* Dunbar Performance Analysis, attached as Exhibit 28.  Dunbar

denies ever receiving this criticism or ever seeing this evaluation. *See* Ex. 15 at 170:2-18; 183:5-184:9.

    **RESPONSE:** Admit, but deny the materiality or admissibility of Dunbar's performance

evaluations or his testimony about them.

22.    NYPD policy and procedure in 1983 required a required an investigator to create a DD5 report for every photographic identification procedure shown, reporting what photographs the witness looked at and reporting and preserving what photographs, if any, were selected. *See* Alfred King deposition excerpts, attached as Exhibit 29, at 14:15-17; 36:2-37:19; 57:24-59:11.

    **RESPONSE:** Admit, but further state that investigators were <u>only</u> required to preserve

and document photos that were affirmatively identified, and no others.  The cited deposition

testimony establishes this fact (*see* PX-29, at 36-37, 57-59 (would retain and document photos

"identified").  Other testimony independently corroborates it.  (<u>Exhibit RR</u> [Gottlieb Dep.], at

186-87] (would only mention "positive" identification in reports))  Detectives were not required

to retain or document photos that were not positively identified.  (*See id.*)

23.    Dunbar admitted that if he had shown any photographs to T.S. he had an obligation to document: (1) how many photos he showed her; (2) where those photos came from; (3) which photos she selected; and (4) any words she spoke while making that selection.  He also had an obligation to maintain a copy of the photograph she selected in his file. *See* Ex. 15 at 139:19-140:17; 141:9-14.  Dunbar testified that he understands today that if he had shown T.S. photographs and failed to document it that would be a breach of his investigatory responsibilities for which he could be disciplined, especially if he lied about it. *See* Ex. 25 at 17:15-18:2.

    **RESPONSE:** Admit <u>only</u> that if Dunbar showed photos to T.S., he had an obligation

under internal NYPD procedure to document where the photos came from and whether she

affirmatively identified anyone as the perpetrator.  (PX-29, at 36-37, 57-59; <u>Exhibit RR</u>, at 186-

87)  Defendants deny that Dunbar was required to document or preserve any photo purportedly

"selected" by T.S. in the circumstances that are described on the IAD memo, because according

to that memo T.S. did not identify anyone, but rather, she pointed out one photo that she said

"resembled" the suspect.  (<u>Exhibit I</u>, at 8)  Defendants also deny the description of Dunbar's

testimony (PX-25, at 17-18), because in the quoted excerpt Dunbar only confirmed in response

to leading questions that if he had shown photos to T.S., and if she had <u>identified</u> one of them as

a suspect, he had an obligation to document those facts (*see id*., at 17-18 (admitting that he could

be disciplined if "she [T.S.] picked somebody out and [he] failed to document it")).

24.     Dunbar testified that if indeed the Sciallo photo showing was brought to his attention, he
also had an obligation to ensure that that photo showing was properly documented.  *See*
Ex. 15 at 138:14-139:12.  As the assigned night watch detective, Dunbar knew that
whoever was assigned to the investigation would be looking to him to him to make sure
that all the previously-gathered evidence was documented.  *See* Ex. 15 at 138:5-13.
Dunbar testified that he had an obligation to inform Gottlieb about both photo showings,
and that it would have been his sworn obligation to bring up that photo showing in
response to questioning by the prosecutor at the second trial.  *See* Ex. 25 at 20:14-23:8;
Ex. 15 at 138:14-139:22.

**RESPONSE:**  Deny, except admit that Dunbar confirmed in response to leading,

hypothetical questions (to which timely objections were made) that if he learned that Sciallo had

shown photos to the victim, he would have had an obligation to ensure that the photo viewing

was documented.  Plaintiff selectively cites Dunbar's deposition testimony and omits the

question and answer appearing on page 138, which makes clear that all detectives working on the

case – not just Dunbar, and not even principally Dunbar – had an affirmative obligation to

inform the sex crimes detective of any investigative steps they took.  (PX-15, at 138:5-13 (Did

you understand in this case that the assigned sex crimes detective was looking to you to make

sure that all of the evidence that had been gathered by detectives prior to her entry onto the case

was provided to her by you?  …. A.  Me as well as any other detectives working at the time,

yes.))  Defendants further deny that Dunbar would have been obligated to testify about photo

viewings by T.S. when questioned by the prosecutor at the second trial.  Rather, under state law,

he would have been <u>prohibited</u> from doing so, because photographic identification procedures

may not be introduced against a criminal defendant on the prosecution's case-in-chief.  The same

- 10 -

rule applied at the time of Fappiano's criminal trials. *See People v. Grajales*, 8 N.Y.3d 861, 862

(2007) (citing *People v. Coiffi*, 1 N.Y.2d 70 (1956)).

25.     Neither the Dunbar photo showing (Photo Showing 1) nor the Sciallo photo showing
        (Photo Showing 2) was disclosed to the prosecution or defense at the time of the grand
        jury or the *Wade* hearing. *See* Ex. 19 at 99:3-4; Ex. 20 at 44:14-21; Ex. 30 at 81:16-25;
        Ex. 18 at ¶3. Shortly before the first trial, ADA Nathan learned from Sciallo about the
        photo showing he had conducted. Ex. 18 at ¶3. However, Nathan testified at her
        deposition that based on her perception of Sciallo's conduct in this case, she had some
        concerns about Sciallo's credibility. *See* Ex. 19 at 87:19-22. Nathan testified that based
        on those concerns, and based on T.S.'s representation that the first photos she saw were at
        the Catch Unit, she determined that Sciallo's report of a photo showing was not credible.
        *See* Ex. 19 at 90:6-25. Nathan testified that if Dunbar had told her that he had shown
        photographs to the victim at the 68th precinct on December 1, that would have caused her
        to question the reliability of the T.S.'s statement that she first viewed photographs at the
        Catch Unit, as well as T.S.'s credibility, and would have caused her to look anew at
        Sciallo's photo showing. *See* Ex. 19 at 107:5-1 6.

        **RESPONSE:**  Admit the first sentence and deny the remainder, on the grounds that

plaintiff's characterizations of ADA Nathan's testimony are inaccurate and the cited testimony

was elicited in large part through improper, leading questions (*see, e.g.*, PX-19, at 107:5-16).

Former ADA Bonnie Orden (then known as Bonnie Nathan) testified in substance that after

Sciallo claimed that he had shown photos to T.S. (even though he failed to document the

purported photo viewing), ADA Nathan asked T.S. whether she ever saw photos in the 68 PDU

as Sciallo claimed. T.S. told her that she did not see any photos in the 68 PDU. After learning

that the photo viewing never occurred, ADA Nathan determined that no further disclosures about

this matter were required to be made to defense counsel (*see* PX-19, at 91:13-14 ("I didn't

disclose the non-existence of something")). The remaining contentions constitute speculation

elicited through leading, hypothetical questions, and are therefore inadmissible and immaterial.

26.     Nathan agreed that the combination of Sciallo showing T.S. photos that included a
        picture of Mr. Fappiano, and Dunbar showing her photos from which she selected
        someone other than Mr. Fappiano, constitutes powerful exculpatory evidence. *See* Ex. 19
        at 107:17-25.

**RESPONSE:**  Deny.  Plaintiff elicited the testimony through an improper leading question with a faulty premise:  T.S. did not "select" or "identify" someone other than Fappiano during Photo Showing #1 (if that photo showing ever occurred).  Rather, she "failed to identify" anyone according to the IAD memo (*see* Exhibit I, at 8).  Defendants also deny the materiality or admissibility of ADA Nathan's views concerning whether Photo Showing #1, Photo Showing #2, or both purported photo showings in combination, constituted "exculpatory" evidence.

27.    Both trial ADAs agree that Photo Showings 1 and 2 were critical exculpatory evidence that should have been disclosed.  *See* Ex. 19 at 112:21-25; 91:2-22; Ex. 5 at 196:16-25; 204:5-11.  Nathan testified that concealment by the police of any identification procedure by the police would have provided the defense with powerful impeachment evidence.  *See* Ex. 19 at 112:21-25; 96:8-15; 91:2-9.

**RESPONSE:**  Deny.  Neither ADA Nathan nor ADA Schwartz ever characterized Photo Showing #1 as "exculpatory" evidence, let alone "critical exculpatory" evidence.  (*See* PX-5, at 196, 204; PX-19, at 91, 112)  The remainder of this paragraph is either unsupported by the evidence cited (*see* PX-19, at 91, 96), or was elicited through improper, leading questions (*id*. at 112).  Defendants further deny the materiality or admissibility of the trial ADA's views concerning whether Photo Showing #1, Photo Showing #2, or both in combination, constituted "exculpatory" evidence.

28.    ADA Suzanne Melendez, who supervised the lineup and presented the case to the grand jury, testified that the first time that a victim sees a photograph of a suspect informs her entire identification.  *See* Suzanne Melendez depositions excerpts, attached as Exhibit 30 at 80:13-21.  Melendez stated that any photo showing should have been brought to her attention (*see* Ex. 30 at 79:2-16), she would have had a duty to document and disclose it (*see* Ex. 30 at 82:2-10), and she would have wanted full disclosure of all of the circumstances surrounding the array.  *See* Ex. 30 at 83:2-4.

**RESPONSE:**  Deny the first sentence and admit the remainder.  Plaintiff misstates the testimony of former ADA, now Judge, Melendez.  She did not, at any time, use the words, "the first time a victim sees a photograph of a suspect informs her entire identification" (*compare*

*with* PX-30, at 80:13-21 (first time a witness sees a photograph or a suspect is "important, it is not the only thing though")).

29.    Gottlieb testified that if anybody showed photographs to the victims prior to her involvement in the case, that information had to be reported in a DD5 (*see* Ex. 16 at 118:5-15; 122:15-123:1), and Scott Fappiano had an absolute right to know about it. *See* Ex. 16 at 132:3-9. Gottlieb agreed that if T.S. was shown photographs and selected someone other than Mr. Fappiano, that was critical exculpatory evidence that the defense could use to prove innocence, and she understood that at the time. *See* Ex. 16 at 124:10-21.

    **RESPONSE:** Admit, but deny the inference – again – that T.S. ever "selected" anyone

from photographs other than Fappiano. (Exhibit I, at 8; Exhibit J, at 105)

30.    Even Dunbar agreed that any photograph T.S. picked out as resembling the perpetrator was exculpatory evidence the defense could use to prove innocence. *See* Ex. 15 at 142:21-144:8.

    **RESPONSE:** Deny. Plaintiff mischaracterizes Dunbar's testimony. He did not testify

that "any photo T.S. picked out as <u>resembling</u> the perpetrator was exculpatory evidence the

defense could use to prove innocence." Rather, he confirmed in response to a leading,

hypothetical question, over objection, that "that photo if she <u>selected</u> someone other than the

suspect might be used by the defense to prove innocence, right?" (PX-15, at 144:20-25;

emphasis added) As set forth above and in defendants' moving papers, T.S. never "selected" or

"identified" anyone in Photo Showing #1, assuming it occurred (*see, e.g.*, Exhibit I, at 8).

**Gottlieb's 12/1/83 Catch Unit photo showing**

    ***Photo Showing 3***

31.    Gottlieb testified that T.S.'s selection at the Catch Unit was her sole basis for probable cause to arrest Mr. Fappiano. *See* Ex. 16 at 174:17-175:3.

    **RESPONSE:** Deny. Gottlieb never testified that T.S.'s photo identification at CATCH

was her "sole" basis for probable cause to arrest Fappiano. Rather, in response to leading

questions, Gottlieb only confirmed that after T.S. identified Fappiano's photographs, she had

"probable cause" to arrest Fappiano, not that she arrested him on that basis.  (Exhibit RR [Gottlieb], at 174-75)  Fappiano acknowledges that "Gottlieb did not arrest [him] prior to the lineup, but rather asked him to come in voluntarily [to stand in the lineups] which he did" (*see* ¶ 48, below).  Plaintiff also admits that T.S. identified him at the lineup (*compare* DE 87 [Rule 56.1 Stmt.], ¶ 106, *with* DE 90 [Pl. Resp.], ¶ 106), after which time he was arrested (*id*., ¶ 112).  Gottlieb did not arrest Fappiano based on the CATCH identifications, but did so based on the lineup identification.

32.    Gottlieb testified that she certainly would have talked to Dunbar to find out exactly what investigative steps he had taken.  *See* Ex. 16 at 116:11-120:12; 122:5-123:2.  The most recent and most significant step Dunbar had taken was Photo Showing 1, in which T.S. had selected one photograph as "resembling" the perpetrator.  While Gottlieb disclaims any memory of Photo Showing 1 (107:25-108:17), she does not deny it occurred, and was adamant that if it did, Dunbar would have told her about it: "Dunbar would have told me he showed photos." 127:20-23.

    **RESPONSE:**  Deny on the grounds that the evidence cited is inadmissible speculation, including but not limited to Gottlieb's testimony about what Dunbar "would" have done "if" he had shown photos to T.S., and specifically state that no evidence whatsoever in this voluminous record supports any inference that Gottlieb knew about Photo Showing #1 (if it occurred).

33.    Gottlieb acknowledged that as the assigned investigator, she had a responsibility to ensure that any investigative activities conducted before she was assigned to the case were fully documented.  *See* Ex. 16 at 116:18-23.  None of Gottlieb's reports reflect Photo Showing 1 or Photo Showing 2.  *See* Ex. 4; Complaint Follow-Up Reports (Gottlieb 12/1/83, 12/3/83, 12/5/83, 12/6/83, 12/15/83, 6/20/84), attached as Exhibits 31-36.  NYPD policy and procedure dictates that detectives' notes get filed in the case folder.  *See* Ex. 29 at 23:11-24:4.  At the *Wade* hearing and again at trial, Gottlieb admitted that she had destroyed her notes.  *See* Helene Gottlieb *Wade* Hearing excerpts, attached as Exhibit 37 at 32:16-23; Helene Gottlieb Trial 1 testimony excerpts, attached as Exhibit 58 at 430:13-24.

    **RESPONSE:**  Admit the first two sentences, but deny that Gottlieb had any responsibility to "document" Photo Showing #1 or Photo Showing #2 in the circumstances here, because (i) Dunbar never told her about Photo Showing #1, even if it occurred (PX-16, at 127 ("I

have no idea that Detective Dunbar showed any photos, no")), and (ii) Sciallo never told her

about Photo Showing #2, even if that photo showing occurred (Exhibit RR, at 134:8-15 (Q:  [A]s

far as you know Sciallo never showed pictures to the victim, correct?  A:  No.  Q:  And you deny

knowing anything about that? … A:  Correct.))  Plaintiff has adduced no affirmative evidence

that Sciallo ever told Gottlieb about Photo Showing #2, and Sciallo admitted to IAD, under oath,

that he did not tell any other police personnel that he showed photos to T.S. (*see* Exhibit I, at 11).

He offers contradictory explanations as to why he now, purportedly, "recalls" doing so.  (Exhibit

SS [Sciallo Dep.], at 66-67 Exhibit L [Sciallo Dep.], at 146-48; *see also* ¶ 19, above)

> Defendants also admit that Gottlieb destroyed her notes and testified at the Wade hearing

and trial that she did so, but specifically deny that Gottlieb violated any NYPD procedure:  Her

own practice was to discard notes of witness interviews after reducing them to a DD5.  (Exhibit

RR [Gottlieb Deposition], at 72-73)  Plaintiff presents no evidence that Gottlieb did not follow

that practice generally, i.e., that she kept notes in other cases but only discarded her notes in this

case, or that she ever tried to hide the fact that she discarded the notes in this case.

34.    Following Photo Showings 1 and 2 described above, on the afternoon of December 1,
       Gottlieb took T.S. to the Brooklyn Catch Unit in the 67th precinct.  *See* Ex. 37 at 7:13-19.
       According to Gottlieb, T.S. selected a photograph of Scott Fappiano and stated that he
       "resembled" the perpetrator: the same words she used when she selected a photograph of
       someone other than Fappiano during Photo Showing 1.  *See* Ex. 16 at 193:19-194:3;
       152:2-16.  Gottlieb reported in writing that T.S. made a "Positive" ID (*see* Ex. 31 at
       N000067), and reported to the prosecution during preparation for trial that T.S. continued
       looking through drawers and positively identified a second photograph of Mr. Fappiano,
       which she was certain was the perpetrator.  *See* Ex. 16 at 152:3-153:20; 220:18-25.  At
       her 2009 deposition, Gottlieb testified that she never intended to document the first photo
       selection, and once T.S. picked the second photo, the first selection was "out of my
       head." *See* Ex. 16 at 191:3-195:11.  Gottlieb testified that she would not have probable
       cause to arrest someone based on a tentative identification.  *See* Ex. 16 at 192:9-12.

> **RESPONSE:**  Admit that (i) on December 1, 1983, Gottlieb took T.S. to the CATCH

unit, (ii) T.S. positively identified Fappiano after looking through photos at CATCH, and (iii)

Gottlieb reported this fact in her DD5.  Defendants also admit the last two sentences.

Defendants deny that T.S. selected a photo of Fappiano and told Gottlieb that the photo "resembled" the perpetrator, on the grounds that the evidence cited – the statement of Gottlieb to IAD in 1987, four years after the events occurred, as to what T.S. told her, and as summarized by an IAD investigator – is far too weak to support the inference that T.S. actually used those words when she picked out the photo of Fappiano, particularly in light of the record as a whole (*see* Response to ¶ 36, below, for a summary of the relevant evidence in this regard).

At the CATCH unit on December 1, 1983, T.S. looked through photos, stopped when she saw one photo, put that photo aside and continued looking, and then stopped for good when she saw another photo.  She testified as follows at the Wade hearing:

> I was going through, it was in the first drawer, I went through the whole one side, however many pictures that is, and I was about a quarter way down the second side and I stopped because I saw the picture and I said, *this could be him*.  And I took it out and put it on the table and I held my finger there and I don't know why, I kept looking.  I continued down that isle [sic] and then I got one and I said, *but this is him*.  Then Helene came back in the room and I said, I got a problem, I think this is him but I pulled this already, I thought this was him too.  And she laughed and said, They are the same one.

(Exhibit J, at 105; emphasis added)

On cross-examination, T.S. described essentially the same process.  She thought the two photos were of different people.  (Exhibit UU, at 132:18-21)  She put the first photo to the side "[b]ecause [she] wanted to show it to Helene Gottlieb and say, I think this might be him." (*Id*. at 134:11-15)  When she reached the second photo, she picked it up in her hand.  When Gottlieb entered the room she said, "I think this is him, but I already pulled this one, I thought that was him, so I have a problem." (*Id*. at 135:9-11)  Both T.S. and Gottlieb testified that when Gottlieb saw the two photos, she told T.S. they were photos of the same person.  (Exhibit J, at 105; Exhibit M, at 10-11; Exhibit RR [Gottlieb Dep.], at 152-53)  The Wade hearing transcript reveals that the photos T.S. selected were Fappiano's arrest photos taken on August 4, 1981, and April

- 16 -

10, 1982.  (Exhibit M, at 12)  It is not disputed that Fappiano was arrested on or about August 4,

1981, and also on or about April 10, 1982, and charged with First Degree Rape and other crimes

on both occasions.  (Exhibits VV, WW, XX)

T.S.'s and Gottlieb's account of Photo Showing 3 establishes that the identification was

positive, not tentative.  It is undisputed that after selecting the first photo, T.S. continued looking

through the photos.  Her first "identification" was therefore tentative, as she described ("this

could be him" or this "might be him").  After she pulled the second photo, however, she stopped

looking.  Gottlieb was not with T.S. while she viewed the photos,[4] but testified that according to

normal practice at CATCH, she would be called back into the room only after the witness makes

an identification.  (Exhibit RR, at 154-55)  Both Gottlieb and T.S. state that her selection of the

second photo was a positive identification ("but this is him"), a conclusion that is supported

circumstantially by the fact that Gottlieb re-entered the room after she selected the second photo,

but not the first.  (Exhibit J, at 105)

At the Wade hearing, T.S. clarified why, after finding the second photo, she may have

had doubts about which photo was the perpetrator:  "I saw two pictures of the person I thought

was him, and I didn't think there could be two pictures . . . . Because, you know, I figured it's

just one picture of each person, but I saw two pictures of this guy that I thought did this to me."

(Exhibit UU, at 151-52)  On re-cross, she stated that she thought the two photos were of different

people "[b]ecause I never thought there would be two of one person in that drawer."  (Id. at

---

[4]     Plaintiff is deemed to have admitted this fact (compare Rule 56.1 Stmt., ¶ 93, with Pl. Resp., ¶ 93).
While plaintiff purportedly "denies" the fact, he offers no admissible evidence to contradict it, as the local rules
require.  See Local Civ. Rule 56.1(c), (d).  Rather, plaintiff (i) asserts summarily that T.S.'s and Gottlieb's accounts
of the CATCH photo viewing "contain vast inconsistencies," and (ii) complains that he is "unable to probe" these
purported inconsistencies because he has not deposed T.S.  (Pl. Resp., ¶ 93)  Prior to defendants' filing this motion,
however, the court affirmed the magistrate's order denying plaintiff's application to depose T.S., referring to
plaintiff's proposed areas of inquiry as "speculative."  (DE 71, at 3)

153:3-4)  T.S.'s explanation is reasonable and is not contradicted by any other admissible

evidence.

35.     The Court conducted a *Wade* hearing on October 14, 1984 concerning the admissibility
        of T.S.'s identification.  At the *Wade* hearing, T.S. testified that she put one picture aside
        that she thought might be the person, continued looking through photographs, picked a
        second picture, and told Gottlieb "I told her, Helene, I think this is him, but I already
        pulled this one, I thought that was him, so I have a problem." T.S. *Wade* Hearing
        testimony excerpts, attached as Exhibit 38 at 135:9-11.  T.S. testified that she believed
        the pictures she picked were of two different people.  *See* Ex. 38 at 132:18-21.  T.S.
        would not confirm that the two photographs of Scott Fappiano Gottlieb produced at the
        *Wade* hearing were the photographs she had selected at the Catch Unit, let alone which
        photo she had allegedly selected first.  *See* Ex. 38 at 107:7-11; 131:19-24.

        **RESPONSE:**  Admit that the court conducted a Wade hearing on October 31, and

November 1, 1984, and admit the description of T.S.'s testimony with the exception of the

statement that she "would not confirm" that the two photos introduced at the <u>Wade</u> hearing were

the ones she selected.  Rather, she only testified in substance that she did not know, or could not

specifically recall, if the photos introduced were the same photos she had selected one year

earlier (*see* PX-38).  Moreover, plaintiff omits T.S.'s explanation for why she may have thought

the photos were of two different individuals.  (*See* ¶ 34, above, citing <u>Exhibit UU</u>, at 151-53)

Defendants further state that the only other witness in a position to confirm which photos were

identified – Gottlieb – <u>did</u>, in fact, confirm that T.S. identified the two arrest photos of Fappiano

from 1981, and 1982, respectively.  (<u>Exhibit M</u>, at 12; <u>Exhibit RR</u>, at 201)

36.     At her deposition Gottlieb admitted that the T.S.'s testimony at the *Wade* hearing was
        "completely different" from what Gottlieb described, and that it described two less than
        positive identifications.  *See* Ex. 16 at 199:6-17.  After Mr. Fappiano was convicted, and
        contrary to her testimony at the *Wade* hearing and her initial report, Gottlieb reported to
        Internal Affairs that "Mrs.  [S.] picked out photos of two (2) suspects whom she stated
        resembled the perpetrator." *See* Ex. 18 at ¶10.

        **RESPONSE:**  Admit the substance of Gottlieb's deposition testimony (although it was

elicited through leading questions based on selected portions of T.S.'s <u>Wade</u> hearing testimony

with other, relevant portions not read to the witness), and admit that the IAD memo states that

Gottlieb told an IAD investigator that T.S. picked out photos of two (2) suspects whom she stated resembled the perpetrator.  Defendants deny that Gottlieb's statement to IAD is in any way "contrary" to her <u>Wade</u> hearing testimony or her DD5 reports concerning the photo identification procedure at CATCH.  Plaintiff suggests here, and argues elsewhere in his opposition papers, that T.S. used the exact same words during Photo Showing 1 (T.S. picked photo that she said "resembled" the rapist) and 3 (T.S. told Gottlieb that she picked two photos "whom she stated resembled" the rapist).  The IAD memorandum – a document that summarizes a multitude of interviews with twelve (12) police officers and two (2) ADA's in 1987, four years after the CATCH unit identification procedures took place – cannot fairly be viewed as reflecting the "exact words" spoken by T.S., especially since T.S.'s words were conveyed to investigators by Dunbar and Gottlieb four years after she spoke them.  The focus of the investigation was not the words spoken by T.S. during the photo identification procedures, but the misconduct of Sciallo. (*See generally* <u>Exhibit I</u>)

Moreover, the author of the IAD memorandum did not quote verbatim T.S.'s, Dunbar's or Gottlieb's words with regard to the photo identification procedures.  Elsewhere in the memorandum, the author clearly intended to quote officers verbatim and when he did so, he transcribed the question asked and the answer given in a "Q and A" format (*e.g.*, <u>Exhibit I</u>, at 12).  The only officer's statement that is transcribed in that manner (in part) is Sciallo's.

37.     At no point prior to the *Wade* hearing—and in fact, at no point prior to the initiation of this civil case in 2006—did Dunbar ever provide, nor did the defense learn from any other source, that any photographs were shown to the victim prior to her selections with Gottlieb at the Catch Unit.  *See* Ex. 20 at 78:17-79:8.

**RESPONSE:**  Admit that the defense was not informed prior to the <u>Wade</u> hearing of any photo viewing by T.S. other than at CATCH.

38.     At the time of this investigation, Gottlieb was a relatively young sex crimes investigator, and was particularly concerned with dotting all her I's and crossing all her T's.  *See* Ex.

16 at 70:17:71:15.  She knew that the Chief of Brooklyn South was present and interested in the case when she took T.S. to the Catch Unit, as was the Chief of Patrol, as well as the Inspector for the Brooklyn South Detectives Squad.  *See* Ex. 16 at 165:5-168:23.  She was very careful to comply with all rules and regulations, and very concerned with properly preparing her paperwork.  *See* Ex. 16 at 70:17-71:5.  Gottlieb retired as Detective First Grade.  *See* Ex. 16 at 16:2-6.

**RESPONSE:**  Admit the substance of Gottlieb's testimony as described.

39.   NYPD policy and procedure in 1983 required a detective running an ID procedure at the Catch Unit to create a DD5 documenting the photographs chosen, which drawers the witness looked through, and a complete description of any photographs selected, including the dates of the arrests on the photographs, and to preserve any photographs selected.  *See* Ex. 29 at 36:2-37:4; 57:24-58:9.

**RESPONSE:**  Admit, except state that the obligation to preserve photographs "selected"

only extended to photographs identified as the perpetrator (*see* Responses to ¶¶ 22-23, above).

40.   Gottlieb's sole documentation regarding the Catch Unit is a single notation on DD5 3 that: "the assigned, along with [T.S.] did respond to the Brooklyn Catch Unit at approximately 1220 hours and thereat the complainant did view photos.  This viewing met with Positive Results.  Identified.  Scott Fappiano, known to this Department under NYSIS #444797OK," and including Mr. Fappiano's date of birth, address, and phone number.  *See* Ex. 31 at N000070; 175:21-25.  Gottlieb created no documentation of the number of photographs T.S. viewed, which photographs they were, or what drawers she looked at.  Nor did Gottlieb document anything specific information about the pictures T.S. pulled, such as the date of the arrest on the photograph, that the initial selection was tentative ("resembled the perpetrator"), anything T.S. said during the selection, or even that she picked out two photographs of Mr. Fappiano.  *Id.*  Gottlieb failed to sign the photographs T.S. selected.  *See* Ex. 16 at 219:4-220:17.

**RESPONSE:**  Admit that the foregoing paragraph accurately describes what appears in

Gottlieb's DD5 report and what does not appear in the report (*see* Exhibit N), and also admit that

Gottlieb did not sign the photos T.S. selected.  Defendants deny, however, that the "sole" source

of information about the CATCH viewing is Gottlieb's DD5.  At the Wade hearing, Gottlieb

provided additional information beyond that reflected on her DD5.  Specifically, she testified

that at CATCH, in the normal course, witnesses look through drawers of photos organized by

height, age and race, and she estimated that each drawer contains approximately one thousand

(1,000) photos.  (Exhibit M, at 8-10)  She saw NYPD officers at CATCH take down the "heavy"

drawers that T.S. looked through.  (*Id.* at 9:10)  She could not state specifically which drawers

T.S. looked through (*id.* at 8:17-19), but testified that the normal practice was followed in this

case.  (*Id.* at 8-10)  At the hearing, Gottlieb further confirmed that the two photos T.S. identified

were arrest photos of Scott Fappiano, dated August 4, 1981, and April 10, 1982, respectively,

consistent with T.S.'s description of what transpired at CATCH.  (*Id.* at 11-12; *compare with*

Exhibit J, at 105)

**Gottlieb's 12/6/83 photo arrays**

41.    On December 5, Gottlieb showed photographic arrays to T.S. and F.S. in the Sex Crime
       Squad Office at the 71st precinct.  *See* Ex. 33.  According to Gottlieb, F.S. viewed a
       photo array that included a photograph of Scott Fappiano.  *Id.*

       **RESPONSE:**  Admit.

42.    By all accounts other than Gottlieb's, F.S. did not get a sufficient view of the perpetrator
       to make an identification.  When T.S. untied F.S. immediately after the rapes, he asked
       her "what did he look like, which way did he go?" and rushed out into the street.  *See* Ex.
       1 at 589:7-9; T.S. Trial 2 testimony excerpts, attached as Exhibit 39 at 162:10-18; F.S.
       Trial 2 Testimony excerpts, attached as Exhibit 40 at 627:5-7.  At trial, Nathan stated to
       the Judge, "he can't make an identification." *See* Ex. 2 at 83:10.  F.S. told Nathan that he
       could not identify the perpetrator, and told his wife that he didn't think he could pick
       anybody out.  *Id.*; Ex. 40 at 660; *see also* Ex. 19 at 53:6-14; 55:14-20.  At the first trial,
       F.S. testified that "I couldn't see his face." *See* Ex. 2 at 113:18.  At the second trial he
       testified that he saw the perpetrator for "approximately five seconds" during which time
       he was staring at the gun.  *See* Ex. 40 at 637:2-18.  ADA Schwartz argued in summation:
       "We know that he was tied up and we know that when he got these glances or glimpses at
       the Defendant, the defendant was at the other side of the room near the light and could
       only see a shadow." *See* Schwartz Trial 2 Summation excerpts, attached as Exhibit 41, at
       1063:4-8.  Nathan told to the jury in her opening statement that he had "only split
       seconds of a glance" and "so very little opportunity to observe the person who committed
       this crime." *See* Nathan's Trial 1 Opening excerpts, attached as Exhibit 42, at 26.

       **RESPONSE:**  Admit that F.S. could not identify the perpetrator, and specifically deny

that F.S.'s "account" that he could not make an identification somehow differs from Gottlieb's

"account" of events on the ground that plaintiff cites no evidence in support of this contention.

43.    Nevertheless, according to F.S. and Gottlieb, F.S. looked at the photo array carefully and
       picked out Scott Fappiano's mug shot without difficulty or any hesitation.  *See* Ex. 16 at
       236:16-237:3; 260:21-261:2; 262:15-19; F.S. deposition excerpts, attached as Exhibit 43

at 109:13-21.  The photo array Gottlieb preserved only included faces; no other body parts were visible.  *See* Ex. 43 at 107:10-22; Photo Array, attached as Exhibit 44.

**RESPONSE:**  Admit that on December 5, 1983, F.S. viewed a photo array that only included the faces of one suspect (Fappiano) and five fillers, and that F.S. picked out Fappiano's photo.

44.   At her deposition, Gottlieb had no explanation for how F.S. could have made a positive identification without hesitation if he did not have an opportunity to view the perpetrator's face.  *See* Ex. 16 at 254:24-255:10.  Gottlieb, who interviewed F.S. on the morning of December 1, and again on December 5, claims that F.S. always told her he was able to make an identification.  *See* Ex. 16 at 247:14-23; 250:2-251:18.  At the second trial, F.S. testified that he told Gottlieb "I thought I knew who it was" and "that is why she allowed me to see a lineup." *See* Ex. 40 at 660:9-661:2.  At her 2009 deposition, Gottlieb emphatically denied that F.S. ever said anything like that.  *See* Ex. 16 at 140:11-23.

**RESPONSE:**  Admit the first sentence, but deny the materiality or admissibility of Gottlieb's inability to explain why F.S. was able to identify Fappiano's photo.  Deny that Gottlieb "claims that F.S. always told her he was able to make an identification," on the grounds that the factual assertion is not supported by the evidence cited.  Gottlieb's testimony establishes that, prior to viewing the photo array, F.S. never told her that he could <u>not</u> identify the rapist, not that he "always" told her that he could.  (*See* PX-16, at 247:14-23 (Q:  Anything in there suggesting he could see the man's face?  A:  Well, the TV was on, the lights were flickering on the TV.  *He never said he couldn't*.  Q:  Okay.  A:  He never said he couldn't.  Q:  All right.  He never suggested to you that he would be unable to make an ID?  A:  No, not to me, no.), 250:2-251:18)  Any detective who is trying to solve an extremely serious crime would reasonably attempt to use some identification procedure with a witness who was undisputedly present when that crime occurred, as long as the witness did not definitively state that he could <u>not</u> make an identification, which is what Gottlieb recalls in substance.  Perhaps F.S. – a young husband who witnessed his wife attacked and raped at gunpoint, with his newborn son just steps away in his

- 22 -

bedroom – can be forgiven for trying to help solve the crime, even by trying to make an

identification in the days afterward even though he ultimately realized that he could not.  These

facts do not demonstrate police misconduct.

Defendants also admit that F.S. testified at the second trial as described above.  However,

plaintiff adds an improper gloss to F.S.'s testimony, suggesting that he specifically meant that he

knew the name or identity of the perpetrator when he told Gottlieb that he "knew who it was."

At deposition, F.S. explained that when he told Gottlieb he "knew who it was," he meant that he

saw and heard enough of the perpetrator's actions while inside the apartment to justify his

viewing a lineup.  (*See* Exhibit GGG [F.S. deposition excerpt], copy attached, at 97-99)  Plaintiff

suggestively questioned Gottlieb using the same gloss on F.S.'s trial testimony, asking her if F.S.

ever told her that he knew the name of the perpetrator, which of course he did not.  (*See* PX-16,

at 140:11-23 (Q:  Now, did [F.S.] ever tell you at any time that he might know who the

perpetrator was, he thought he knew who it was? …. A:  No.  …. Q:  Never told you he believed

it was Scott Fappiano or somebody else?  A:  No, no.))  Gottlieb's denial that F.S. ever told her

he knew the identify of the rapist is not surprising.

45.  After the photo arrays, Gottlieb met with T.S. and F.S. together and told them they had
both selected the suspect.  *See* Ex. 43 at 102:5-103:3.  Thus, F.S. knew on December 5
that he had made a positive identification during the photo array.  *See* Ex. 43 at 51:18-22;
100:19-22.  He also knew that his wife had selected the same suspect at the Catch Unit.
*See* Ex. 43 at 56:22-57:5.

**RESPONSE:**  Admit.

46.  At her deposition, Gottlieb admitted that if F.S. did not have an opportunity to see the
perpetrator, it would have been inappropriate to show him photographs.  *See* Ex. 16 at
250:2-251:18.  ADA Nathan testified that any police misconduct in connection with the
identification by F.S. would have absolutely been material exculpatory information that
had to be given to the defense.  *See* Ex. 19 at 71:25-72:20.  Mr. Fappiano's first attorney,
Anthony Fusco, testified that he had concerns that Gottlieb's photo array with F.S. was
not legitimate, but that he was constrained in his cross-examination of Gottlieb because
he was concerned about opening the door to the alleged positive identification at trial.
*See* Ex. 20 at 93:2-94:3.

**RESPONSE:**  Admit.

**Gottlieb's 12/6/83 Lineups**

47.  On December 6, 1983, less than twenty-four hours after F.S. viewed the photo array and allegedly selected Scott Fappiano without hesitation, both T.S. and F.S. viewed a lineup at the 71st precinct.  Ex. 37 at 51:15-17; 57:13-16.

**RESPONSE:**  Admit that on December 6, 1983, the day after the photo arrays, both T.S. and F.S. viewed a lineup at the 71st Precinct.

48.  By the evening of December 1, 1983, Gottlieb had Scott Fappiano's telephone number and address in Brooklyn.  *See* Ex. 31 at N000070.  Nevertheless, despite the fact that, according to Gottlieb, T.S.'s Catch Unit ID provided her probable cause for his arrest, Gottlieb did not arrest Scott Fappiano prior to the lineup, but rather asked him to come in voluntarily, which he did.  *See* Ex. 4.  During the five days between the Catch Unit procedure and the lineup, officers continued to canvass the neighborhood, dust the crime scene for prints, run vehicle checks, look for links with similar crimes, and interview witnesses.  *See* Complaint Follow-Up Reports, attached as Exhibits 46-47; Ex. 32.

**RESPONSE:**  Admit.

49.  Although ADA Melendez supervised the lineup, Gottlieb ran it.  *See* Ex. 16 at 327:6-15.  It was Gottlieb's role to bring witnesses in and out of the lineup room.  *Id*.  The district attorneys did not monitor that process.  *See* Ex. 30 at 86:19-87:7; 84:20-25.  In fact, both ADA Melendez and ADA Ozaruk—the only two ADAs present for the lineup—remained in the lineup room while Gottlieb escorted the witnesses in and out.  *See* Ex. 30 at 85:2-11; Ex. 16 at 316:14-21.

**RESPONSE:**  Deny the characterization that ADA Melendez "supervised" the lineup but that Gottlieb "ran" it, on the grounds that the evidence cited does not support the factual assertion, and also on the obvious ground that any assistant district attorney present at a lineup is a higher-ranking law enforcement officer than any police detective.  (*See* PX-16, at 327:4-9 (Q: Who was running [the lineups]?  …. A:  I guess I was running it *sort of with the DA* with the boss getting the fillers.  I didn't call for the fillers but the fillers came, so.))  Admit the remainder.

50.  T.S. viewed the lineup and selected Mr. Fappiano, who was in position 4.  *See* T.S. Grand Jury testimony excerpts, attached as Exhibit 48 at 9.  Gottlieb immediately escorted her out of the lineup room and brought her to another room in the precinct.  *See* Ex. 16 at 328:22-329:2.  Gottlieb then got F.S. and brought him into the lineup room.  *See* Ex. 16 at 329:12-15.  Ex. 19 at 67:17-68:3.

**RESPONSE:**  Admit that T.S. viewed the lineup and selected Fappiano, who was in position number four.  Deny that Gottlieb "immediately" escorted T.S. out of the lineup room, but admit that Gottlieb escorted her out of the viewing room, brought her to another room in the precinct, and then got F.S. and brought him into the viewing room.  The cited evidence does not support the characterization "immediately" to describe Gottlieb's actions.

51.     Gottlieb and F.S. were alone while Gottlieb escorted F.S. into the lineup room.  *See* Ex. 43 at 169:11-16.

**RESPONSE:**  Deny.  The evidence cited does not support the factual assertion.  F.S. testified that Gottlieb "started to escort" him to the viewing room but that others were present when Gottlieb arrived to take him there, and he also testified that he did not recall when the assistant district attorneys who were present at the lineups met Gottlieb and him.  There was no general practice as to when or where the ADA's would meet witnesses, according to F.S. Rather, the practice "varies."  (PX-43, at 169; Exhibit GGG [F.S. deposition excerpt] at 170)

52.     While Gottlieb and F.S. were out of the room, Mr. Fappiano requested permission from ADA Ozaruk to switch seats.  *See* Scott Fappiano deposition excerpts, attached as Exhibit 49 at 152:17-23; Bohdan Ozaruk deposition excerpts, attached as Exhibit 50 at 12:21-13:5.  Between the lineups he moved from seat 4 to seat 6.  *Id.*  Thus, when F.S. viewed the lineup, Mr. Fappiano was sitting in seat 6.  *Id.*  Gottlieb was not aware that Mr. Fappiano switched out of seat 4 between the lineups.  *See* Ex. 16 at 341:24-343:2. Immediately after F.S. viewed the lineup, Mr. Fappiano asked Ozaruk "who got picked" and Ozaruk responded "seat 4." *See* Ex. 49 at 156:2-23.

**RESPONSE:**  Admit, except deny the last sentence.  The only evidence cited in support of the factual assertion is Fappiano's deposition, where he testified that ADA Ozaruk told him after the F.S. lineup that F.S. had selected number four, and that he then launched into a discussion with ADA Ozaruk, asking if the filler in seat # 4 was going to be arrested since F.S. had just picked him out.  (Exhibit BBB [Fappiano Dep.], at 156-57)  Fappiano's testimony is plainly false, however:  At his 50-H hearing, which occurred on April 25, 2007, long before his deposition, Fappiano testified that he did not know what number F.S. had picked, that he spoke

- 25 -

to the ADA afterward, and that the ADA told him only that F.S. "mis-hit" him.  (Exhibit CCC

[Fappiano 50-H], at 106-7)  At the time, Fappiano did not describe the ADA's telling him that

F.S. picked number four.  Fappiano reviewed the 50-H transcript before his deposition and did

not notice any "blatant" errors.  (Exhibit BBB, at 3-4)  Fappiano has concocted an elaborate story

about ADA Ozaruk's supposedly telling him that F.S. picked number four, and his deposition

testimony describing his alleged conversation with Ozaruk should be disregarded.

53.     Gottlieb preserved and vouchered photographs of the lineups (*see* 12/6/83 lineup
        photographs, attached as Exhibit 45) and prepared lineup cards documenting the
        witnesses' selections, as well as other information about the lineup, such as the heights
        and weights of the fillers.  *See* Ex. 37 at 55:2-56:20; 61:2-13; 65:4-1 7; Ex. 16 at 74:5-24.
        The lineup card prepared by Gottlieb originally indicated that F.S. had selected number
        "4", but the "4" was crossed out and replaced with a "5."  *See* Ex. 37 at 67:6-23; Helene
        Gottlieb Trial 1 testimony excerpts, attached as Exhibit 58 at 461:23-463:5.  Neither the
        prosecution nor the defense received the lineup card prior to the *Wade* hearing.  *See* Ex.
        37 at 61:2-13; 65:4-17.  At the first trial, the defense questioned Gottlieb aggressively
        about the crossed-out "4," and argued to the jury that Gottlieb had improperly told F.S.
        what position Mr. Fappiano sat in during the first lineup.  *See* Ex. 20 at 92:20-93:1; Ex.
        58 at 461:3-463:5.  The defense's theory was that F.S. had in fact selected seat 4, as
        opposed to seat 5, and Gottlieb doctored the lineup card to conceal that fact.  *See* Ex. 20
        at 95:5-11; Ex. 58 at 461:5-463:7 ADA Nathan, too, had a concern that the cross-out on
        the lineup card might have indicated that someone told F.S. where Scott Fappiano was
        sitting, and she questioned Gottlieb about that.  *See* Ex. 19 at 66:23-67:18.  Gottlieb
        testified at the *Wade* hearing that she called the S.'s before the lineup to notify them that
        "Scott Fappiano" was at the precinct for a lineup.  *See* Ex. 37 at 51:22-25.  Gottlieb then
        corrected herself and said she had told them "somebody" was at the precinct.  *Id*.

        **RESPONSE:**  Admit the facts set forth, for purposes of this motion only, but specifically

deny that "the lineup card prepared by Gottlieb originally indicated that F.S. had selected number

4," on the grounds that the cited evidence does not support the factual assertion.  Assuming

arguendo that the lineup card had the number "4" typed in, but crossed out with the number "5"

written over it, that fact standing alone does not support the inference that F.S. actually selected

number "4" at the lineup.  Plaintiff has adduced no evidence whatsoever that any police officer

told F.S., or suggested that T.S. tell F.S., that Fappiano was in seat number four during the lineup

she viewed.  Plaintiff concedes that T.S. and F.S. did not speak to each other in between the

lineups.  (*Compare* DE 87 [Rule 56.1 Stmt.], ¶ 111, *with* DE 90 [Pl. Resp.], ¶ 111)

Moreover, the evidence conclusively shows that F.S. selected number "five," not number

"four."  As former ADA (now Criminal Court Judge) Suzanne Melendez explains, she

supervised both lineups and also presented the case to the grand jury.  (Melendez Dec., ¶ 2)  In

the grand jury, both Gottlieb and F.S. testified that F.S. selected number five.  If F.S. had

selected number four, ADA Melendez would have corrected the record to make sure the grand

jury heard the complete, accurate account of the lineup.  She did not do so, because there was no

need to do so.  (*Id.*, ¶¶ 3-5)  The mistake on the lineup card was explained by Gottlieb as a

typographical error (Exhibit Q [Gottlieb Trial Testimony], at 462-63), and plaintiff can offer no

evidence that Gottlieb's explanation is false.  Viewed in the light most favorable to plaintiff, the

only evidence supporting the inference of "suggestion" is the typographical error itself, which is

not enough.

54.   By the time of the retrial, the original lineup card had gone missing, and although
      Gottlieb had her own copy with her in court, she did not produce it when asked.  *See*
      Excerpts from Trial 2 Proceedings, attached as Exhibit 51 at 998:3-9; Ex. 16 at 393:9-14.
      When the defense attorney asked her for the lineup card, or for a copy of it, she
      repeatedly stated that she did not have it.  *See* Helene Gottlieb Trial 2 testimony excerpts,
      attached as Exhibit 52 at 428:8-434:33.  She then testified that she could not recall
      whether the number F.S. picked had been crossed out and typed over.  *See* Ex. 52 at
      429:3-7 ("And on that document that you prepared pursuant to this lineup was there a
      number placed in that document and then marked out with X's?  Answer: I don't recall.  I
      don't have the documents.").

      **RESPONSE:**  Admit, except deny that "Gottlieb had her own copy [of the F.S. lineup

card] in court" but "did not produce it when asked."  Gottlieb testified at deposition, in response

to leading, hypothetical questions, that normally she "would" keep a copy of any lineup card in

her file, and further explained that she "would hope [the lineup card] would have stayed [in her

file] and all my other stuff would stay there."  (PX-16, at 393:15-17)  With regard to this specific

- 27 -

lineup card, however, Gottlieb explained that she did not have a copy in her own file and therefore could not produce it at the second trial.  (Exhibit HHH, at 409:11-22 (Q:  If you followed your own procedures and your own way of doing things you would have had a copy in your file?  A:  Well, if I had a copy in my file I would have taken it out of my file and given it to [defense counsel] Mr. [Luther] Williams.  I honestly did not.  It was submitted to the court. Somebody took it at a court proceeding.  I don't know who took it.  I don't know.  But if I gave them my copy and I never got my copy back I can't be responsible for a copy that I had that I never got back from the court.  I'm sorry.))  Plaintiff adduces no evidence that the F.S. lineup card was in Gottlieb's file while she testified, but that she refused to produce a copy when asked.

55.     At her 2009 deposition, Gottlieb admitted that she would have had a copy of the lineup card with her in her case folder at trial; however, she said it was not her job to tell anyone that it was there.  *See* Ex. 16 at 394:8-395:10.  Gottlieb testified that when she went to trial she bought her case folder with her, and that if she gave anything to the district attorneys or anybody else they would have to make a copy.  *See* Ex. 16 at 80:16-24. Gottlieb further testified that she would never have returned to the office from trial without her case folder intact.  *See* Ex. 16 at 80:25-81:20.  Indeed, at the *Wade* hearing, Gottlieb produced the original lineup card for the T.S. lineup, gave it to the defense attorney, and then referred to a copy from her case folder during questioning.  *See* Ex. 37 at 61 :2-64:12.

      **RESPONSE:**  Admit that in the passages cited, Gottlieb described her normal practices with respect to maintaining her case folder.  Defendants admit that Gottlieb appeared to have kept a copy of the T.S. lineup card and referred to her copy when testifying during the Wade hearing.  (*See* PX-37, at 64:9-10)  However, Gottlieb later testified at the same hearing about the F.S. lineup and it appears from the transcript that she did not have her own copy of the F.S. lineup card, but instead referred during testimony to the original which was marked by Fappiano's defense counsel as Defendant's Exhibit C.  (Exhibit III, at 65-68, attached)

56.     At his 2010 deposition, ADA Ozaruk was certain that he had asked Mr. Fappiano whether he wanted to switch seats between the lineups, and specifically recalled their conversation.  *See* Ex. 50 at 12:6-15.  Mr. Fappiano, too, specifically recalled the conversation and testified at his 2009 deposition that he discussed switching seats with

Ozaruk.  *See* Ex. 49 at 152:13-23.  At her 2009 deposition, Gottlieb testified that she would have been out of the room while Mr. Fappiano switched seats.  *See* Ex. 16 at 341:24-343:2.  At the first trial, after she had been questioned about the lineup card, Gottlieb testified that "the district attorney" had asked Mr. Fappiano if he wanted to switch seats.  *See* Ex. 58 at 465:23-466:10.  Earlier at the *Wade* hearing, however, *before* she was ever asked for or produced the lineup card, Gottlieb testified that she had been the one who asked Mr. Fappiano if he wanted to switch seats: "Well I asked your client, the defendant, if he wanted to change his seat, was he happy sitting where he was sitting, was he happy next to the person he was sitting next to, and he decided to change his seat." *See* Ex. 37 at 58:10-14.

**RESPONSE:**  Admit that the paragraph accurately summarizes the cited testimony, except state that Gottlieb testified that her "general practice" would have been to take the victim, T.S., out of the lineup room after she viewed the lineup.  (PX-16, at 342:18-22 (Q:  But your practice would have been to take the victim back to where she was?  A:  Absolutely.  And then somebody could have gone in.  There's another lineup.  You can change your seat.))  Gottlieb further testified at deposition that she did not remember in this instance telling the suspect, Fappiano, whether he could change seats, or whether another detective did so.  (*Id.*, at 341-43)

57.    When asked at his deposition how he could have mis-hit at the lineup after identifying a photograph of Mr. Fappiano the day before, F.S. testified that he was unable to make a positive identification at the lineup because as soon as he was taken in to view the lineup he began "banging on the glass," and loudly screaming "that's the motherfucker, let me in" repeatedly for approximately twenty seconds, such that he had to be restrained.  *See* Ex. 43 at 127:3-129:4; 130:4-134:4.  He testified that no one could have failed to notice his behavior.  *Id.*  "It was just a total mess.  It was total chaos when I went in there….I would have killed everybody in there if I had gotten in."  *See* Ex. 43 at 88:14-22; 127:3-129:4; 129:5-9; 130:9-1 6.

**RESPONSE:**  Admit, except deny the characterization that "no one could have failed to notice [F.S.'s] behavior" because the cited evidence, F.S.'s own deposition testimony about what others could or could not have "noticed," is inadmissible speculation.

58.    ADAs Melendez and Ozaruk, who were present at the lineup, deny that the outburst F.S. describes took place.  ADA Melendez testified that if that had happened "it would have been written and also it would have been something that everybody remembered." *See* Ex. 30 at 103:6-21.  ADA Ozaruk testified that he had no recollection of F.S. banging on the glass and yelling and that he would remember anything like that had it occurred.  *See* Ex. 50 at 49:8-24.

**RESPONSE:**  Deny.  The cited evidence – deposition testimony of ADA's Melendez and Ozaruk – establishes that neither witness could recall F.S.'s demeanor or behavior (*see* PX-30, PX-50).  Therefore, neither witness is in a position to confirm or deny anything about that behavior.  In addition, the testimony on which plaintiff relies was elicited by leading, hypothetical questions, and would not be admitted at trial.  However, Scott Fappiano, who was behind the glass in seat #6 during the F.S. lineup, recalled hearing "noise, scuffling, like a scuffling noise" after the shade went up, and when asked if he heard raised voices or shouting, answered, "Yes, it sounded like something was going on back there."  (Exhibit BBB [Fappiano Dep.], at 155:21-156:1)  Fappiano therefore corroborates F.S.'s account of what happened when he saw the lineup.

59.    At the *Wade* hearing, the trial prosecutor and the defense learned for the first time that the lineups had been taped.  *See* Excerpts from Wade Hearing Proceedings, attached as Exhibit 53 at 158.  The tapes were played at the *Wade* hearing, and again during the first trial.  *See* Bohdan Ozaruk Wade Hearing testimony excerpts, attached as Exhibit 54 at 166; Bohdan Ozaruk Trial 1 testimony excerpts, attached as Exhibit 55 at 700.  Although the entire viewing by T.S. was taped, it was clear that the portion of the tape containing F.S.'s viewing of the lineup was blank.  *See* Ex. 54 at 167:24-168:5; Ex. 50 at 31:24-32:8.  ADA Ozaruk testified that there is no legitimate reason for taping one witness's identification and not the others.  *See* Ex. 50 at 32:20-33:10.  ADA Melendez testified that if one viewing is taped, the other should be taped as well; that all lineups should be taped from the moment the witness enters the room until he or she leaves so that any relevant statements are caught on tape; and that for one lineup to be taped and not the other would be a very unusual situation.  *See* Ex. 30 at 93:11-24; 95:9-12.

**RESPONSE:**  Admit that the paragraph accurately summarizes the testimony cited, except clarify that former ADA Ozaruk did not testify that "there is no legitimate reason" for taping one witness' identification and not another's; rather, he testified that he could not think of any such reason at the time of his deposition.  (PX-50, at 32-33)

60.    The lineup tapes were maintained by the Defendant officers until the time of trial.  *See* Ex. 19 at 122:23-123:18.  ADA Nathan first learned that the tapes existed at the *Wade* hearing.  *Id.*

**RESPONSE:**  Admit.

61.     Following the lineups, Gottlieb arrested Mr. Fappiano.  *See* 12/06/83 Arrest Report, attached as Exhibit 56.  ADA Melendez presented the case to the grand jury; T.S. described the rape and testified about her lineup identification, but not the Catch Unit. *See* Ex. 30 at 9:13-10:18; Ex. 48.  At the conclusion of a *Wade* hearing, the Court ruled that T.S.'s identification of Mr. Fappiano would be admissible at trial.  *See* Ex. 53 at 215:21-216:2.  Prior to the Court's ruling, Nathan argued to the Judge, "I think that clearly the record shows that there was nothing done in this case which was suggestive in anyway."  Ex. 53 at 212:17-21.  T.S. was thus permitted to make an in-court identification of Mr. Fappiano at trial.  *See* Ex. 1 at 622:25-623:5; Ex. 39 at 201 :9-23.

**RESPONSE:**  Admit.

62.     ADA Nathan prosecuted the first trial.  She testified that in this case in particular, because it relied solely on a single victim's identification, any other identification procedures were extremely important and had to be disclosed to the defense.  *See* Ex. 19 at 112:15-20.  Dunbar agreed that because this was primarily an identification case any information about any negative IDs made by the victim were particularly important.  *See* Ex. 25 at 42:20-44:4.

**RESPONSE:**  Admit that ADA Nathan prosecuted the first trial but deny that "she testified" that any other identification procedures were extremely important and had to be disclosed to the defense, on the ground that the cited testimony was elicited through improper, leading questions.  (*See* PX-19, at 112:15-20)  Admit that Dunbar testified as described in this paragraph, but deny the materiality or admissibility of the testimony because the term "negative ID" is ambiguous, and because – assuming the term "negative ID" means "mis-hit" – the circumstances of Photo Showing #1 do not establish a "mis-hit."

63.     Steven Penrod, a Distinguished Professor of Psychology at the John Jay College of Criminal Justice of the City University of New York,[5] who has authored more than 30 eyewitness publications including original research articles published in peer reviewed scientific journals, describes how psychological research informs the eyewitness identification issues in this case.  First, he describes how well-documented scientific phenomena, such as weapons focus and the influence of stress on human performance, tend to undermine the reliability of crime victims' reports of their observations as well as the accuracy of their subsequent identifications.  Second, he explains that even a tentative identification gives important information, and that the tentative identification Dunbar described in Photo Showing 1 "arguably constituted [T.S.'s] most complete and detailed

---

[5]     Dr. Penrod holds a B.A. degree from Yale College, a J.D. degree from the Harvard Law School, and a Ph.D. degree in social psychology, also from Harvard University.

description of the perpetrator" and could have been used as a basis for investigation, later identification procedures, etc.  He also explains so-called "mugshot exposure"—the phenomenon that "prior views of an innocent person in a mugshot (as in the present case) significantly increase the risk that the innocent person will be misidentified as the perpetrator in a later presentation and that once an innocent person is so selected, witnesses are committed to that selection."  *See* Report of Dr.  Steven Penrod, attached as Exhibit 57.

    **RESPONSE:**  Admit that Penrod's report so states, but deny the materiality or relevance

of his opinions, as set forth in defendants' Reply Brief (DE 93, at 15-17).

64.    Based on numerous studies, Penrod notes that the vast majority of people will select the same person twice, even if the initial identification is a misidentification, and the true perpetrator is later included as an option to pick in the later procedure.  Another issue Penrod describes is "confidence malleability"—the ability of police officers to turn a tentative identification into a positive one by providing confirming feedback to the witness: such as telling the witness another witness had selected the same person, or telling the witness she had selected "the suspect."  Such confirming feedback not only increases the witness' expression of confidence in the identification, it also leads witnesses to "exaggerate[e] how good their view was of the culprit, how much attention they paid to the culprit's face while observing the event, and so on."  Finally, Penrod explains that all of these factors had been established by research before Mr. Fappiano's 1985 conviction.  *See* Report of Dr. Steven Penrod, attached as Exhibit 57.

    **RESPONSE:**  Admit that Penrod's report so states, but deny the materiality or relevance

of his opinions, as set forth in defendants' Reply Brief (DE 93, at 15-17).

65.    Applying those principles to this case, Penrod concludes that, particularly in light of T.S.'s failure to identify Mr. Fappiano during Photo Showing 2, it is likely that T.S.'s later identification of Mr. Fappiano was a product of "mugshot exposure"—that is, T.S. was identifying someone merely because she had seen his photograph before.  This is especially likely since T.S. initially stated only that Mr. Fappiano bore a resemblance to the perpetrator—the same thing she had said about a different person during Photo Showing 1—and thus was not indicating much confidence in her identification.  Her later positive identification of Mr. Fappiano at the lineup could have been the product of confirming information from the officers, including telling her she had identified the right suspect, that her husband had also identified him, or any other information conveyed to her indicating the officers' belief in Mr. Fappiano's guilt.  *See* Report of Dr. Steven Penrod, attached as Exhibit 57.

    **RESPONSE:**  Admit that Penrod's report so states, but deny the materiality or relevance

of his opinions, as set forth in defendants' Reply Brief (DE 93, at 15-17).

66.     Mr. Fappiano's defense attorney at the first trial, Anthony Fusco, never learned of either Photo Showing 1 or Photo Showing 2.  *See* Ex. 20 at 78:17-79:8.  Fusco, an experienced criminal defense attorney who had been practicing for twelve years by the time of trial in 1984 (*see* Ex. 19 at 91:23-92:14; Ex. 20 at 3:19), testified upon questioning by the defense that he would have done three things with the undocumented photo showings had they been disclosed.  First, Fusco testified that his strategy at the *Wade* hearing was to attack the victim's photo selections at the Catch Unit with the goal of preventing her from making an identification at trial.  *See* Ex. 20 at 79:18-80:4.  Thus, had he had learned that Dunbar showed her photographs in the precinct and she spoke the same words she did when she selected the first photograph of Mr. Fappiano at the Catch Unit, that would have been his primary line of attack at the *Wade* hearing.  *See* Ex. 20 at 84:5-12.  Second, Fusco testified that if he had learned about the Dunbar photo showing, he would have cross examined the victim about it at trial even though that could have opened the door to her later allegedly positive identification of Mr. Fappiano at the Catch Unit.  *See* Ex. 20 at 56:8-10; 87:11-12 ("if I had those two, you know, that's a different case, counselor.").  Finally, Fusco would have impeached Dunbar at trial with Dunbar's failure to document and disclose the photo showing.  *See* Ex. 20 at 85:4-10.

**RESPONSE:**  Admit that defense counsel Anthony J. Fusco was not informed of any photo viewings by T.S. other than at CATCH.  Deny that Fusco testified as plaintiff describes "upon questioning by the defense."  Contrary to plaintiff's assertion, upon questioning by the defense Fusco testified that without reviewing all the trial transcripts, he could not say why he did not cross-examine T.S. at trial about the photo identifications (Exhibit YY [Fusco], at 41:10-14), and added that even if he had known about Photo Showing 1, he could not say whether he would have used that information to cross-examine T.S.  (*Id*. at 48-50)  He later stated that he would have cross-examined T.S. about "mis-hits" (*id*. at 54, 56), but was equivocal about whether he would have cross-examined her about the specifics of Photo Showing 1.  (*Id*. at 48-64)  His testimony is not surprising, because Photo Showing 1 was not a "mis-hit" (or a *mis*identification), but was not an identification at all (*see* Exhibit I, at 8).  The testimony plaintiff cites was elicited by *plaintiff's* counsel, not defense counsel (*see* PX-20), after he had met with Mr. Fusco that morning (Exhibit YY, at 6), and was for the most part the result of leading questions.  Plaintiff's counsel also asserted a privilege when defense counsel sought to inquire as to communications between them and Mr. Fusco.  (*Id*. at 7, 25)  To the extent Fusco's

- 33 -

testimony when questioned by Fappiano's counsel differs materially from his testimony when questioned by defendants' counsel, we submit that it should be disregarded.

67.    Luther Williams, Mr. Fappiano's defense attorney at his second trial, testified that he had no knowledge of either the Dunbar or Sciallo photo showings at the time of trial, and if he had, he would absolutely have presented them as exculpatory evidence at trial.  *See* Ex. 21 at 29:10-30:4.

**RESPONSE:**  Deny the admissibility, materiality or relevance of Luther Williams' testimony.  Mr. Williams merely confirmed in response to three leading questions by plaintiff's counsel, at the end of his deposition, that he would have used the photo viewings at trial because he believed they were exculpatory.  (PX-21, at 29-30)  He gave no explanation for this pat answer.  (*See id*.)  The testimony is inadmissible because it was elicited by leading questions and is so perfunctory and speculative that it lacks probative value.

## FACTS RELEVANT TO MR. FAPPIANO'S TATTOOS

68.    When Gottlieb arrived at the precinct on the morning of December 1, she met with Dunbar to discuss the investigation.  *See* Ex. 16 at 116:11-120:12; 122:5-123:2.  Gottlieb then conducted her own interviews with T.S. and F.S.  *See* Ex. 31.  She obtained a description of the incident from each victim.  *Id*.  T.S.'s interview lasted for more than an hour; in it, she reiterated that the perpetrator was 5'10" and 160 pounds.  *Id*.  T.S. also gave a comprehensive report of the incident, describing each of the rapes in detail.  *Id*.  Gottlieb testified that during her initial interview with T.S., T.S. was "precise, clear and very detailed and descriptive."  Ex. 58 at 429:22-25.

**RESPONSE:**  Admit.

69.    Since before 1981, Scott Fappiano has had ten-to-twelve inch color tattoos on both of his lower legs, one of which spells out his name.  *See* Ex. 16 at 283:17-284:25.

**RESPONSE:**  Admit.

70.    During her initial interview with the victim on December 1, Gottlieb would have asked T.S. whether she observed any distinguishing marks on the perpetrator such as scars, marks or tattoos.  *See* Ex. 16 at 287:6-11; 297:23-298:10.  Gottlieb re-interviewed both T.S. and F.S. on December 5; neither changed their initial statements.  *See* Ex. 16 at 225:6-22; 301:24-302:17.  T.S. never reported noticing any tattoos on the perpetrator.  *See* Ex. 17; Ex. 31; Ex. 33.

**RESPONSE:**  Admit.

71.     At the first trial, however, for the first time, T.S. stated that during each of the five distinct sexual assaults, the perpetrator never pulled his pants completely down, but instead "he opened them and just shimmies them off to here…right to the top of his legs." *See* Ex. 1 at 567:24-568:10.  At the second trial she testified that each time he raped her "he would inch his pants down to below his hips, a little below his hips, and after every - after every time, he would pull them back up." *See* Ex. 39 at 141:12-142:12.  ADA Schwartz argued to the jury in his closing "The defendant has tattoos on his legs.  Don't ignore that.  That is important…The Defendant knows from his conception that if anybody saw those tattoos that is it.  That is it.  So what does he do? He is so careful at all times.  All times to make sure his pants never come down  he makes sure at all times when he's standing, and those pants are dropped, that they don't fall down because if they fell down [T.S.] would see the tattoos on his legs and they would add more evidence to this case, but it didn't make a difference because he held those pants up to hide those tattoos."  *See* Ex. 41 at 1058:13-19.

        **RESPONSE:**  Admit the substance of the testimony and closing arguments, but deny that at trial T.S. stated "for the first time" that the rapist "never pulled his pants completely down." The cited testimony does not support the inference that T.S. conveyed this information "for the first time" when she testified at trial.  Gottlieb's report of her first interview with T.S. states that, according to T.S., "every time, after every sex act, [the rapist] would zipper his pants up and then unzip them," a clear reference to the assailant's <u>modus</u> <u>operandi</u> of not pulling his pants all the way down (*see* <u>Exhibit N</u> [Gottlieb report], at page 2).  Furthermore, ADA Nathan specifically testified, contrary to the premise of a leading question asked by plaintiff's counsel, that she recalled T.S. telling her before the first trial that the rapist held up his pants during the various sex acts.  (<u>Exhibit JJJ</u> [Nathan Dep.], at 162-63, copy attached (Q:  Would it be fair to say, based on your practice of not interviewing victims about the circumstances of the rape, prior to her testimony at trial you had not heard from the victim the specifics as to how the perpetrator was holding up his pants during the various sexual acts?  A:  That's not accurate); *see also* <u>Exhibit K</u>, at 163-68 (describing what T.S. said about perpetrator's holding his pants up))

72.     Even without the benefit of scientific proof of innocence, Luther Williams, Mr. Fappiano's second criminal defense attorney, argued to the jury that the way T.S. described the perpetrator holding his pants was physically impossible: "he held the gun in her eye with one hand and held his pants with the other.  You got to remember these

pants are attached to a keyring with a number of keys pulling downward perhaps on them.  So the perp is holding the gun in this fashion and holding his pants in this fashion and able to make penetration, and how did he hold himself up?  With a third hand, perhaps?  I find that to be physically impossible." *See* Excerpts of Luther Williams Trial 2 Closing, attached as Exhibit 59 at 1020:2-10.

**RESPONSE:**  Admit that defense counsel made the closing argument as described.

73.   During Gottlieb's initial interview with T.S. on December 1, 1983, T.S. reported to her only that the rapist "pulled his pants down."  *See* Ex. 31 at N000068; Ex. 16 at 291:19-292:10.  Gottlieb testified that if T.S. had given her more specific information about how the rapist held up his pants during her re-interview on December 5, she would have prepared a DD5 documenting that information.  *See* Ex. 16 at 301:24-302:9.

**RESPONSE:**  Deny the first sentence, on the ground that in her initial interview, T.S.

reported to Gottlieb that "every time, after every sex act, [the rapist] would zipper his pants up

and then unzip them," a clear reference to the assailant's <u>modus</u> <u>operandi</u> of not pulling his pants

all the way down (*see* <u>Exhibit N</u> [Gottlieb report], at page 2).  Admit the second sentence.

74.   Two years before this case—in 1981—Scott Fappiano was misidentified in another rape case in the 71st precinct for which he was arrested and tried.  During the assault, the victim had a clear view of the perpetrator's legs.  After Mr. Fappiano displayed his tattoos at trial, she that Mr. Fappiano could not have been the rapist.  He was acquitted.  *See* Ex. 49 at 219:11-220:4; Ex. 5 at 50:7-51:11.  Gottlieb's partner, Alice Santimays, was the arresting officer and testified in that case.  *See* 07/06/81 arrest report, attached as Exhibit 60; Ex. 16 at 20:2-22:18.  Although he was not present in court when the victim testified, ADA Schwartz recalled learning the details of the exoneration from participants at the time of that trial, and indicated that it was widely discussed.  Ex. 5 at 50:7-51:11.

**RESPONSE:**  Admit that (i) Fappiano was identified as the assailant in a July, 1981,

rape, and that he was not convicted of that crime, and (ii) Fappiano testified at deposition to the

facts described.  Defendants deny that Santimays testified at any trial involving criminal charges

against Fappiano on the grounds that the cited evidence – an arrest report (PX-60) and unrelated

deposition testimony by Gottlieb (PX-16, at 20-22), does not support this inference.  Defendants

deny that former ADA Schwartz ever "indicated that [Fappiano's prior rape case] was widely

discussed," on the ground that the cited deposition testimony does not support – even remotely –

that inference.  (*See* PX-5, at 50:7-51:11 7 (Q:  Are you familiar with the trial he was prosecuted

in which he showed his tattoos?  A:  Yes.  Q:  Do you believe he committed that crime? A:  Yes.

Q:  Describe for me what you understand to have happened in connection with him showing his

tattoos in the courtroom? ….  A:  From what I can remember, I think it was a summer and she

had -- the only thing I remember is that there was an issue as to she didn't see anything on his

legs.  He came into the courtroom and showed his tattoos.  I think she screamed or something

like that.  Again, I wasn't there.  That's what I remember the ADA kind of describing the scene.

Q:  Do you remember in substance you were told that she indicated "the person that raped me

didn't have tattoos?"  A:  I don't recall.  I don't recall that.  I'm not saying it didn't happen.  I don't

recall it.  Q:  You understand he was acquitted in that case after he showed the tattoos?  A:

Yes.))

75. Santimays was off-duty on the day of the T.S. rapes, and Gottlieb testified that she may not have returned until two or three days later. *See* Ex. 16 at 22:8-12 ("But after that day she partnered with you on this case? A: I don't know if it was that day, the day after or the day after that because it was a two-day swing.  I don't remember.").  Santimays' first documented involvement in this case was on December 3, after Mr. Fappiano had become a suspect. *See* Ex. 32.  On that date, she and Gottlieb interviewed witnesses together at the S.'s apartment complex; both the superintendent and his wife reported that they had not seen the perpetrator and could not describe him.  *Id*.  On December 6, she accompanied Gottlieb to Mr. Fappiano's house to ask him to come in for a lineup.  *See* Ex. 4.

   **RESPONSE:**  Admit.

76. Despite the fact that Santimays, her partner, was involved in the prior case, and even though Schwartz indicated that Mr. Fappiano's in-court tattoo-based exoneration was widely discussed, Gottlieb—remarkably—testified at her deposition in 2009 that she had never before learned about Mr. Fappiano's tattoos.  *See* Ex. 16 at 282:3-285:6.

   **RESPONSE:**  Admit that Gottlieb never learned about Fappiano's tattoos, and deny any

inference that Gottlieb's testimony was not truthful on the grounds that plaintiff has not adduced

any evidence that would support such an inference.

77. Fusco testified that he was concerned that Gottlieb was involved in creating a fabricated story to account for the tattoos, but that he lacked direct proof and, based on his experience, believed that it would be very dangerous to accuse police officers of

intentional police misconduct without direct proof.  *See* Ex. 20 at 97:2-98:2.  The first
trial judge, however, criticized Gottlieb from the bench: "She does not want to be
professional.  She volunteers information.  She answers questions that she tries to
explain.  Come on."  *See* Ex. 6 at 452:4-16.

**RESPONSE:**  Admit that Fusco never had, and still does not have, any "direct proof"

that Gottlieb fabricated evidence.  Refer the court to the transcript for a full record of Judge

Lagana's remarks, and deny the materiality or admissibility of those remarks.

## RELATIONSHIPS BETWEEN THE VICTIMS AND POLICE DEFENDANTS

78.    At the time of the rapes, F.S. was a police officer with the 5th precinct.  *See* Ex. 2 at
       37:9-38:6.

**RESPONSE:**  Admit.

79.    This investigation into the home-invasion rape of a police officer's wife in front of her
       husband generated substantial police attention and interest throughout the police
       investigation and at trial.  *See* Ex. 37 at 34 ("There were everybody from chiefs to the
       police commissioner's office interested all the way down the line."); Ex. 16 at 167:20-
       168:23; Gerald Donohue deposition excerpts, attached as Exhibit 61 at 41:14-25; Ex. 15
       at 97:1-98:21.

**RESPONSE:**  Admit.

80.    Dunbar talked to F.S. and T.S. throughout the police investigation.  *See* Ex. 15 at 157:9-
       18; 161:6-18; Ex. 25 at 116:6-10.  Based on his erroneous belief that Mr. Fappiano had
       three prior convictions, Dunbar believed that Mr. Fappiano had committed this crime as
       well, and he discussed that belief—and its basis—with F.S. and T.S. *See* Ex. 15 at 156:2-
       25.

**RESPONSE:**  Deny, except admit that Dunbar's belief that Fappiano had three prior rape

convictions is erroneous.  The cited evidence – Dunbar's testimony – does not otherwise support

the foregoing paragraph.  First, the questions (most of them leading) concern conversations

between Dunbar and F.S. only, not T.S., and the evidence therefore does not support any

inference that Dunbar spoke to T.S. about the investigation.  Second, Dunbar did not testify that

he spoke to F.S. "throughout the police investigation," but rather, he testified that he shared

information with him "reluctantly at times" (Exhibit KKK, copy attached, at 158:18).  Third, he

- 38 -

testified (over objection) that the "probability" is that he did not tell F.S. about Fappiano's

criminal history regarding prior rape allegations or convictions, although in the same answer

acknowledged a "possibility" that he may have done so.  (*Id*. at 157-58 (Q:  One of the things

you told him was that Scott Fappiano had three prior convictions, correct?  A:  I didn't say that

.... Q:  One of the things you might have told him, correct? …. A:  It could have been.  Let me

restate this, okay, there's a possibility.  However, the probability is that I didn't.))

81.     Gottlieb testified that she was in close contact with her victims, and did whatever she
        needed to do to make them comfortable and productive witnesses.  *See* Ex. 16 at 43:19-
        45:21.

        **RESPONSE:**  Admit.

82.     Gottlieb knew Dunbar from the Nightwatch Squad and they worked together frequently.
        *See* Ex. 16 at 92:20-93:11.

        **RESPONSE:**  Admit that Gottlieb knew Dunbar from the Nightwatch Squad but deny

the remainder.  Gottlieb did not testify that she worked with Dunbar "frequently."  (*See* PX-16,

at 92-93)

83.     Gottlieb knew Donohue from his work with the Crime Scene Unit prior to this case.  *See*
        Ex. 58 at 415:18-22.  Gottlieb and Donohue discussed the crime scene in this case right
        before Donohue testified at the first trial.  *See* Ex. 74 at 302:13-24.

        **RESPONSE:**  Deny that Gottlieb's trial testimony (PX-58) establishes that she knew

Donohue "prior to this case"; her testimony only establishes that she knew him as a crime scene

detective as of the date she testified at the first trial.  Admit that Donohue's trial testimony (PX-

74) could support the inference that he and Gottlieb discussed "the crime scene in this case"

before Donohue testified, but clarify that Donohue confirmed in response to a leading question

from Fappiano's defense counsel, Anthony Fusco, that he, Gottlieb and ADA Nathan discussed

"this case" in the halls at the courthouse before Donohue testified, but the testimony was not

more specific than that.

## CONTAMINATION FACTS

### Fabrications by Gottlieb

84.    The Crime Scene Unit conducted an initial crime scene run at 3:25 a.m. on the morning of December 1. *See* Chester Stoyeck Trial 1 testimony excerpts, attached as Exhibit 62 at 328:20. Detectives Stoyeck and Moran photographed the scene and dusted for fingerprints. *See* Stoyeck Report, attached as Exhibit 65. The only physical evidence collected during this first crime scene run was the telephone cord the rapist had used to tie up F.S. *Id.* Later that afternoon, Gottlieb requested a second crime scene run because she learned the perpetrator had touched some things in the apartment. *See* Ex. 18 at ¶10. Multiple runs by the Crime Scene Unit are a common practice, especially in sex crimes cases where officers might get relevant information from a severely traumatized victim over the course of time. *See* Ex. 62 at 358:18-360:4; Ex. 61 at 88:17-23; 113:23-114:17.

    **RESPONSE:** Admit, except deny the last sentence. Neither Stoyeck nor Donohue testified that multiple crime scene runs are "a common practice," and Donohue testified specifically that in rape cases multiple runs were "unusual." In the cited excerpts, both witnesses merely confirmed that more than one run is "possible," or that crime scene detectives can get "recalls" depending on the circumstances. (*See* PX-61 [Donohue Dep.] at 114:12-17 (Q: So in a rape case, even more so than other kinds of cases, it might be that there needed to be two or three or four crime scene runs depending on new information that came up? A: It is possible.); PX-62 [Stoyeck trial testimony] at 359:19-20 (Q: Recalls are not unusual, are they? A: We get recalls, yes.)) With regard to rape cases in particular, however, Donohue testified that in his experience, multiple crime scene runs were unusual. (Exhibit LLL [Donohue Dep.], at 116:6-15, copy attached (Q: Would it be fair to say that in both of those kinds of cases [i.e., rapes and homicides], it was routine to have multiple crime scene unit runs? A: No, I have to disagree with you. Q: You do disagree with that. It was an unusual occurrence if that happened? …. A: For rape cases, to have multiple runs was unusual. Homicide cases, multiple runs was not unusual.))

85.    Gottlieb gathered various items of physical evidence from the crime scene on the afternoon of December 1. Those items included the jogging pants worn by T.S.

immediately after the rapes, a bra the perpetrator sucked on, a brown towel, a white towel, and the S.'s bed sheet. *See* Ex. 58 at 399:17-401:9. She subsequently vouchered all of the evidence she had collected. *See* Helene Gottlieb Grand Jury testimony excerpts, attached as Exhibit 63 at 21:13-20.

**RESPONSE:** Admit.

86.     None of the physical evidence collected from the crime scene— including the evidence vouchered by Gottlieb, the cigarettes collected during the second crime scene run, and the twelve usable fingerprints lifted by the Crime Scene Unit—connected Scott Fappiano to the crime in any way. All of the results obtained from the scientific evidence that the City's own laboratory tested for blood group substances -namely the white towel and the cigarettes—excluded Scott Fappiano, who is blood type O, as a donor and pointed to a perpetrator with type A blood instead. *See* Dr. Robert Shaler Trial 1 testimony excerpts, attached as Exhibit 64 at 523:2-8; 527:8-11.

**RESPONSE:** Admit that the physical evidence described above did not connect

Fappiano to the crime scene. Deny that "all of the results obtained from the scientific evidence"

excluded Fappiano "and pointed to a perpetrator with type A blood instead." The cited evidence

does not support this inference. Dr. Shaler only testified that (i) blood group tests on the white

towel showed semen deposited by a Type A secretor (PX-64 at 523), and (ii) blood group tests

on the cigarette butts showed the saliva of a Type A secretor (PX-64, at 527). He did not testify

that these test results suggested that the assailant was a Type A secretor. Moreover, the record as

a whole conclusively demonstrates that the rapist did not use the white towel, nor did he smoke

any of the five cigarette butts collected from the crime scene (DE 86 [Defendants' Memorandum

of Law], at 7-10; DE 87 [Defendants' Rule 56.1 Statement], ¶¶ 122-32 (cigarette butts), 153-61

(white towel); DE 93 [Defendants' Reply Memorandum of Law], at 17-21 (cigarette butts), 22-

23 (white towel)). Finally, the DNA tests on the extract from the jogging pants do not reveal the

blood type of the assailant, and no other scientific tests have ever established that body fluids

from the assailant are those of a Type A secretor.

87.     It was never alleged that the perpetrator wore gloves. The Crime Scene Unit collected twelve usable prints from the scene (*see* Forensic Report, attached as Exhibit 65); William Plifka Trial 2 testimony excerpts, attached as Exhibit 66, at 827:9-20. Two of

those prints were identified as T.S.'s.  *See* Ex. 66 at 824:7-22.  The NYPD's latent print unit then compared the remaining ten usable prints to thirty-one other people the investigators thought might have left prints at the scene, including Scott Fappiano.  *See* Ex. 66 at 822:17-823:25.  None of the ten remaining prints found in the apartment matched Scott Fappiano.  *See* Ex. 66 at 825:25-826:3.  Nor did they match any of the other thirty individuals they were compared to, including the superintendent of the apartment, F.S., T.S., various family members, and police officers.  *See* Ex. 66 at 825:23-827:6.  *See* Latent Print Unit Results of Evaluation 03/06/84, attached as Exhibit 67.

**RESPONSE:**  Admit.

### Gottlieb's Fabrications Regarding the Cigarettes

88.     Gottlieb learned on the first day of the investigation that the perpetrator had smoked a cigarette in the S.'s apartment.  *See* Gerald Donohue Trial 2 testimony excerpts, attached as Exhibit 68 at 812:15-24.

**RESPONSE:**  Admit that Gottlieb learned this information at some point during the day on December 1, 1983, but expressly deny that T.S. told her the perpetrator smoked a cigarette during her initial interview which began at approximately 8:10 a.m., on December 1, 1983 (*see* Exhibit N [Gottlieb Report]).

89.     At some point following her interview with T.S., Gottlieb ordered a second crime scene run, because she had learned from T.S. that the perpetrator had touched certain places and items in the apartment.  *See* Ex. 18 at ¶10.  Gottlieb arrived at the scene with T.S. and F.S. while the second crime scene run was taking place for the purpose of gathering evidence.  *See* Ex. 2 at 77:27-78:19; *See* Ex. 61 at 180:13-18; Ex. 58 at 425.  During the second crime scene run, a sergeant named Shields directed Donohue, an experienced detective with the Crime Scene Unit, to collect and package cigarettes taken from the ashtray on the divider next to the S's bed.[6]  *See* Ex. 61 at 197:16-199:9.  Donohue, whom Gottlieb knew, reported to Gottlieb that he had recovered cigarette butts allegedly smoked by the perpetrator.  *See* Ex. 31 at p.4, ("The assigned was advised by Det. Donohue, C.S.U., that cigarette butts allegedly smoked by the perpetrator were recovered and given to Detective Sciallo, 68 P.D.U. for vouchering.").

---

[6]     At trial, Donohue testified that he was directed to collect the cigarettes by Sciallo, and that he had reported to Sciallo that the cigarettes lacked value. *See* Ex. 74 at 270:8-17. Both Shields and Sciallo testified independently at their respective depositions in 2009 and 2010 that it was Shields who directed Donohue to gather the cigarettes, and that Sciallo was not present when the cigarettes were collected. *See* Ex. 26 at 46:9-12; Ex. 72 at 28:20-30:21.

> **RESPONSE**:  Admit, except deny that Shields directed Donohue to collect cigarettes from the apartment (*see* Response to ¶ 110, below), or that Gottlieb knew Donohue before this case (*see* Response to ¶ 83, above).

90.    During preparation for trial, Gottlieb reported to ADA Nathan for the first time that the testing on the cigarettes lacked value because the crime scene was contaminated.[7]  *See* Ex. 19 at 170:5-25.  At trial, Gottlieb testified that she knew the crime scene was contaminated as soon as she arrived on the afternoon of the 1st.  *See* Ex. 58 at 424:3-425:14.

> **RESPONSE**:  Deny the first sentence and admit the remainder.  Defendants deny that, during preparation for trial, Gottlieb stated "for the first time" that the testing on the cigarettes lacked value because the crime scene was contaminated.  The evidence cited only establishes that Gottlieb testified at trial consistently with what she told ADA Nathan (viz., that the crime scene was contaminated) (*see* PX-19, at 170).

91.    Prior to that time, however, Gottlieb created no written documentation of contamination at the crime scene.  *See* Ex. 58 at 426:8-11; Ex. 19 at 174:19-25.  Nor did Gottlieb ever communicate to the police laboratory that the evidence they were testing came from a contaminated crime scene.  *See* Ex. 58 at 426:12-16.

> **RESPONSE**:  Admit.

92.    Approximately five months before trial, in June 1984, OCME conducted ABO blood group testing on the cigarettes.  *See* Ex. 64 at 527:2-4.  At that time, OCME also tested a reference sample from Scott Fappiano to determine his blood type.  *See* Ex. 64 at 519:11-19.  OCME determined that Scott Fappiano was blood type O.  *Id.*  OCME detected saliva and blood group substance A on all five of the cigarettes.  *See* Ex. 64 at 527:8-11.

> **RESPONSE**:  Admit.

93.    Gottlieb testified at her deposition that she has a good recollection of the events of this case: "There are certain cases that will stay in my mind until the day I die.  This is one."  *See* Ex. 16 at 139:3-11.  At her deposition she did not recall being concerned about the crime scene being contaminated, including when she gathered the physical evidence, and stated that if she had had concerns about contamination, it would have been important for her to note those concerns in writing.  *See* Ex. 16 at 439:15-440:17.

---

[7]    Both ADA's met with both Gottlieb and Donohue to discuss the substance of their testimony prior to calling them at trial. *See* Ex. 19 at 35:8-11; 29:21-31:14; Ex. 5 at 59:13-18; 123:9-13; Ex. 74 at 302:13-24.

**RESPONSE:**  Admit the substance of Gottlieb's testimony as described.  However, plaintiff isolates one portion of Gottlieb's testimony without reference to other, highly relevant portions.  Gottlieb was asked if she recalled having concerns about the crime scene being contaminated on the day she went to the victims' residence, December 1, 1983, and answered, "I don't remember, I don't remember, I really don't remember."  She then confirmed that if she had concerns about contamination it would have been important to document those concerns.  (PX-16, at 439-40)  These questions were the last ones at the end of a full-day deposition.  (*See id.*)

Previously, however, Gottlieb testified to the <u>facts</u> that when she arrived at the residence, people were inside "walking around" and no officer was stationed outside the front door. (<u>Exhibit RR</u>, at 413-16 & 413:13-14 ("it was not a closed crime scene, everybody was there"))  She was a young officer, not yet promoted to detective, and she did not understand what "contamination of a crime scene" meant, at the time.  (*Id.* at 415-16 ("I didn't know contaminated.  They were walking around . . . . I'm telling you as an experienced detective, I'm using verbiage 30 years later."))  At trial, Gottlieb used the word "contaminated" to describe the crime scene (<u>Exhibit Q</u>, at 399:16), but explained that by this term she specifically meant that no officer was stationed outside and "everybody was walking in and out" (*id.* at 398-99).

Donohue corroborated Gottlieb's account of the relevant facts:  He recalled that the scene was not safeguarded when he arrived (<u>Exhibit X</u>, at 796), and that family members including F.S.'s brother were inside the apartment (*id.* at 803-4), some of whom were smoking (*id.* at 798:4-6).  Plaintiff offers up no evidence – no testimony, nothing – showing that an officer was stationed outside the victims' residence to safeguard it, or that Donohue and Gottlieb are wrong, or their recollections are faulty, or they are simply lying, about family members or others being inside the apartment the day after the crime.  Plaintiff concedes, though, that elimination

fingerprint checks were run on no fewer than thirty-one (31) persons who "investigators thought might have left prints at the scene," including "various family members and police officers" (*see* ¶ 87, above, citing PX-67), strong corroborating evidence that Gottlieb's and Donohue's recollection that officers and family members were there is accurate.  Plaintiff points to nothing suggesting that the thirty-one (31) persons against whom print checks were run were <u>not</u> at the scene in the hours after the crime (except for Fappiano).

### <u>Gottlieb's Fabrications Regarding the White Towel</u>

94.     One of the items Gottlieb collected on the afternoon of December 1 was a semen-stained white towel collected from the floor of the S.'s apartment.  *See* Ex. 58 at 400:18-21; Edward Masin deposition excerpts, attached as Exhibit 70 at 238:3-7.  Gottlieb subsequently submitted that towel for testing (*see* Ex. 52 at 438) to determine whether or not there was semen on it that could be attributed to Scott Fappiano based on blood typing.  *See* Ex. 16 at 431:10-433:23.

    **<u>RESPONSE</u>:**  Admit the first sentence and admit the second sentence to the extent that Gottlieb submitted the white towel to the NYPD lab for testing for the presence of semen only, but deny that Gottlieb requested tests "to determine whether or not there was semen on it that could be attributed to Scott Fappiano based on blood typing."  Defendants admit that Gottlieb confirmed at deposition, in response to a leading question, that she thought she did so, but note that plaintiff's counsel did not show her any contemporaneous documentation or other materials to refresh her recollection as to what specific tests she requested (*see* PX-16, at 431-33).

    Moreover, the record shows that the NYPD crime lab only tested the white towel and other items (the brown towel, brassiere, jogging pants and bed sheets) for the presence of sperm, but did not perform any blood group tests on those items.  (<u>Exhibit E</u> [Masin trial testimony], at 236-38)  The record also shows, conclusively, that Barbara Newman, Bureau Chief of the Kings County District Attorney Sex Crimes Unit – <u>not</u> Gottlieb – requested in writing that the OCME perform blood group tests on the physical evidence in the case.  (*See* <u>Exhibit LL</u> [OCME File ##

272/84, 292/84] – Letter from ADA Newman to Dr. Elliot Gross, dated March 27, 1983)  ADA

Newman requested that OCME undertake these tests because, among other reasons, Fappiano

had been arrested three times before, all for assaults or alleged rapes of young women.  (*See id.*)

ADA Newman informed OCME that "given the facts of this case and the history of the

defendant, it is … imperative that Dr. Shaler perform the tests in question."  (*Id.*)  Gottlieb did

not request any blood group tests on the white towel or other evidence.

95.  Eighty percent of the population are "secretors," whose ABO blood group substances are contained in non-blood fluids such as semen, saliva, or vaginal fluids.  *See* Edward Masin Trial 1 testimony excerpts, attached as Exhibit 70 at 255:11-20.  Individuals who are "non-secretors" do not secrete their ABO antigens in their bodily fluids.  *Id.*  OCME determined that T.S. was an A non-secretor, which means no blood group substances would be detected in her bodily fluids, F.S. was an A secretor, which means A and H antigens would be detected in his bodily fluids, and Scott Fappiano was an O secretor, which means only H antigen would be detected in his bodily fluids.  *See* Ex. 64 at 51 7:14-520:2.

**RESPONSE:**  Admit.

96.  In June 1984, OCME conducted ABO blood typing on the white towel.  *See* Ex. 64 at 523:2-8.  The NYPD lab already had already <u>visualized</u> human sperm present on the towel.  *See* Ex. 70 at 238:3-7.  Before conducting any other tests, Dr. Shaler, too, identified the presence of sperm on the white towel.  *See* Ex. 64 at 523:2-8.  Dr. Shaler then performed ABO testing on the seminal fluid on the white towel and identified blood group substances A and H.  *Id.*  Dr.  Shaler also tested the brown towel for seminal fluid, and determined that there was no seminal fluid on the brown towel.  *See* Ex. 64 at 524:3-15.

**RESPONSE:**  Admit.

97.  Gottlieb admitted at trial that she would have been familiar with everything happening in the case.  *See* Ex. 58 at 507:16-19.  At the second trial, Gottlieb testified that she had the results of the testing on the towels in her case folder, and acknowledged that she had seen the results previously.  *See* Ex. 52 at 441:7-16.  Pursuant to NYPD policy and practice in 1983, results of laboratory analysis—including results of testing done by the OCME—would be sent to the detective in charge of the investigation and would be included in the detective's case folder.  *See* Ex. 29 at 63:19-64:10.  At her 2009 deposition, she testified that she would have been very interested in the serology results, and she "absolutely" would have received them and maintained a copy in her case folder.  Ex. 16 at 431:10-433:23.  At trial, however, Gottlieb testified that she "may have been advised" the white towel was sent for testing, that she didn't "know anything about fluids" and that she

never got the serology report that indicated blood type A substances were detected on the towel.  *See* Ex. 58 at 449:2-17; 508:20-23.

**RESPONSE:**  Admit the first sentence.  Admit the second sentence but <u>only</u> to the extent that Gottlieb had in her case folder the NYPD crime lab tests on the white towel which merely showed the presence of sperm, <u>not</u> the later OCME tests that showed semen from a Type A secretor.  (*See* PX-52, at 441:17-19 (Q:  And where were those tests performed?  A:  Police Department Laboratory, Police Academy.))  Admit the third sentence.  Deny the fourth sentence on the grounds that the testimony was elicited through leading, hypothetical questions that are not admissible at trial or on this motion.  Admit the last sentence, and further state that Gottlieb's testimony at the first and second trials was consistent at all times, viz., that she received copies of the NYPD crime lab reports but not the OCME reports (which, as shown above, were requested by the DA's office, not the police detectives).  (*Compare* PX-52, at 441:17-19, *with* PX-58, at 449:13-22 (Q:  Did you know what the blood type was after it was tested on the white towel?  A:  I don't recall if I know [sic] what the blood type was.  I don't get that serology report.  Q:  You don't get that?  But did you ever see one that maybe the District Attorney has?  A:  No, I have never seen any of her reports), *and* 508:20-23 (Q:  … Do you know in this case that certain body fluids of Mr. Fappiano were taken for comparison?  A:  I don't know anything about fluids))

98.     At trial, for the first time, T.S. and F.S. testified that F.S. had used the white towel to wipe up his own semen during sexual intercourse the Tuesday morning before the rapes, and that it was not relevant to this case.  *See* Ex. 2 at 55:11-56:9; Ex. 1 at 603-04.  During her testimony describing the perpetrator's actions during the rapes, however, T.S. made a wiping motion with her hands.  *See* Ex. 20 at 89:9-90:6.  Fusco argued to the jury in summation that T.S.'s indication that the perpetrator had wiped himself off during the rape demonstrated that the white towel was, in fact, used during the rapes: "do you remember her, when she testified like this with her hand moving, that the person was wiping something, the perpetrator? Do you recall that testimony, and use your common sense that something in that case had to be used, some drippings had to appear, just like they did in the jogging pants and sure enough it is going to show up on a white towel but we'll get to that explanation over where that came." *See* Excerpts of Anthony Fusco Trial 1 Closing Statement, attached as Exhibit 71 at 754:14-22.

**RESPONSE:**  Admit the first sentence, except deny that T.S. and F.S. testified at trial "for the first time" about their using the white towel after sexual intercourse.  T.S. told Gottlieb the day of the crime that the assailant never used the white towel, at any time, during commission of the crimes.  (PX-1, at 604:8-10 (T.S. testified, "I gave her the whole story, there was no white towel, there were no towels involved except for the brown one"); 604:15-20 (Q: … Did you ever see the defendant use any towel?  A:  No.  Q:  Did you ever see that white towel during the course of the whole night?  A:  No.))  Gottlieb's report of her interview with T.S. the day of the crime, likewise, makes no mention whatsoever of the assailant's using any towel to wipe himself, and only mentions that T.S. wrapped herself in a towel when she ran out of the apartment.  (*See* Exhibit N [Gottlieb Report])

Admit that Fusco testified at deposition and made the closing arguments as set forth above, but deny the materiality or admissibility of this evidence.  No reasonable juror could conclude that Fusco's argument to the jury about hand gestures T.S. supposedly made while testifying constitutes "evidence" that the rapist actually used the white towel to wipe himself.  Fusco made no mention of any specific evidence connecting the white towel to the purported "wiping" motion T.S. supposedly made, because there is none.  No juror could possibly conclude that T.S. and F.S. lied when they described F.S.'s using the towel after the couple had sex – there is no evidence suggesting that they did so.  And as plaintiff acknowledges, the blood tests on the towel are consistent with F.S. having deposited semen on it (*compare* DE 87 [Defendants' Rule 56.1 Stmt.], ¶ 155, *with* DE 90 [Pl. Resp.], ¶ 155), just as he and his wife testified.

99.   Gottlieb testified before T.S. testified.  Although Gottlieb testified that she vouchered other items of evidence because T.S. directed her to them and indicated that the perpetrator had used them during the rapes—including the bra (*see* Ex. 58 at 400:9), the jogging pants (*see* Ex. 58 at 401:15-17), the brown towel (*see* Ex. 58 at 403:20-23; 443:9), and the bottle cap (*see* Ex. 58 408:12-18)—she claimed to have gathered and vouchered the white towel without discussing it with anyone.  *See* Ex. 58 at 443:6-9.

Gottlieb testified for the first time at trial and reported in substance to the prosecution prior to trial that "I got on my hands and knees and see that maybe the perpetrator in this crime dropped something or something was left on the floor and I crawled under the bed to see if anything was there and there was a towel so I took it." Ex. 58 at 400:18-21.

**RESPONSE:**   Admit that, at the first trial which resulted in a hung jury (mistrial), Gottlieb testified before T.S. testified.  Deny the remainder as incomplete and misleading.  T.S. specifically reported to Gottlieb on December 1, 1983, that (i) the assailant "suck[ed] on my left breast over the bra" that was later collected and vouchered by Gottlieb, (ii) she was wearing jogging pants when he broke into their home, which she later put back on after he left, (iii) she "took a towel off the back of the bathroom door" which she later confirmed was the brown towel, and "bolted out of the apartment screaming he raped me, he raped me," and (iv) the assailant "opened [a bottle of] beer and the top fell on me, he threw it on the floor."  (Exhibit N [Gottlieb report])  Gottlieb vouchered all four of those items – the bra, jogging pants, brown towel and bottle cap – as evidence.  Apart from the foregoing, Gottlieb also collected bed sheets and the white towel which was under the bed (*see* PX-58).

No reasonable juror could agree with plaintiff's version of events:  Plaintiff would have this court, and eventually the jury, believe that (i) T.S. described the rapist wiping himself with the white towel (even though Gottlieb's report makes no mention of any such fact), (ii) Gottlieb vouchered the white towel for this reason, (iii) Gottlieb specifically requested blood group tests on the white towel (even though no documentation whatsoever exists to suggest this), and (iv) when Gottlieb learned that the results would tend to exculpate Fappiano, she, T.S. and F.S. fabricated an explanation for those test results based on the couple's sexual and birth control practices – which just happened to be consistent with the blood group test results on the towel.

To describe this argument is to illustrate its absurdity.  Any juror would conclude that a detective investigating a rape would very likely collect a towel under the victim's bed (the same

bed where that rape occurred).  The fact that the detective vouchered the towel proves nothing

except that she was extra careful to collect any evidence that might ultimately prove relevant to

the case.  No evidence whatsoever exists, or has ever been marshaled by plaintiff despite more

than 20 depositions and hundreds of pages of trial transcripts, suggesting that F.S. and T.S. lied

when they described using the white towel after sexual relations.

100.    T.S. subsequently testified that Gottlieb came to her with a shopping bag full of evidence
        and told T.S. she had collected a brown towel and a white towel.  *See* Ex. 1 at 641:14-
        645:4.  T.S. initially testified that she told Gottlieb "I don't know where any white towel
        came from." *Id.*  T.S then testified that she emphatically instructed Gottlieb not to "take
        stuff under my bed." *Id.*  Upon questioning by the defense, T.S. stated she had guessed
        the towel was under the bed "because it had to be somewhere where I couldn't see it." *Id.*
        Fusco subsequently accused T.S. of conferring with Gottlieb about her testimony.  *Id.*
        Gottlieb confirmed T.S.'s account to the prosecution.  *See* Ex. 58 at 400:18-21.

        **RESPONSE:**  Admit that the foregoing paragraph summarizes the testimony of T.S. and

accurately describes the offensive accusation made by Fusco.  Defendants further admit that

Gottlieb testified as follows:  "I got on my hands and knees and see that maybe the perpetrator in

this crime dropped something or something was left on the floor and I crawled under the bed to

see if anything was there and there was a towel so I took it."  (PX-58, at 400:18-21)

101.    NYPD policy and practice in place in 1983 required officers to document any
        information from the victim of a sex crime that biological evidence collected in
        connection with a sexual assault case could have come from another source, and to report
        that information to the laboratory conducting testimony.  *See* Ex. 29 at 53:23-54:22.
        Melendez testified that she would never expect a detective to voucher evidence that was
        irrelevant to the case.  *See* Ex. 30 at 39:4-17.

        **RESPONSE:**  Admit that the City's Rule 30(b)(6) witness so testified (*see* PX-29) and

that ADA Melendez so testified, but deny the relevance or materiality of the foregoing

testimony.  The Rule 30(b)(6) testimony was elicited through leading, hypothetical questions and

would not be admissible at trial.  ADA Melendez' "expectations" as to what detectives would do

when investigating a case, or when they would voucher evidence, are speculative and

inadmissible as well.

102.   Gottlieb never documented that the white towel was collected by mistake.  *See* Ex. 4; Ex. 31-36.

**RESPONSE:**  Admit.

103.   Pursuant to NYPD practice, Gottlieb initialed all of the evidence she vouchered, including the white towel, but failed to initial the brown towel.  *See* Ex. 58 at 474:18-475:8.

**RESPONSE:**  Admit but deny the materiality or relevance of this fact.  Gottlieb

explained that she "couldn't get [her initials] on the brown towel," but marked the towel with the

voucher number (*see* PX-58, at 474-75).  T.S. identified the brown towel that Gottlieb vouchered

as the one that she wrapped around herself just before she ran out of the apartment, and the towel

was introduced at the second trial as People's Exhibit 7, without objection.  (Exhibit A, at 154-

58, 167-70)

### Gottlieb's Reports to the Prosecution Prior to the Grand Jury

104.   ADA Melendez met with Gottlieb before the grand jury and reviewed all of the physical evidence that had been gathered during the investigation.  *See* Ex. 30 at 37:5-13.

**RESPONSE:**  Deny, on the grounds that the testimony was elicited through improper,

leading questions, and would not be admissible at trial.

105.   Melendez questioned Gottlieb about those items of physical evidence that she thought might bear biological evidence from the perpetrator.  *See* Ex. 30 at 37:16-25.

**RESPONSE:**  Deny, on the grounds that the testimony was elicited through improper,

leading questions, and would not be admissible at trial.

106.   Gottlieb did not report any problems with the gathering of physical evidence at the crime scene, including the cigarettes, to Melendez during their conversations prior to the grand jury.  *See* Ex. 16 at 38:10-19; 43:17-23.

**RESPONSE:**  Deny, on the grounds that the testimony was elicited through improper,

leading questions, and would not be admissible at trial.

107.    ADA Melendez testified that if Gottlieb had reported any problems with the cigarettes, she would have made sure she brought those problems out before the grand jury.  *See* Ex. 30 at 44:7-21.

    **RESPONSE:**  Deny, on the grounds that the testimony was elicited through improper,

leading, hypothetical questions, and would not be admissible at trial.

108.    Gottlieb did not report to ADA Melendez that the white towel was irrelevant to the case. Melendez testified that if Gottlieb had reported to her that any of the evidence collected was not relevant to the investigation, she would have made sure she brought that out before the grand jury.  *Id.*

    **RESPONSE:**  Deny, on the grounds that the testimony was elicited through improper,

leading, hypothetical questions, and would not be admissible at trial.

109.    ADA Melendez presented all of the physical evidence vouchered, including the cigarettes and the white towel, to the grand jury through Gottlieb's testimony.  *See* Ex. 63.  Her purpose in doing so was to lay a foundation such that if testing was done on those items later on, it could be used in further proceedings.  *See* Ex. 30 at 39:18-40:2.

    **RESPONSE:**  Admit the first sentence and deny the remainder, on the grounds that the

testimony was elicited through improper, leading questions, and would not be admissible at trial.

In addition, any "foundation" purportedly "laid" before a grand jury would not be sufficient to

support admission of physical evidence, or test results on that physical evidence, at a later trial

before a petit jury.  Rather, under basic rules of evidence, an independent basis for admission

through appropriate testimony would have to be provided when the evidence was sought to be

introduced.

**Fabrications by Donohue**

110.    Donohue also reported to the prosecution immediately before trial and testified at trial that the cigarettes were valueless because of contamination.  *See* Ex. 74 at 302:13-24; Ex. 19 at 36:19-25; Ex. 5 at 148:21-149:16.  Donohue testified at his deposition that he got into an argument with Sergeant Shields[8] over collecting the cigarettes, because Donohue

---

    [8]    Donohue testified at trial that Sciallo directed him to collect the cigarettes, and it was Sciallo with whom he argued. Both Sciallo and Shields testified that Shields directed that the cigarettes be collected. *See* Ex. 72 at 29:2-13; Ex. 26 at 43:23-46:15. Shields reported to Internal Affairs that he had directed C.S.U. to collect the cigarettes. *See* Ex. 18 at ¶14.

felt the cigarettes should not be collected due to the scene being contaminated.  *See* Ex. 61 at 197:16-199:9.  Sergeant Shields testified that he arrived at the crime scene while Donohue and Kuhn were processing the scene, and he directed Donohue to collect the cigarettes.  *See* Eugene Shields deposition excerpts, attached as Exhibit 72 at 29:5-15.  It appeared to Sergeant Shields that the cigarettes had been in the apartment for some amount of time.  *See* Ex. 72 at 30:6-8.  Shields testified at his 2010 deposition that there was no argument, and that no one from the Crime Scene Unit ever reported to him that there was any problem with contamination at the crime scene, or that the cigarettes were valueless.  *See* Ex. 18 at p.5-6; Ex. 72 at 31:9-22.

**RESPONSE:**  Admit, except deny that Shields directed anyone from the crime scene unit, as opposed to someone else (i.e., Sciallo) to collect the cigarettes, and deny that Donohue got into an argument with Shields.  Retired Sgt. Shields told IAD that the cigarettes "were taken from an ashtray, at his direction," but did not ever tell IAD that he specifically directed a crime scene detective (Donohue or anyone else) to take the cigarettes (*see* Exhibit I, at 5-6).  Plaintiff's footnote to this paragraph (*see* fn. 8, above) is plainly inaccurate to the extent it states the contrary.  Shields' deposition testimony was elicited through an improper, leading question that included the premise that Shields "directed the crime scene unit people" to collect the cigarettes, which is not what he told IAD and which is not supported by any other admissible evidence in the record.  Counsel objected to the leading question but plaintiff did not rephrase it.  For this reason, the testimony is inadmissible here and would not be admissible at any trial (*see* PX-72, at 28:20-29:13).  In addition, no evidence whatsoever supports the factual assertion that Donohue "testified at his deposition that he got into an argument with Shields."  On the contrary, Donohue testified consistently at trial in 1984-85, and at deposition in 2009, that he got into an argument with Sciallo, not Shields, and Shields testified that he recalled no arguments over the cigarettes with anyone.

111.    Detective Stoyeck, who conducted the first crime scene run on December 1, 1983, and testified for the prosecution at both trials, testified that the fact that a crime scene is contaminated would not stop an officer from collecting evidence from that crime scene, and that it was not for a CSU detective to determine that a particular item of evidence was so contaminated that he need not collect it.  *See* Chester Stoyeck deposition excerpts,

attached as Exhibit 73 at 66:5-11; 69:10-14.  Stoyeck testified that no one ever stated to him that the crime scene was contaminated.  *See* Ex. 73 at 13:23.

**RESPONSE:**  Admit (and note that Stoyeck's deposition testimony that no one told him the crime scene was contaminated appears at page 74, ll. 18-23, of the deposition transcript).

112.  Donohue could not think of a single other case at any point in his career where he was inside a crime scene and decided a piece of evidence was so compromised that he should not gather it.  *See* Ex. 61 at 216:9-15.

**RESPONSE:**  Admit.

113.  Donohue created only one report of his work on this case, and did not document contamination anywhere on that report.  *See* Gerald Donohue Trial 1 testimony excerpts, attached as Exhibit 74 at 279:24.  Nothing in Donohue's notes stated that the crime scene was contaminated.  *See* Ex. 74 at 279-286; 289.  It was Donohue's practice to write down information in his notes that might be relevant later on, including contamination.  *See* Ex. 61 at 162:6-16.

**RESPONSE:**  Admit.

114.  At his deposition Donohue testified that all CSU case folders had a pre-printed box on the front with a space to check off whether the crime scene was safeguarded or not, and that his primary method of documenting a concern about contamination was to check the "not safeguarded" box on his case folder.  Donohue testified that there was no other way to document contamination at a crime scene.  *See* Ex. 61 at 264:5-22.  Stoyeck testified at his 2010 deposition that pursuant to NYPD protocol, officers would write down any pertinent information about the crime scene in the "summary of the case" section on their official reports, not by marking the "not safeguarded" space, and that pursuant to NYPD protocol, and that officers did not use that space on the case folder to indicate an unsafeguarded crime scene.  *See* Ex. 73 at 90:16-21; 85:8-86:2; 89:20-90:4.

**RESPONSE:**  Admit the substance of Donohue's testimony as described, and deny the remainder on the grounds that Stoyeck did not testify as the foregoing paragraph describes.  According to plaintiff, Stoyeck testified that "pursuant to NYPD protocol, officers would write down <u>any</u> pertinent information about the crime scene in the 'summary of the case section' on their official reports, <u>not</u> by marking the 'not safeguarded' space [on the folder], and that pursuant to NYPD protocol, … officers did <u>not</u> use that space on the case folder to indicate an unsafeguarded crime scene."  (PX-73, at 90:16-21, 85:8-86:2, 89:20-90:4; emphasis added)

- 54 -

However, Stoyeck testified that the "summary of the case" section is "quite general . . . [and] not very detailed" (Exhibit AAA [Stoyeck Dep.] at 91:2-8); that if an officer was stationed outside the scene on an "A" (i.e., second) run, he "would have made a notation on [his] folder" (PX-73, at 85:20-22) just as Donohue described at both trials; that if no officer was stationed outside the scene on an "A" run (which was often the case), he would not fill anything out on the outside of the envelope (*id.*, at 85:23-86:2).  At no time did Stoyeck state that officers would note in the "summary of the case" section that a crime scene was "contaminated," and he confirmed that the envelope was used to indicate whether an officer was stationed outside the scene (as Donohue testified).

115.   Stoyeck testified that he would not expect an officer to be guarding the scene on a second crime scene run, and the fact that an officer wasn't stationed at the door when he arrived for a second, third, or fourth run wouldn't keep him from collecting evidence he'd been directed to gather.  *See* Ex. 73 at 63:18-64:2, Ex. 62 at 358:18-360:22.  Stoyeck also testified that there could be three or four crime scene runs as new evidence about the crime scene comes to light, and the crime scene might not be guarded by an officer during that time period.  *See* Ex. 73 at 63:18-64:2.

   **RESPONSE:**  Admit the first sentence to the extent that Stoyeck so testified at deposition, but deny that he testified to those facts at the first trial in the pages cited by plaintiff (*see* PX-62, at 358-60).  Admit the remainder but deny the materiality or admissibility of the testimony on the grounds that it constitutes inadmissible speculation.

116.   Donohue was asked at the first trial why he did not write down that the scene was contaminated anywhere.  *See* Ex. 74 at 279:11-284:11; 293:5-24.  At that time, Donohue had his case folder in front of him.  *Id.*  Donohue never told the defense attorney questioning him that he had marked the not safeguarded box on his case folder.  *Id.*

   **RESPONSE:**  Admit, except deny that Donohue "had his case folder in front of him" at the time he testified in the first trial, on the grounds that the evidence cited does not establish this fact.  He was not asked if he had his entire case folder – much less the envelope for the case

folder – with him when he was testifying.  During the testimony, he only referred to his notes

and report (*see* PX-74).

117.     At the second trial, when he was asked about contamination, Donohue volunteered for
         the first time that he had noted the scene was not safeguarded on his case folder.  *See* Ex.
         68 at 810:7-20; Ex. 61 at 244:4-12.

         **RESPONSE:**  Deny that, at the second trial, Donohue "volunteered for the first time that

he had noted the scene was not safeguarded on his case folder."  At the second trial, Donohue

produced in court the envelope with the notation he described.  (Exhibit X, at 810)  Plaintiff

appears to suggest that Donohue's testimony is not credible because he did not "volunteer" the

same facts at the first trial, but at the first trial he was only asked the specific question whether he

noted in his reports the fact that he <u>believed</u> the crime scene was contaminated (*see* Exhibit ZZ,

at page 318:9-19 (Q:  My question is if it was your *opinion* as an expert that the crime scene was

contaminated why didn't you put it down on a piece of paper in a basic report to say this scene

was contaminated?  …. A:  In my *opinion* I go there and make observations.  My report contains

what I did there, not my observations (emphasis added)), a different question from whether he

noted anywhere the <u>fact</u> that the scene was not safeguarded.  No reasonable juror could conclude

that Donohue "lied" at the second trial:  He produced the envelope in court and could have been

cross-examined about the notations (*see* Exhibit X, at 810).

118.     Donohue admitted at his deposition that he would have reviewed his testimony from the
         first trial between trials.  *See* Ex. 61 at 244:4-12.

         **RESPONSE:**  Deny.  In the cited excerpt, Donohue testified that he did not recall

whether he reviewed his testimony from the first trial before testifying at the second trial,

although admitted that he "would have" discussed the testimony with prosecutors.

119.     Donohue admitted at his deposition that whether or not a cigarettes had been added to the
         ashtray would not have affected the laboratory's ability to conduct blood typing on a
         cigarette the perpetrator had smoked, the only concern would be if the perpetrator's

cigarette had been removed, and that it would have been simple to establish whether or not anyone at the scene had dumped an ashtray.  *See* Ex. 61 at 325:10-326:16.

**RESPONSE:**  Admit, except deny that "it would have been simple to establish whether or not anyone at the scene had dumped an ashtray."  At deposition, Donohue acknowledged that he could have asked anyone at the scene *at that time* whether he or she had dumped the contents of the ashtray, but he never testified that it would have even been possible – let alone "simple" – to determine whether anyone had dumped the contents of the ashtray before he got to the scene.  The record establishes that as many as thirty-one (31) persons were present at the crime scene at some point on December 1, 1983.  (*See* ¶ 87, above, citing PX-67; Exhibit RR [Gottlieb Deposition], at 413-16 & 413:13-14 ("it was not a closed crime scene, everybody was there"); Exhibit Q [Gottlieb trial excerpt], at 398-99 (no officer was stationed outside the residence and "everybody was walking in and out"))  The cited evidence therefore does not support the factual assertion made, and the record as a whole conclusively rebuts it.

120.    The prosecution argued to the jury that the cigarette smoked by the perpetrator was never tested, and therefore OCME's results concerning the cigarettes were not reliable evidence of Mr. Fappiano's innocence, despite the fact that each cigarette testing positive for blood group substance A, and Mr. Fappiano is blood type O.  *See* Bonnie Nathan Trial 1 Closing Statement excerpts, attached as Exhibit 75 at 834:11-17; Ex. 41 at 1070:9-1071:7.

**RESPONSE:**  Admit.

121.    NYPD policy and practice in the 1980s required that if an officer has any concerns about contamination, he or she would need to report that fact in a DD5 in writing.  *See* Ex. 29 at 44:8-18.

**RESPONSE:**  Admit.

122.    No mention of contamination appears on Gottlieb's DD5s, Donohue's crime scene report, or any other police documents.  *See* Ex. 4; Ex. 31-36; Donohue Report, attached as Exhibit 76.

**RESPONSE:**  Admit that no mention of contamination appears on Gottlieb's DD5's or Donohue's crime scene report, but deny the remainder.  The appropriate notation indicating that

the crime scene was not safeguarded appears on Donohue's crime scene run envelope, which he

produced at the second trial upon specific questioning by defense counsel. (Exhibit X, at 810)

## SEROLOGY FACTS

123. In 1983 and before, the NYPD had a custom or policy of consuming swabs from rape kits
by performing tests for the presence of semen that prevented subsequent ABO testing on
those swabs, which could have exonerated suspects. ABO testing—also called
absorption inhibition testing—is a scientific method of detecting an individual's blood
type from their bodily fluids such a semen, saliva, vaginal fluid and sweat. *See* Dr.
Robert Shaler deposition excerpts, attached as Exhibit 77 at 5:17-25.

    **RESPONSE:** Admit.

124. Dr. Robert Shaler, who holds a doctorate in biochemistry from the Pennsylvania State
University (Penn State) and an honorary doctorate from the State University of New
York, and was a professor of biochemistry and molecular biology at Penn State and the
founding director of the Penn State forensic science program prior to his retirement in
2010, testified at both of Mr. Fappiano's trials. *See* Ex. 77 at 4:2-5:16; 50:4-10. At the
time of the T.S. rapes in 1983, Dr. Shaler was the director of the serology laboratory at
OCME, a position he held from 1978-1986. *See* Ex. 77 at 4:9-5:2. Dr. Shaler also
testified at a deposition in this civil litigation.

    **RESPONSE:** Admit.

125. Immediately after the rapes, T.S. was taken to the hospital where a rape kit was prepared.
*See* Jihad Bitar Trial 1 testimony excerpts, attached as Exhibit 78 at 835:15-22. The
doctor who examined T.S. collected fluids on three swabs: one from the vagina, one from
the cervix and one from the mouth of the victim; and created six slides from those swabs,
which were placed in envelopes inside the rape kit. *See* Ex. 78 at 849-852.

    **RESPONSE:** Admit.

126. At his deposition, Dr. Shaler explained that back in 1983, the most dispositive test for
the presence of semen from the rape kit was to simply examine the slide made from a
swab under a microscope and confirm the presence of spermatozoa. *See* Ex. 77 at 27:18-
28:5. A less dispositive test was known as the acid phosphotase (AP) test and it would be
conducted on a small portion of the swab rather than the slide. *See* Ex. 77 at 10:21-11:10.
A special reagent would be applied to a few threads from the swab. *Id*. If the threads
turn purple, that indicates that semen is present. *Id*. If the swab tests positive for semen
or if sperm are observed on the slide, then the forensic scientist can test the remaining
portion of the swab in an effort to identify the ABO blood group of the semen donor. *See*
Ex. 77 at 11:19. The reason one only tested a few threads of the swab, is that it was
known that the special reagent in AP tests washes away the seminal plasma in which
blood group substances are found, and without seminal plasma, it is not possible to detect
ABO blood group substances. *Id*. *See* Ex. 77 at 15:6-22. It was understood generally by

serologists working in forensic laboratories that ABO testing of vaginal swabs would be extremely useful in any sexual assault case because it offers the potential to either include or exclude the suspect as the source of the semen recovered from the victim shortly after the rape. *See* Ex. 77 at 11:14-19.

**RESPONSE:** Admit except deny the last sentence, on the grounds that Dr. Shaler is not in a position to testify as to what was "understood generally by serologists working in forensic laboratories," i.e., the statement lacks an evidentiary foundation and is speculative. Dr. Shaler was not disclosed as a Rule 26 expert in this case, nor could he testify in that capacity because he is a fact witness, having conducted blood group tests on evidence in this case in or about 1984 (*see* Exhibit AA [Shaler trial testimony]).

127.  It came to Dr. Shaler's attention in either late 1979 or early 1980 that the NYPD was doing acid phosphotase testing differently from the way it was done in the rest of the country. *See* Ex. 77 at 15:3-17:1; 19:9-20:4. Rather than conducting an AP test on just a few threads from the swab, the NYPD was dunking the entire swab in the special reagent, thus needlessly washing away the seminal plasma in which ABO blood groups are found and preventing any ABO blood group testing on the swabs. *Id.*

**RESPONSE:** Admit that Dr. Shaler so testified, but deny that Dr. Shaler is in any position to know what was "done in the rest of the country" with regard to AP testing. His testimony on that issue is inadmissible speculation and he is not a Rule 26 expert in this case, nor could he testify in that capacity (*see* Response to ¶ 126, above).

128.  Around that time, Dr. Shaler received swabs from the NYPD lab – sent to OCME for further testing – that were entirely purple. *See* Ex. 77 at 19:21-20:4. The fact that the vaginal, cervical, and oral swabs in the kit were purple indicated to Dr. Shaler that the NYPD laboratory was treating entire swabs with acid phosphotase reagent, rather than only testing a small portion of the swab. *See* Ex. 77 at 20:6-17. Dr. Shaler then spoke to Sergeant Eddie Huggins (*see* Ex. 77 at 20:3-25), the supervisor of NYPD serology lab at that time, *see* Ex. 69 at 121:7-12 and told him that by treating entire swabs with acid phosphotase reagent, his laboratory was preventing OCME from doing ABO testing on those swabs. *See* Ex. 77 at 21:22-22:1. Dr. Shaler informed Huggins that it was possible to test a part of a swab, rather than testing the entire thing. *See* Ex. 77 at 22:7-12. Dr. Shaler specifically recalls Huggins responding that he thought that sounded reasonable, but Dr. Shaler does not recall Huggins saying he was going to do anything different from what the NYPD laboratory was already doing. *See* Ex. 77 at 22:18-23:1.

**RESPONSE:** Admit.

129.   Defendant Edward Masin performed the laboratory work conducted by the NYPD laboratory in this case on December 7, 1983, three years after Dr. Shaler first observed the problem at NYPD of completely consuming swabs with AP tests. Masin was trained by Dr. Alexander Wiener, Dr. Shaler's predecessor at OCME, who pioneered ABO testing in the United States and subsequently trained scientists at both the NYPD laboratory and OCME, including Edward Masin, on methods of typing blood and examining evidence for sperm. *See* Ex. 69 at 8:14-9:14; 11:10; 12:14; Ex. 77 at 5:21-6:7; 18:12-19:7. Dr. Shaler had been trained by Dr. Wiener to conduct AP testing on a small portion of the swab so that the rest could be saved for ABO testing. *See* Ex. 77 at 18:2-19:7. Dr. Shaler has no reason to believe that Dr. Wiener would have trained the scientists at the NYPD laboratory differently than he trained the scientists at the OCME laboratory. *Id.*

**RESPONSE:** Admit, except deny the materiality or admissibility of the last sentence.

Whether or not Dr. Shaler has "reason to believe" that Dr. Weiner "would" have trained

scientists in the NYPD lab differently than he trained scientists at the OCME lab is speculative

and inadmissible.

130.   Masin admitted at his deposition that he knew in 1983, at the time he did his laboratory work in this case, that dunking an entire swab in acid phosphatase reagent would prevent it from being used for ABO testing. *See* Ex. 69 at 108:17-109:3; 224:17-225:3. Masin admitted at his deposition that it was scientifically possible in December of 1983 to take a portion of a swab to do an AP test, rather than using the whole swab. *See* Ex. 69 at 212:10-16. Masin also knew in 1983 that ABO testing had the potential to exculpate or exclude a defendant. *See* Ex. 69 at 228:19-229:9. Specifically, Masin understood in December 1983 that there would be cases where ABO testing on a vaginal swab would exclude somebody who was accused of a rape. *See* Ex. 69 at 231:9-16.

**RESPONSE:** Admit that Masin testified as described above, but deny the materiality or

admissibility of the testimony on the grounds that (i) it is speculative, and (ii) it would not

establish, or help to establish, any violation of Fappiano's constitutional rights, as more fully set

forth in defendants' Reply Memorandum of Law (DE 93, at 32-33 (citing *Arizona v.*

*Youngblood*, 488 U.S. 51, 59 (1988); *Colon v. Kuhlmann*, 865 F.2d 29, 30 (2d Cir. 1988)).

131.   Masin processed the contents of the physical evidence in this case, including the swabs from the rape kit, on December 7, 1983. *See* Ex. 70 at 234; 236:14-238:21. Gottlieb had informed the NYPD laboratory the previous day that an arrest had been made. *See* Ex. 34. The rape kit collected in this case contained one cervical swab, one vaginal swab, one oral swab, two cervical slides, two vaginal slides, and two oral slides. *See* Masin Report, attached as Exhibit 79; Ex. 70 at 232:5-233:9. Masin examined the slides under a

microscope and observed sperm on the vaginal and cervical slides but did not observe sperm on the oral slides.  *See* Ex. 69 at 196:13-20; Ex. 70 at 233:12-25.  He then dunked all three swabs in their entirety in the special reagent for AP testing.  *See* Ex. 69, at 183:25-1 84:15; Ex. 70 at 234-235.  The AP tests were positive for the presence of semen on the vaginal and cervical swabs but negative on the oral swab.  *See* Ex. 79.  Masin also detected sperm on the jogging pants and the white towel.  Ex. 70 at 238:3-7.

**RESPONSE:**  Admit.

132.   Approximately six months later, in June 1984, Dr.  Shaler attempted to perform ABO testing on the physical evidence, including the contents of the rape kit.  *See* Ex. 77 at 4:9-5:8; *See* Ex. 64 at 520:9-527:11.  OCME had been doing ABO testing since 1978.  *See* Ex. 77 at 6:22-7:12; Ex. 77 at 5:17-6:11.  Dr.  Shaler detected type A blood group substances on the white towel, but there was not enough seminal fluid present for him to get results on the jogging pants.  *See* Ex. 64 at 523:2-525:14.  Dr.  Shaler attempted to perform ABO testing on the vaginal swab from the rape kit, but was not able to identify the blood group of the person who left the semen.  *See* Ex. 77 at 17:21-25.  Dr.  Shaler testified that he did not expect to get ABO results from the vaginal swab, because when he opened the rape kit, the swab was purple—a sign that the entire swab had been treated with acid phosphotase reagent.  Ex. 77 at 15:6-22.  Like Masin, Dr.  Shaler also observed sperm on the vaginal swab.  *See* Serology Report 4/20/84, attached as Exhibit 80.  Dr.  Shaler did not even attempt to perform ABO testing on the cervical swab, because the AP test performed by Masin had washed away all of the seminal fluid on the cervical swabs.  *See* Ex. 64 at 521:22-522:9.

**RESPONSE:**  Admit.

133.   Dr.  Shaler testified that there is no scientific or forensic basis for doing the acid phosphotase testing in the way that Masin performed it; and that, in fact, from a forensic perspective, such testing ruins the evidence.  *See* Ex. 77 at 16:6-21.

**RESPONSE:**  Admit that Dr. Shaler so testified, but deny the materiality or admissibility

of his opinions because he is not a Rule 26 expert, nor could he testify in that capacity.

134.   Masin testified that the reason he dunked the entirety of the swabs in acid phosphotase reagent was because "it was laboratory policy" to do so.  *See* Ex. 69 at 186:23-187:15.

**RESPONSE:**  Admit that Masin so testified.

135.   Masin testified at trial that the rationale for the laboratory policy of consuming entire swabs with acid phosphotase reagent, thereby precluding ABO testing results, was that "we have been in the past criticized by defense counsels for not examining them because they are the only, they are the only instrument that comes in contact with the female at the time, at the hospital."  *See* Ex. 70 at 248:9-13.  At his deposition, however, Masin testified that the laboratory policy of submerging each entire swab in acid phosphotase

reagent was in place even before the lab was ever criticized by defense attorneys. *See* Ex. 69 at 211:17-212:4.

**RESPONSE:** Admit.

136. Dr. Shaler testified at his deposition that Masin's explanation does not make sense because detection of spermatozoa does not require consumption of an entire swab. *See* Ex. 77 at 27:18-28:3

**RESPONSE:** Admit that Dr. Shaler so testified, but deny the materiality or admissibility

of his opinions of Masin's explanation for why certain tests were done, on the grounds that he is

not a Rule 26 expert and his opinions in this regard are not admissible.

## MISSING EVIDENCE

137. To date, the following evidence from this case is missing without explanation: the rape kit, including the slides prepared from the vaginal and cervical swabs taken from T.S. on the morning of the rapes; both towels; the cigarettes; the white jogging pants; the original NYPD criminal case file, including the lineup card from the lineup viewed by F.S.; the photographs selected by T.S. at the Catch Unit; Gottlieb's notes prepared during the investigation; the audio tapes of the lineups; the tapes of the G0-15 interviews prepared during the Internal Affairs investigation into Frank Sciallo; and the Kings County District Attorney's Office file from the time of trial. *See* 01/25/08 Correspondence from Arthur Larkin to Nick Brustin regarding discovery, attached as Exhibit 81. *See* Ex. 94 at Response No. 110.

**RESPONSE:** Admit that the foregoing evidence cannot be located at this time, but deny

that the evidence is "missing without explanation." Det. Gottlieb, for example, testified in 1984

that she destroyed her notes after creating her DD5's, and affirmed at her 2009 deposition that

she followed this practice throughout her career (Response to ¶¶ 33, above; *see also* Response to

¶ 153, below (explaining absence of sex crimes case folder)).

138. After the second trial, Gottlieb returned the cigarettes, the rape kit, the bed sheet, the white towel, the jogging pants, and the brown towel to the Brooklyn Property Clerk. *See* Property Receipt, attached as Exhibit 82; Property Clerk's Invoices, attached as Exhibits 83 and 84.

**RESPONSE:** Admit.

139.   On July 27, 1988, Mr. Fappiano filed a motion pursuant to N.Y.C.P.L. 440.40 seeking an order vacating his conviction, or, in the alternative, requesting to conduct DNA tests on the cigarettes, the white towel, the contents of the rape kit, and the jogging pants. *See* People v. Fappiano, 07/27/88 Motion to Vacate Judgment, attached as Exhibit 85.

   **RESPONSE:**  Admit.

140.   On August 31, 1988, Mr. Fappiano exhausted his direct appeals. *See* People v. Fappiano, 10/05/88 Affirmation in Opposition to Defendant's Motion to Vacate Judgment, attached as Exhibit 86.

   **RESPONSE:**  Admit.

141.   On September 26, 1988, the property clerk invoice vouchers for the rape kit, the cigarettes, the jogging pants, the sheet, the bra, the white towel, and the brown towel, were marked with the notation "hold do not destroy 9/26/88." *See* Property Clerk's Invoice, attached as Exhibit 87; Ex. 83-84.  The property clerk invoice voucher for the photographs of the lineups viewed by T.S. and F.S. are stamped "closed destroyed December 23, 1987." *See* Property Clerk's Invoice, attached as Exhibit 88.  None of the property clerk invoice vouchers corresponding to the white towel, the cigarettes, the rape kit, or the jogging pants bear a "closed destroyed" notation.  Deputy Chief Trabitz, the commanding officer of the NYPD Property Clerk Division, testified that the "hold do not destroy" notations mean that: "there was obviously a reason at that time, to hold the property." *See* Jack Trabitz deposition excerpts, attached as Exhibit 96 at 288:7-8.

   **RESPONSE:**  Admit.

142.   On, July 27, 1988, as soon as forensic DNA testing became available, Mr. Fappiano moved for leave to conduct DNA tests on several pieces of physical evidence. *See* Ex. 85.  The evidence on which he sought testing included the cigarettes smoked by the perpetrator and the white towel collected from the crime scene. *See* Ex. 85 at F000742-751.  In the memoranda of law submitted in connection with that motion, Fusco, who represented Mr. Fappiano on the motion, argued that the victims' explanation for the semen on the white towel was a "desperate and obviously contrived effort to explain away the exculpatory (scientific) testimony" that "was also notoriously absent from any prior police reports." *See* Ex. 85 at F000749.  The prosecution countered that in light of T.S. and F.S.'s testimony about the white towel, "any additional testing on the towel would add nothing to the evidence adduced at Defendant's trial." *See* People v. Fappiano, 09/14/88 Memorandum of Law in Opposition to Defendant's Motion to Vacate Judgment, attached as Exhibit 89 at DA000277.

   **RESPONSE:**  Admit, and refer the court to Fappiano's motion and the People's

opposition for a complete statement of their contents and arguments.

143.   On March 23, 1989, the Court ordered the NYPD to produce the rape kit and the jogging pants to the LifeCodes Corporation for DNA testing. *See* Court Order, attached as

Exhibit 90.  The Court denied Mr. Fappiano's request with regard to the white towel and the cigarettes.  *Id.*

**RESPONSE:**  Admit.

144.    The rape kit arrived at LifeCodes with all of the swabs collected from the victim missing. *See* Ex. 9.

**RESPONSE:**  Admit for purposes of this motion, although defendants reserve an

objection to admission of the LifeCodes report at any trial in order to prove this fact.

145.    LifeCodes <u>visualized</u> sperm on the white jogging pants, as Masin and Shaler had done in 1983 and 1984.  LifeCodes extracted DNA from the jogging pants, but was unable to generate a DNA profile because the test LifeCodes used at that time was not sensitive enough to generate a profile from a sample as small as the sample on the jogging pants. *Id.*

**RESPONSE:**  Admit.

146.    On June 13, 1989, LifeCodes issued a report stating that no results could be obtained from the jogging pants or the rape kit.  *See* LifeCodes Evidence Receipt and Summary of Results, attached as Exhibit 91; LifeCodes Evidence Receipt and Summary of Results, attached as Exhibit 92; Ex. 11.

**RESPONSE:**  Admit.

147.    On June 16, 1989, Detective Gregory Watford returned the jogging pants and the rape kit to the Brooklyn Property Clerk.  *See* Evidence Receipt, attached as Exhibit 93.

**RESPONSE:**  Admit.

148.    On September 22, 2004, Mr. Fappiano again requested access to the physical evidence in this case.  The NYPD conducted a search for the physical evidence from this case in response to that request, but was not able to locate any of it.  *See* Defendants' 8/14/09 Responses to Plaintiffs' Second Requests for Admission, attached as Exhibit 94 at Response 109.

**RESPONSE:**  Admit.

149.    In August 2005, a representative from Orchid Cellmark, Inc., a DNA laboratory that had inherited custody of the inventory from DNA testing performed by LifeCodes in the 1980s, informed counsel for Mr. Fappiano that they had located two tubes of DNA extract from the white jogging pants preserved by LifeCodes in 1989.  *See* Ex. 12 at ¶ 18. Testing on that extract determined that one female donor and one male donor had contributed to the sample; T.S. was conclusively proven to be the female donor; and Mr. Fappiano and F.S. were excluded as the male donors.  *Id.* The Court then vacated Mr.

Fappiano's conviction and dismissed the indictments against him on a joint motion by the Kings County District Attorney's Office. *Id.*

**RESPONSE:** Admit

150.  Mr. Fappiano requested access to the physical evidence from this case again in on October 19, 2007. The NYPD again searched for the evidence, but was unable to locate it. *See* Ex. 94 at Response No. 110.

   **RESPONSE:** Admit.

151.  Also on October 19, 2007, Mr. Fappiano requested several documents from the police investigation, including the original Sex Crimes Squad criminal case file, including the lineup card from the lineup viewed by F.S.; the photographs selected by T.S. at the Catch Unit; Gottlieb's notes prepared during the investigation; the audio tapes of the lineups; the tapes of the G0-15 interviews prepared during the Internal Affairs investigation into Frank Sciallo; and the Kings County District Attorney's Office file from the time of trial. *Id.* The City of New York has been unable to locate any of this evidence, and has to date provided no explanation for its absence. *See* Ex. 81.

   **RESPONSE:** Admit that the City has been unable to locate the evidence described

above, although note that according to defendants' files, the GO-15 interviews were requested

sometime after January, 2008.

152.  By January 25, 2008, the NYPD had conducted formal searches for the cigarettes, the rape kit, the jogging pants, the bra, both towels, and the bed sheet. *See* Ex. 94 at Response No. 113.

   **RESPONSE:** Admit.

153.  Pursuant to NYPD police and procedure, in 1983 Gottlieb's DD5 and notes should have been sent to Brooklyn Sex Crimes and placed in the Sex Crimes Squad Case File. *See* Steven Litwin deposition excerpts, attached as Exhibit 95, at 18:25-19:10. In October 2006 the NYPD conducted a search for Gottlieb's Sex Crimes Squad Case file and was unable to locate it. *See* Ex. 95 at 34:1-36:20; 40:1-43:18. The City of New York has to date provided no explanation for its absence. *See* Ex. 81.

   **RESPONSE:** Admit that the Sex Crimes Squad case file cannot be located, and

specifically deny that the City "has to date provided no explanation for its absence." The City

witness who searched for the case file, Steven M. Litwin, a first grade detective, explained that

old sex crimes files were stored at the 71st Precinct and that he searched the storage area for the

- 65 -

file.  He did not find any files for cases prior to 1990, except for certain "pattern" rape cases which were kept together, some of which pre-dated 1990.  (Exhibit MMM [Litwin deposition excerpt], at 38-40, copy attached)  The "explanation" for the City's inability to locate the case file, therefore, is that in the normal course the NYPD disposed of all sex crimes case files created prior to 1990, with the exception of some pattern cases.  Defendants further deny the materiality or relevance at any trial of this purported "fact."

154.    To date, the City of New York has not provided any explanation for its failure to locate any of the evidence detailed above.

   **RESPONSE:**  Deny (*see* response to ¶ 153, above).

155.    Deputy Chief Trabitz testified that the Property Clerk Division's policy in the 1990s was to retain arrest evidence from a felony case for three quarters of the maximum sentence, and that may have been the policy in the 1980s as well.  *See* Ex. 96 at 225:24-228:16.  Deputy Chief Trabitz formally codified that policy based on his experience in the Property Clerk Division that if there are no appeals pending and three quarters of someone's sentence has already expired, then it is reasonable to assume that there will be no more appeals.  *See* Ex. 96 at 228:23-233:21.  At the time of his deposition in January 2009, Deputy Chief Trabitz had never heard of a CPL 440 motion, and did not know what a "collateral attack" on a conviction was.  *See* Ex. 96 at 231:11-21.

   **RESPONSE:**  Deny the first sentence on the grounds that Chief Trabitz did not testify as described.  Rather, he testified in substance that the policy was in effect at the time he became commanding officer of the property clerk division in 2000, and that it had been in effect prior to 2000, but that he did not know when the policy first was adopted.  (*See* PX-96, at 228:5-14 (Q: Do you have any knowledge as to how long it was the practice to retain evidence for three-quarters of the maximum sentence?  A:  Are you asking me what year it started?  Q:  Yes.  A: No, I don't know the year it started.  Q:  Do you know the decade it started?  A:  No.))  Defendants further deny that Chief Trabitz "had never heard of a CPL 440 motion" on the grounds that he testified to the contrary.  (See PX-96, at 230:11-17 (Q:  What about a CPL 440?  A:  Could you please explain a CPL 440?  Q:  You've never heard of that expression?  A:  I've

heard of it.  I can't regurgitate it to you, but I'm asking you to do that for me.))  Defendants admit

the remainder, but deny the materiality or admissibility of any of the foregoing facts.

156.    In the 1980s, the only method the property clerk division used to track the movement or destruction of evidence within its custody was notations made on yellow copies of property clerk invoices.  *See* Ex. 96 at 140:2-143:17; 179:7-12; 193:7-196:5; 196:21-197:19.

**RESPONSE:**  Deny.  Movement was tracked on yellow "working" copies, along with

certain log book entries, and destruction was tracked on white copies.  Defendants deny the

materiality or admissibility of the foregoing facts.

157.    These yellow copies were stored in manila file folders.  *See* Ex. 96 at 86:20-89:3; 179:13-183:10.  No policies or procedures dictated that invoices had to be stored sequentially, nor were there policies and procedures in place dictating what number of invoices should be stored in each folder.  *Id*.  There was also no requirement that those invoices be kept for any particular length of time.  *Id*.

**RESPONSE:**  Admit the first and third sentences but deny the second sentence.  Yellow

invoices were organized according to voucher (pre-printed) number pursuant to the Property

Guide, Section 211-7 (copy attached as <u>Exhibit NNN</u>, produced in discovery on January 12,

2009).  Defendants further deny the materiality or admissibility of these facts.

158.    Pursuant to PCD practice, destruction orders were noted on the white copies of property clerk invoices.  *See* Ex. 96 at 287:22-288:10; 344:23-344:3; 345:19-23.

**RESPONSE:**  Admit but deny the materiality or admissibility of this fact.

159.    Property Clerk Division officers who searched for the evidence in this case also conducted a search for the yellow copies of the vouchers and located the yellow copy of the invoice pertaining to the cigarettes, but to failed locate yellow copies of the invoices pertaining to the rape kit and the clothing.  *See* Ex. 96 at 283:13-287:16.  The yellow copy of the invoice pertaining to the cigarettes bears the notation "hold do not destroy," but contains no further indication that the property has been moved from its initial storage location.  *Id*.  The white copies pertaining to the rape kit and the clothing also state "hold do not destroy," but contain no other notations indicating that the property has been moved.  *Id*.

**RESPONSE:**  Admit but deny the materiality or admissibility of these facts.

160.   Trabitz admitted at his 2009 deposition that based on the fact that the invoices corresponding to the physical evidence have gone missing, he assumes that the evidence has been destroyed, but the PCD has lost or failed to properly create the documentation of destruction: "If a member of the service assigned to my command neglected to stamp documentation that this evidence was destroyed, or if that documentation for several years gone by for an item of property – I'm sorry, for an item of property is unable to be located, that's not telling me that the item is missing.  It may have lawfully been disposed of and correctly been disposed of by our guidelines, but someplace along the line, either that documentation is not available or the correct notation wasn't made on that documentation." *See* Ex. 96 at 331 :25-332:13.

   **RESPONSE:**  Admit the testimony as quoted but deny the characterization that the PCD

has "failed to properly create documentation," and further deny the materiality or admissibility of

these facts.

161.   Trabitz had no explanation for why the yellow copies of the vouchers pertaining to the rape kit and the clothing were missing, or why the white copy of the voucher pertaining to the cigarettes is missing.  *See* Ex. 96 at 206:22-207:6.

   **RESPONSE:**  Admit but deny the materiality or admissibility of these facts.

Dated:        New York, New York
              February 17, 2012

                         Respectfully submitted,

                         MICHAEL A. CARDOZO
                         Corporation Counsel of the City of New York
                         *Attorney for Defendants*
                         100 Church Street
                         New York, New York 10007
                         (212) 788-1599


                         By:   _____/s/_____
                               Arthur G. Larkin (AL 9059)

- 68 -

## <u>LIST OF EXHIBITS</u>

<u>Exhibit GGG</u>                              F.S. deposition excerpt (97-99, 169-70)

<u>Exhibit HHH</u>                              Gottlieb deposition excerpt (409)

<u>Exhibit III</u>                              Wade hearing excerpt (65-68)

<u>Exhibit JJJ</u>                              Orden deposition excerpt (162-63)

<u>Exhibit KKK</u>                              Dunbar deposition excerpt (156-61)

<u>Exhibit LLL</u>                              Donohue deposition excerpt (115-16)

<u>Exhibit MMM</u>                              Litwin deposition excerpt (38-40)

<u>Exhibit NNN</u>                              Property Guide Section 211-7