UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
SCOTT FAPPIANO,

                Plaintiff,                  **MEMORANDUM & ORDER**

       — against —               07-CV-2476 (SLT) (SMG)

THE CITY OF NEW YORK, *et al.*,

                Defendants.
--------------------------------------------------------------X
**TOWNES, United States District Judge:**

      Plaintiff Scott Fappiano, who spent more than twenty years in prison for a crime he did

not commit, brings claims under 42 U.S.C. § 1983 and New York state law against New York

City Police detectives Chester Stoyeck, Edward Masin,[1] John Ulsamer, Helene Gottlieb, Gerald

Donohue, and Clyde Dunbar and the City of New York (together "Defendants"), alleging that

their misconduct – allegedly amounting to malicious prosecution and a deprivation of his right to

a fair trial – led to his wrongful conviction.   Defendants move for summary judgment.  For the

reasons stated below, Defendants' motion for summary judgment is granted, except as to

Plaintiff's state law negligence claims, over which this Court declines to exercise jurisdiction.

### Legal Standard

      Summary judgment is only appropriate where, considering "the record, including

depositions, documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory answers, or

other materials," Fed. R. Civ. P. 56(c), "the movant shows that there is no genuine dispute as to

any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P.

56(a).  The role of the court is not "to weigh the evidence and determine the truth of the matter

---

[1] Edward Masin is also sometimes referred to as Edward Mason in the underlying papers.

but to determine whether there is a genuine issue for trial." *Cioffi v. Averill Park Cent. Sch. Dist. Bd. of Educ.,* 444 F.3d 158, 162 (2d Cir. 2006) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)); *Douglas v. City of New York*, 595 F. Supp. 2d 333, 339 (S.D.N.Y. 2009) (citing *Anderson*, 477 U.S. at 252) (The role of the Court in deciding a summary judgment motion is not to ask whether "the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.") "Because the Court's role is limited in this respect, it may not make factual findings, determine credibility of witnesses, or weigh evidence." *Douglas*, 595 F. Supp. 2d at 339 (citations omitted). Rather, on summary judgment, the Court must accept the "plaintiff's version [of the facts]—given under oath—as true." *Id*. at 340. A genuine issue of fact exists when there is sufficient "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. However, "[a] party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," and "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks v. Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (citation and quotation marks omitted). In determining whether there is a genuine issue of material fact, a court resolves all ambiguities and draws all justifiable inferences in favor of the non-moving party. *Id*. at 255.

With that standard in mind, the pertinent facts, undisputed, or where disputed considered in Plaintiff's favor, are as follows:

## Background

*A. The Underlying Crime*

On December 1, 1983, sometime after midnight, an armed man broke into the home of T.S. (a woman), F.S. (her husband, a police officer), and their six-month old son. (Defendants'

Local Rule 56.1 Statement of Material Facts ("Defs. SOF") ¶¶ 1-3; Aug. 2-15, 1985 Trial Tr. ("1985 Tr."), 110:16-113:22.) The assailant tied F.S.'s hands behind his back with a telephone cord and forced him against a wall. (Defs. SOF ¶ 4.) The assailant then raped T.S. numerous times in various locations around the apartment, repeatedly penetrating her vaginally and forcing her to perform oral sex on him. (*Id*. at ¶¶ 5-10, 20, 22, 25.) Throughout the assault, the assailant was unmasked and ungloved and touched various items in the apartment. (*Id*. at ¶¶ 14-16, 37.) The assailant took a beer from the refrigerator and smoked a cigarette, which he put out in an ashtray next to the bed. (*Id*. at ¶¶ 16-18.) After the assailant ejaculated, T.S. asked the assailant if she could use the bathroom. (*Id*. at ¶ 29.) The assailant allowed her to leave the room and, while she was in the bathroom, T.S. wrapped herself in a towel. (*Id*. at ¶ 30; Plaintiff's Local Rule 56.1 Response to Defendants' Statement of Facts ("Pl. SOF") ¶¶ 29-30.) T.S. then ran out the front door of the apartment into the hall and yelled that she had been raped and to call the police. (Defs. SOF ¶¶ 30-31.) The assailant opened the front door, said "stupid bitch," retrieved his jacket and the bottle of beer that he had been drinking, and fled the building. (*Id*. at ¶¶ 32-33.) After T.S. untied F.S.'s hands, he asked her "what did he look like, which way did he go?" and left to try to find the assailant. (*Id*. at ¶ 35; Pl. SOF ¶ 35.) T.S. went back into the apartment and put on the pair of white jogging pants and the terry cloth shirt that she had been wearing before the rape. (Defs. SOF ¶ 36.)

*B. The Police Investigation*

T.S. testified that fifty police officers arrived on the scene, "it was just a zoo," and police were "yelling" questions at her, "asking, how tall, what he looked like, how tall. What color hair[?]" (1985 Tr. at 166:6-12; 163A:6-164A:2.) T.S. was taken to Lutheran Medical Center, where a doctor examined her and collected samples for a rape kit, called a "Vitullo kit." (Pl.

SOF. at ¶ 44.)  The Vitullo kit contained vaginal, cervical, and oral swabs, as well as slides made from those swabs.  (*Id*. at ¶ 45.)

   1. <u>Photo Showing 1</u>

After leaving the hospital, in the middle of the night of December 1, 1983, T.S. was interviewed by Detective Clyde L. Dunbar at the 68th Precinct Detective's Unit.  (*Id*. at ¶ 47.) Dunbar reported that during the interview, T.S. described the assailant as soft-spoken, 5'10" tall, 160 lbs., olive complexion with dark hair, wearing old-fashioned low cut white sneakers, faded but clean blue jeans, a red and green plaid shirt, black leather jacket and keys hanging from his belt.  (*Id*. at ¶¶ 49-50.)

Police department policy in 1983 required police officers to include in their investigation reports, referred to as "DD5s," if a witness viewed photos of possible suspects and/or made a positive identification while viewing those photos; the policy did not require that officers describe which photos were viewed or where they came from.  (Defs. Ex. RR, Gottlieb Dep. 186:17-21; Defs. Ex. L, Sciallo Dep. at 64:5-65:22.)  In practice, this requirement was not "followed all the time."  (Defs. Ex. L, Sciallo Dep. at 65:1-22.)

The parties dispute whether Dunbar showed T.S. any photographs that day.  Dunbar's December 1, 1983 report ("DD5") indicates that T.S. did not view any photos.  (Defs. SOF ¶ 56.) However, during an interview with the Internal Affairs Bureau ("IAB") that occurred after Plaintiff's conviction, Dunbar recalled showing photos of possible suspects, not including Plaintiff, to T.S. ("Photo Showing 1").  (*Id*. at ¶¶ 53-54; Plaintiff's Statement of Additional Facts ("Pl. Add'l SOF") ¶ 16; Ps. Ex. 18, IAB Report ¶ 20.)  According to the IAB Report, Dunbar told an investigator that T.S. did not identify her assailant, but did direct Dunbar's attention to an individual who she said "resembled" the suspect.  (IAB Report ¶ 20.)  Dunbar did not inform an

Assistant District Attorney ("ADA") of Photo Showing 1, and Photo Showing 1 was never disclosed to the defense. (Defs. SOF ¶ 57.) In a 2009 deposition, Dunbar testified that the IAB Report was mistaken and stated: "Let me make it abundantly clear, at no time did I ever show photos to [T.S]." (Defs. Ex. OO, Dunbar Dep. at 120:4-6.)

    2.  <u>Photo Showing 2</u>

The parties dispute whether T.S. viewed photographs during a second photographic lineup, later – in the middle of that night. According to Detective Frank Sciallo, Sciallo showed T.S. photos of mug shots from a file cabinet at the 68th precinct ("Photo Showing 2").[2] (Defs. SOF ¶¶ 58-59.) The cabinet contained at least one photograph of Plaintiff, and Sciallo believed that T.S. might have viewed it, but T.S. did not identify anyone as her assailant. (*Id*. at ¶¶ 61, 63.)

During an interview with the IAB, Sciallo stated that prior to Plaintiff's trial, he informed ADA Bonnie Nathan, who was one of the prosecutors in charge of Fappiano's prosecution, that he had shown photos to T.S. and that T.S. had "failed to identify [Plaintiff]." (*Id*. at ¶ 67.) Sciallo said that he did not inform any other police personnel that he had shown photos to T.S, nor did he prepare a DD-5 concerning Photo Showing 2. (*Id*. at ¶¶ 69-71.) However, in his October 2009 deposition, Sciallo testified that he informed Dunbar of Photo Showing 2 and expected Dunbar to include the information in his report. (*Id*. at ¶ 72.) Dunbar, however, did not note Photo Showing 2 in any of his reports. (Pl. Add'l SOF ¶ 20.) ADA Nathan ultimately chose not to disclose Photo Showing 2 to defense counsel. She testified that, because she did not find Sciallo credible, she independently questioned T.S. about whether T.S. had participated in

---

    [2] Detective Sciallo is not named as a defendant in this action.

Photo Showing 2, and T.S. denied that the she had been shown any photographs until Photo

Showing 3.  (Pl. Ex. 19, Nathan Dep. at 87:12-22, 88:8-90:25, 89:11-91:22.)[3]

### 3.  Interview with Detective Gottlieb

At around 8:00 a.m. on December 1, 1983, T.S. described the details of the rape to

Detective Helene Gottlieb, a detective in the Sex Crimes Unit who was the primary officer

assigned to the case.  (Defs. SOF ¶ 84; 1985 Tr. at 438:6-11.)  Gottlieb testified that during that

interview, T.S. was precise, clear, descriptive, and very detailed.  (Pl. SOF ¶ 68.)  As part of

standard procedure, Gottlieb would have asked T.S. whether her assailant had any distinguishing

marks or tattoos.  (*Id.* at ¶ 70.)  T.S. did not report noticing any tattoos.  (*Id.*)  According to

Gottlieb's DD5, T.S. stated that, at one point, "he pulled his pants down" and that "[e]very time

after every sex act, [the assailant] would zipper his pants up and then unzip them.  There were a

lot of keys jingling on the left side of his pants."  (Defs. SOF ¶ 87; Pl. SOF ¶ 87; Pl. Ex. 31,

12/1/83 DD5 at 2.)

### 4.  Photo Showing 3

After the interview, Gottlieb took T.S. to look at photographs ("Photo Showing 3").

(Defs. SOF at ¶ 89.)  In the 67th Precinct, thousands of photographs were organized in drawers

according to height, age, and race.  (*Id*. at ¶ 90; *Wade* Tr. at 34:2-5.)  T.S. looked through a

drawer of photos and selected one, put it aside and continued looking, and then selected a second

photo.  (Defs. SOF ¶¶ 91-92.)  Because the photographs were both pictures of Plaintiff taken at

different times, Gottlieb reported that T.S. made a positive identification.  (*Id*. at ¶ 94; Pl. Add'l

SOF ¶ 34.)

---

[3] ADA Nathan is not named as a defendant in this action.

5. Collection of Physical Evidence

On December 1, 1983, the police made multiple "runs," or visits to the crime scene to collect evidence. On the first run, which was conducted at approximately 3:25 a.m., Officer Chester Stoyeck and another officer took photographs and dusted for fingerprints. (Defs. SOF ¶¶ 117-18.) The Crime Scene Unit collected twelve usable prints from the scene, two of which were identified as T.S.'s. (Pl. Add'l SOF ¶ 87.) There were as many as thirty-one individuals present at the crime scene on December 1, 1983. (*Id*.) The NYPD's Latent Print Unit compared the remaining prints to the thirty-one people who might have left prints at the scene and found no other matches. (*Id*.)

On the afternoon of December 1st, during a second run, Gottlieb, accompanied by T.S. and F.S., collected a bottle opener and bottle top that the assailant had touched, the jogging pants that T.S. wore immediately after the rape, a bra the assailant had sucked on, a brown towel, a white towel, and T.S.'s bed sheet. (*Id*. at ¶¶ 85, 99; 1985 Tr. at 374:16-377:23; Defs. SOF ¶ 120.) In addition, Detective Gerald Donohue, from the Crime Scene Unit, collected five cigarette butts: four Newport brand cigarette butts, the brand both T.S. and F.S. smoked, and one Salem brand cigarette butt, all from the ashtray next to T.S. and F.S.'s bed. (Defs. SOF ¶¶120, 124.) Gottlieb's December 1, 1983 report states that "cigarette butts allegedly smoked by the perpetrator were recovered." (Ex. 31, 12/1/83 DD5 at 4.) No contemporaneous police reports reveal any concerns about the potential usefulness of the evidence collected. T.S. and Gottlieb both testified at trial that during the second run, police officers and civilians were smoking in the apartment. (1985 Tr. at 177:9-13; 374:25-75:2.)

6. <u>Photo Showing 4</u>

Several days later, on December 5, 1983, at the direction of then-ADA Suzanne Melendez,[4] Gottlieb showed photo arrays to T.S. and F.S. at the Sex Crime Squad Office at the 71st precinct ("Photo Showing 4"). (Defs. SOF ¶¶ 97, 101; *Wade* Tr. at 13:13-25 (stating Photo Showing 4 was organized because an ADA instructed Gottlieb "there was somebody that possibly looked similar … [and] ha[d] a record for rape.").) T.S. viewed a photo array that included a photo of an individual named Richard Alexandria, who resembled Plaintiff and who had previously been arrested on rape charges. (Defs. SOF at ¶ 97.) The array did not include a photo of Plaintiff, and T.S. did not identify anyone from that array as her assailant. (*Id.* at ¶¶ 98-100.) F.S. viewed a photo array that contained photographs of both Plaintiff and Alexandria, as well as four other fillers; F.S. identified Plaintiff as the assailant. (Pl. SOF ¶ 102.)

7. <u>Lineup and Arrest</u>

The next day, on December 6, 1983, T.S. and F.S. viewed a lineup at the 71st precinct. (Defs. SOF ¶ 103.) Gottlieb did not arrest Plaintiff prior to the lineup, but rather asked him to come in voluntarily, which he did. (Pl. Add'l SOF ¶ 48.) During the days between Photo Showing 3 and the lineup, police officers had continued their investigation. (*Id.*) T.S. viewed the lineup and selected Plaintiff, who was seated in position number four, as her assailant. (Defs. SOF ¶¶ 105-06.) Gottlieb escorted T.S. out of the lineup room and brought in F.S. (Pl. Add'l SOF ¶ 50.) Before F.S. entered the room, Plaintiff changed his seat and moved from position number four to position number six. (Defs. SOF ¶ 107.) The parties dispute which position F.S. selected. (*Id.* at ¶ 108; Pl. SOF ¶ 108.) It appears that the number originally typed on the lineup card was a "four" and was crossed out and changed to the number "five." (Defs. SOF ¶ 109.)

---

[4] ADA Melendez is now Acting Supreme Court Justice Melendez of the Queens County Criminal Court. Judge Meledez is not named as a defendant in this action.

There was an audio recording made of T.S.'s lineup viewing, but there was no recording of F.S.'s lineup viewing. After he was identified by T.S. at the lineup, Plaintiff was arrested. (Defs. SOF ¶ 112.)

8. <u>Crime Lab Testing</u>

In 1983, forensic testing was significantly less sophisticated than it is today. At the time, forensic scientists could test for the presence of semen in a Vitullo kit by examining a slide made from a swab under a microscope or by conducting an acid phosphatase test on a portion of the swab. (Pl. Add'l SOF ¶ 126.) If a swab tested positive for semen or sperm, forensic scientists could follow up by performing an ABO test on the remaining portion of the swab to determine the ABO blood group of the semen donor. (*Id*.)

In 1983, the NYPD maintained a custom or policy of fully submerging swabs from rape kits in acid phosphatase when testing for the presence of semen, thereby corrupting the sample and making subsequent ABO testing on those swabs impossible. (*Id*. at ¶ 123.) This practice had been criticized by Dr. Robert Shaler, who was the director of the serology laboratory at the Office of the Chief Medical Examiner of New York City ("OCME"). (*Id*. at ¶ 124.) Shaler testified that in late 1979 or early 1980, he realized that the NYPD was "dunking the entire swab in the special reagent" rather than using threads from the swab, "thus needlessly washing away the seminal plasma in which ABO blood groups are found and preventing any ABO blood group testing on the swabs." (*Id*. at ¶ 127.) Shaler received swabs sent by the NYPD lab to the OCME for further testing that were entirely purple, indicating that the entire swab had been submerged in an acid phosphatase reagent. (*Id*.) Shaler promptly brought this issue to the attention of the supervisor of the NYPD serology lab, informing him that this practice prevented the OCME

from performing ABO testing on the swabs. (*Id*. at ¶ 128.) Nevertheless, several years later, in 1983, fully submerging swabs continued to be the NYPD lab's practice.

After Plaintiff was arrested on December 6, 1983, Gottlieb contacted the NYPD Crime Lab and informed them of the arrest. (*Id*. at ¶ 131.) On December 7, 1983, Edward Masin, who worked in the Crime Lab, tested the Vitullo kit, jogging pants, bed sheet, and bra for the presence of sperm and semen by fully submerging samples taken from them in acid phosphatase reagent. (*Id*.) Vaginal and cervical swabs from the Vitullo kit returned positive for semen, but the oral swabs did not. (*Id*.) Masin also determined that sperm was present on the jogging pants that T.S. wore immediately after the attack and on the white towel that was collected from T.S.'s apartment. (*Id*.)

About six months later, Shaler attempted to perform ABO testing on the physical evidence but, because Masin had fully submerged the swabs, Shaler was only able to detect blood group substances on the white towel. (*Id*. at ¶ 132.) Shaler also detected blood group substances only on each of the cigarettes, on which Masin had not performed tests. (Defs. SOF ¶ 129.) The ABO tests that were run on the cigarettes and white towel excluded Plaintiff as the donor of the saliva on the cigarettes or the semen on the white towel. The serology tests performed indicated that the saliva on the cigarette butts and semen on the towel was from an individual with blood type A, such as F.S., and not from an individual with blood type O, such as Plaintiff.

*C. Trials*

T.S., F.S., and Gottlieb testified before the grand jury, which indicted Plaintiff on charges of rape in the first degree, sodomy in the first degree, sexual abuse in the first degree, burglary in the first degree, unlawful imprisonment in the first degree, and criminal use of a firearm in the

first degree. (*Id.* at ¶¶ 114-15; Defs. Ex. W, Indictment.) Before presenting the case to the grand jury, ADA Melendez met with Gottlieb, who debriefed ADA Melendez about the investigation and discussed, without mentioning any concerns about the evidence, the white towel and cigarette butts that had been submitted for serological testing (while the results were still pending). (Pl. SOF ¶ 154; Melendez Decl. ¶¶ 1-2; Pl. Ex. 30, Melendez Dep. at 37:16-25, 38:10-19; 43:17-23.) ADA Melendez testified that she would have expected Gottlieb to reveal if there was any contamination at the crime scene "[b]ecause that's very important in terms of the case," and she would not have expected Gottlieb to voucher and discuss "irrelevant" evidence. (Pl. Ex. 30, Melendez Dep. at 38:25-39:3; 39:4-17.) ADA Melendez introduced the white towel and cigarette butts before the grand jury so that they "could be utilized in further proceedings." (*Id.* at 39:18-40:2.) She further testified that if she was aware of "any problems with any of the physical evidence" she would have affirmatively brought the problems out to the grand jury. (*Id.* at 44:14-22.)

On October 14 and November 1, 1984, Justice Lagana of the New York Supreme Court, Kings County ("Kings County Supreme Court") conducted a *Wade* hearing[5] to determine the admissibility of T.S. and F.S.'s identifications of Plaintiff. (Pl. Add'l SOF ¶ 35; *Wade* Tr. at 215:21-216:8.) T.S. testified as follows:

> A: I was going through, it was in the first drawer, I went through the whole one side, however many pictures that is, and I was about a quarter way down the second side and I stopped because I saw the picture and I said, this could be him. And I took it out and put it on the table and I held my finger there and I don't know why, I kept looking. I continued down that isle [sic] and then I got one and I said, but this is him. Then Helene came back in the room and I said, I got a problem, I think this is him but I pulled this already, I thought this was him too. And she laughed and said, They are the same one.

---

[5] *See United States v. Wade*, 388 U.S. 218 (1967).

(*Wade* Tr. at 105:7-19.) Gottlieb confirmed that T.S. had made a positive identification. (Pl. Add'l SOF ¶ 34; *Wade* Tr. at 10:22-11:19.) At the time of the *Wade* hearing, the police had not disclosed Photo Showings 1 or 2 to the ADAs. (Pl. Add'l SOF ¶ 25.) Accordingly, those photo showings were not discussed. (*Id*. at ¶¶ 25, 33, 35.) After considering the evidence presented at the *Wade* hearing, Justice Lagada found T.S.'s identification testimony admissible but F.S.'s inadmissible. (*Wade* Tr. at 215:21-216:8.)

At Plaintiff's first jury trial in November of 1984, among the evidence heard by the jury was: F.S. and T.S.'s testimony about the break-in and rape, T.S.'s identification testimony, testimony from Officers Donohue, Dunbar, and Gottlieb about the investigation and collection of evidence, and testimony regarding the forensic evidence from Detective Masin and Dr. Shaler. The 1984 trial ended in a mistrial. (Defs. SOF ¶¶ 162, 165.) During Plaintiff's second trial in August of 1985, the jury again heard: testimony about the break-in and rape from F.S. and T.S., identification testimony from T.S., testimony from Officers Donohue, Dunbar, and Gottlieb about the investigation, and testimony regarding the forensic evidence from one of Detective Masin's colleagues and Dr. Shaler. The 1985 trial resulted in Plaintiff's conviction for first degree rape, first degree burglary, and weapons charges. (*Id*. at ¶ 166.) On or around September 11, 1985, Plaintiff was sentenced to 20 5/6 to 50 years in prison. (*Id*. at ¶ 171.) Plaintiff appealed to the New York Supreme Court, Appellate Division, Second Department, which affirmed his conviction, and sought leave to further appeal to the New York Court of Appeals, which denied leave. *People v. Fappiano*, 139 A.D.2d 524, 525, 526 N.Y.S.2d 620, 621 (1988), *lv denied*, 72 N.Y.2d 918, 529 N.E.2d 182 (1988).

*D. Post-Conviction Relief*

On July 27, 1988, while Plaintiff's appeal to the New York State Court of Appeals was pending, Plaintiff moved in the Supreme Court of New York, Kings County for leave to conduct DNA tests on the Vitullo kit, jogging pants, white towel, and cigarette butts collected in his case. (*Id*. at ¶ 173.)  On March 23, 1989, Justice Vinik of Kings County Supreme Court granted the motion in part and directed that only the Vitullo kit and jogging pants be produced for testing. (*Id*. at ¶¶ 175-76.)  When the Vitullo kit arrived for testing at LifeCodes Corporation, all of the swabs were missing.  (Pl. Add'l SOF ¶ 144.)  LifeCodes identified sperm on the jogging pants and took a sample, but, at the time, DNA testing was not sensitive enough to generate a DNA profile from such a small sample.  (*Id*. at ¶ 145.)  Accordingly, LifeCodes issued a report on June 13, 1989 conveying that no results could be obtained from the jogging pants or the rape kit.  (*Id*. at ¶ 146.)  A few days later, on June 16, 1989, the jogging pants and (empty) Vitullo kit were returned to the Brooklyn Property Clerk.  (*Id*. at ¶ 147.)

On September 22, 2004, given advances in DNA testing, Plaintiff again requested access to the physical evidence.  (*Id*. at ¶ 148.)  Although the NYPD conducted a search, it could not locate any of the physical evidence.  (*Id*.)  However, LifeCodes had preserved the extract taken during their 1989 tests.  (*Id*. at ¶ 149.)  In August of 2005, a representative from Orchid Cellmark, Inc., a DNA laboratory that had inherited custody of LifeCodes' inventory, provided two tubes of DNA extracted from the white jogging pants by LifeCodes in 1989.  (*Id*.)  Testing on that extract showed that one female donor and one male donor had contributed to the sample; T.S. was conclusively proven to be the female donor, and both Plaintiff and F.S. were excluded as the male donors.  (*Id*.)  On October 6, 2006, upon consent of the Kings County District

Attorney's Office ("D.A.'s Office"), the Kings County Supreme Court vacated Plaintiff's conviction and dismissed the indictments against him. (Defs. SOF ¶ 179.)

*E. The Instant Proceeding*

    1. Procedural History

Plaintiff commenced the instant proceeding on June 20, 2007 seeking compensatory and punitive damages from the City of New York, and Police Officers Gottlieb, Donohue, Dunbar, Stoyeck, Masin, and Ulsamer[6] alleging that Defendants' unconstitutional actions caused his wrongful conviction. (Compl. ¶ 1, Prayer for Relief.)[7] Defendants answered, denying all allegations in the complaint. (Dkt. 10.)

    2. Deposition of T.S.

The matter was referred to Magistrate Judge Gold, who oversaw discovery. By letter dated March 24, 2010, Plaintiff sought leave to take T.S.'s deposition. (Dkt. 58.) Plaintiff acknowledged the emotional toll such a deposition would have on T.S., but explained that her testimony is "uniquely relevant" to Plaintiff's case because T.S. was present for and may have participated in the misconduct that led to Plaintiff's wrongful conviction. In a hearing that took place on April 27, 2010, Judge Gold ruled that Plaintiff's argument that he should be permitted to cross-examine T.S. about her trial testimony is "too speculative and frankly too irrelevant to the issues raised on summary judgment to warrant imposing the burden of a live deposition at this stage." (Dkt. 60, Tr. at 20:22-21:7.) Judge Gold granted Plaintiff leave to propound limited

---

[6] John Ulsamer is deceased. (Defs. March 4, 2008 letter).

[7] In his opposition papers, Plaintiff withdraws his section 1983 false arrest, false imprisonment, failure to intercede, supervisory liability and loss of familial association claims and his state law negligent supervision and New York State constitutional claims. Accordingly, the Court deems abandoned and does not address Counts 3, 5, 8, 11, and 12.

written questions to T.S., however Plaintiff declined to do so.  Plaintiff appealed, (Dkt. 64), and this Court found Judge Gold's decision not "clearly erroneous or contrary to law."  (Dkt. 71.)

3. <u>Plaintiff's Theory of the Case</u>

Plaintiff asserts that, resolving all factual inferences in his favor and drawing certain adverse inferences against Defendants, the facts support the following theories:

<u>Photo Showings 1 & 2 *Brady* Violation</u>: When T.S. was first brought to the station after the rape, she was shown two photo arrays (Photo Showings 1 and 2, by Dunbar and Sciallo, respectively), which included a photograph of Plaintiff, from which she identified someone other than Plaintiff as "resembling" her attacker.  A few hours later, she was interviewed and again shown photographs, this time by Gottlieb.  From those photographs, she selected two different photographs as "resembling" her attacker.  Plaintiff contends that Gottlieb's statement to the IAB suggests that T.S. made only a tentative identification.  Photo Showing 1 and 2, which Plaintiff contends constitute *Brady* material, particularly in light of the purportedly tentative nature of T.S.'s identification in Photo Showing 3, were never disclosed to the defense.

<u>Fabricated Identification</u>: F.S.'s lineup card was altered so that a number "four" was crossed out and replaced with a number "five."  Gottlieb testified at Plaintiff's first trial that the original number had been a typographical error, and the alteration was to correct this error.  (Def. SOF at ¶ 110.)  Plaintiff alleges that Gottlieb coached F.S. to select the same position as T.S. selected, not knowing that the lineup participants had switched positions, and subsequently tampered with the lineup card to conceal her efforts.  (Pl. SOF ¶ 108; Pl. Add'l SOF ¶ 53.)  There is no dispute that F.S. did not identify Plaintiff in the lineup and that T.S. and F.S. did not speak to each other between lineup viewings.  (Defs. SOF ¶ 111.)

Leg Tattoos:  During T.S.'s initial interview, before she identified Plaintiff, she reported that her assailant had "pulled his pants down."  (Pl. Ex. 31, 12/1/83 DD5 at 2.)  Plaintiff contends that Gottlieb was not unfamiliar with Plaintiff.  Her partner, who became involved in the case a few days after the rape, had previously arrested Plaintiff for rape, but Plaintiff was acquitted after the victim could not recall his distinctive leg tattoos.  After T.S. identified Plaintiff, T.S. recounted a peculiar *modus operandi* that was not recorded in Gottlieb's initial report – her assailant held his pants up just below his hips, even while sitting on a couch and forcing T.S. to sit on top of him and when standing over her while holding a gun and a beer bottle.  Plaintiff alleges that Gottlieb manipulated or convinced T.S. to lie about this detail to explain why T.S. did not report seeing Plaintiff's tattoos.  (Pl. Br. at 28-29.)

Cigarettes & White Towel:  On the afternoon of the rape, T.S. returned to the crime scene with Gottlieb and other officers who collected several pieces of physical evidence including five cigarette butts and two towels.  (Pl. Add'l SOF ¶¶ 84-85.)  At the time, Gottlieb made no contemporaneous records indicating that she had any concerns about either contamination of the crime scene or the potential usefulness of the evidence collected.  There was a great deal of pressure placed on Gottlieb's investigation because she was a "relatively young detective" and "people from the commissioner's office, chiefs, all kinds of people" were interested in the case because T.S. was the wife of an NYPD officer.  (Pl. Ex. 16, Gottlieb Dep. 70:17-23; 166:4-168:23.)  She testified that she was "very concerned with things like paperwork" and "dotted all [her] I's and crossed all [her] T's."  (*Id.* at 70:24-71:15.)

After T.S. positively identified Plaintiff in a lineup, Gottlieb arrested Plaintiff.  (Def. SOF ¶ 112.)  At that point, she requested that the crime lab run serological testing on the physical evidence recovered from the crime scene.  (1985 Tr. at 438:21-23.)  She did not note in her

request that she had any doubts about the integrity or usefulness of the evidence. (Pl. Add'l SOF at ¶ 91.) Before the serology results came back, Gottlieb discussed the cigarettes and white towel with ADAs Melendez and Nathan, during preparation for the grand jury, and did not mention any concerns with the evidence. (*Id*. at ¶ 90.) Based on conversations with Gottlieb, ADA Melendez introduced the cigarette butts and white towel before the grand jury, "in order to lay a foundation such that if testing was done on those items of clothing later on[, they] could be utilized in further proceedings." (Pl. Ex. 30, Melendez Dep. 39:18-40:2.) When the serological testing results came back, the biological material was shown to have been deposited by someone with blood type A, and not blood type O. Plaintiff argues that a reasonable jury could infer, from the surrounding circumstances, that Gottlieb believed that the evidence was linked to the rapist until the serology results unexpectedly came back exonerating Plaintiff, and that at that point, Gottlieb fabricated a theory of contamination and tampered with a vulnerable witness to seal the cracks that had developed in her case as a result of the exculpatory test results. (Pl. Br. at 24-28.)

With respect to the cigarettes, Plaintiff alleges that, in an attempt to explain away the exculpatory evidence, Gottlieb and Donohue concocted a story that none of the cigarettes recovered at the crime scene could have been smoked by the perpetrator because the crime scene was contaminated. The prosecution argued that none of the cigarette butts recovered had fingerprint dust on them, although they were collected after the scene was dusted for prints. Gottlieb testified that she always knew the scene was contaminated, although she never recorded this fact. Plaintiff contends that Gottlieb convinced or manipulated T.S. and F.S. to lie that the perpetrator had only taken a few drags from a Newport cigarette, thereby further supporting her theory that none of the fully smoked butts that were recovered, including a Salem, could have

been the rapist's. Plaintiff alleges that Officer Donohue worked with Gottlieb to falsify this theory of contamination.

Plaintiff alleges further that Gottlieb convinced or manipulated T.S. to lie that the white towel was saturated with her husband's semen. Before Gottlieb received test results indicating that the white towel was saturated with type-A semen, there was no mention that the white towel was unrelated to the rape. (Pl. Add'l SOF ¶ 98.) However, during Plaintiff's first trial, T.S. testified that after Gottlieb collected the towel, T.S. asked Gottlieb "you got the one brown towel" and Gottlieb answered, "No, I got the white one too," to which T.S. replied, "I don't know where any white towel came from." (November 5-16, 1984 Tr. at 841:14-20.) She further testified that she told Gottlieb "[the white towel] has nothing to do with it, please. … don't take stuff [from] under my bed[.]" (*Id.* at 842:11-20.) On cross-examination, she testified that she knew that the white towel was tested for blood types and knew that the results excluded Plaintiff. Plaintiff's counsel asked T.S.: "Q: … [Did you] use the white towel after the person left and there was sperm on the white towel from the person?" T.S. replied: "A: No, I did not. I swear to God I did not. … I never used that towel. That towel was never used." (*Id.* at 843:7-20.) She insisted that she argued with Gottlieb because she thought that the police were collecting her dirty laundry and she was embarrassed. (*Id.* at 844:2-7.) She also testified that she wrapped herself in the brown towel after the rape. (*Id.* at 809:7-14.) F.S. also testified that when T.S. untied him, she was wearing the brown towel. (*Id.* at 107:19-108:4.)

During Plaintiff's second trial, on cross-examination, T.S. denied having a conversation with Gottlieb about the white towel. (1985 Tr. at 234:3-4.) Rather, she testified that "I asked [Gottlieb] to leave everything in the bag. I asked her to leave the shopping bag there and don't go taking it off with her. … [t]he whole shopping bag, everything in it." (*Id.* at 232:11-23.) She

testified that "the first time that [she, (T.S.),] realized that they [(the police)] had this white towel" was "[i]n the District Attorney's office." (*Id.* at 347:19-23.) She testified that the towel was from "[u]nder the bed … [and] came from my husband and I, from a few mornings before, and it slipped down the bed." (*Id.* at 233:24-34:2.) Plaintiff alleges that Gottlieb deprived Plaintiff of a fair trial by causing T.S. to give this testimony. He contends that without Gottlieb and T.S.'s false testimony inoculating the exculpatory forensic evidence, no reasonable jury would have convicted him and he would not have served over 20 years in prison for a crime he did not commit. Plaintiff also brings claims against Masin and the City for failing to properly test and preserve the forensic evidence.

    4. <u>The Instant Motion</u>

Defendants move for summary judgment on Plaintiff's outstanding claims – namely, claims under Section 1983 for malicious prosecution (Count 1), denial of a fair trial, (Count 2), and conspiracy (Count 4) against Dunbar, Gottlieb, and Donohue; a Section 1983 claim for withholding and destroying material exculpatory evidence against Masin (Count 6), a Section 1983 *Monell* claim against the City of New York (Count 7), and state law claims of malicious prosecution and negligence against Defendants (Counts 9 and 10).

**Discussion**

Section 1983 of Title 42 of the United States Code provides, in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured

42 U.S.C. § 1983. To state a Section 1983 claim, a plaintiff must allege: (1) that the challenged conduct "deprived [the plaintiff] of rights, privileges, or immunities secured by the Constitution or laws of the United States," and (2) that such challenged conduct was "committed by a person

acting under color of state law." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010) (quoting *Pitchell v. Callan*, 13 F.3d 545, 547 (2d Cir. 1994)). "Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of [federal] rights established elsewhere." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999).

## I. Section 1983 Malicious Prosecution Claim

A malicious prosecution action under Section 1983 is, in essence, a claim for damages for violations of a plaintiff's Fourth Amendment constitutional right "to be free of unreasonable seizure of the person — *i.e.*, the right to be free of unreasonable or unwarranted restraints on personal liberty." *Washington v. Cnty. of Rockland*, 373 F.3d 310, 316 (2d Cir. 2004) (quoting *Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995)).[8] Criminal prosecution, which is a "deprivation of liberty consistent with the concept of 'seizure,'" *Singer*, 63 F.3d at 115-16, is only actionable if it is "'unreasonable' within the meaning of [the Fourth] Amendment," and is only unreasonable if initiated or continued without probable cause, *Murphy v. Lynn*, 118 F.3d 938, 946 (2d Cir. 1997). *See Boyd v. City of New York*, 336 F.3d 72, 75 (2d Cir. 2003) (If there is "probable cause for the prosecution, … no malicious prosecution claim can stand."). Indeed, "probable cause is a complete defense to a claim of malicious prosecution." *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003).

"[I]ndictment by a grand jury creates a presumption of probable cause." *Id.* That presumption may only be rebutted "by evidence that the indictment was procured by 'fraud,

---

[8] "In order to prevail on a § 1983 claim against a state actor for malicious prosecution, a plaintiff must show a violation of his rights under the Fourth Amendment, and must establish the elements of a malicious prosecution claim under state law." *Manganiello v. City of New York*, 612 F.3d 149, 160-61 (2d Cir. 2010) (internal citations omitted). "To establish a malicious prosecution claim under New York law, a plaintiff must prove (1) the initiation or continuation of a criminal proceeding against plaintiff; (2) termination of the proceeding in plaintiff's favor; (3) lack of probable cause for commencing the proceeding; and (4) actual malice as a motivation for defendant's actions." *Id.* at 161 (citations and quotation marks omitted).

perjury, the suppression of evidence or other police conduct undertaken in bad faith.'" *Id.* (quotations omitted); *Colon v. City of New York*, 60 N.Y.2d 78, 82 (1983) (same); *Boyd*, 336 F.3d at 77 (presumption rebutted by evidence that officers acted in "bad faith" or "lied in order to secure an indictment"); *McClellan v. Smith*, 439 F.3d 137, 146 (2d Cir. 2006) (finding "a jury could reasonably find that the indictment against [the plaintiff] was secured through bad faith or perjury," where evidence suggested that a police officer instigated an altercation with the plaintiff and pressed a case against Plaintiff, motivated by personal animus); *Hill v. Melvin*, No. 05 Civ. 6645(AJP), 2006 WL 1749520, at *13 (S.D.N.Y. June 27, 2006) (explaining that the presumption of probable cause can be overcome by showing "that the conduct of the police deviated so egregiously from acceptable police activity as to demonstrate an intentional or reckless disregard for proper procedures") (citation omitted). Thus, "[a]lthough the government has no constitutional obligation to present exculpatory material to a grand jury, New York law ... strips an indictment of its presumptive force in a malicious prosecution action when the indictment was obtained through improper means." *McCaffrey v. City of New York*, 11 CIV. 1636 RJS, 2013 WL 494025, at *5 (S.D.N.Y. Feb. 7, 2013) (quoting *Richards v. City of New York*, No. 97 Civ. 7990(MBM), 2003 WL 21036365, at *14 (S.D.N.Y. May 7, 2003) (citation omitted)).

Plaintiff brings a malicious prosecution claim against Gottlieb[9] on two theories. First, he alleges that he has rebutted the presumption of probable cause by alleging that Gottlieb secured the indictment against him through improper means, namely by misrepresenting T.S.'s tentative identification in Photo Showing 3 as positive and by suppressing T.S.'s earlier failures to identify

---

[9] Although Plaintiff mentions other officers in his argument section on malicious prosecution, he does not allege that any other officers acted with the requisite malice. Accordingly, this Court construes his malicious prosecution claim as directed only at Gottlieb.

Plaintiff in Photo Showings 1 and 2. Second, he asserts that probable cause was vitiated after the grand jury indictment was returned by the exculpatory serology results.

### A. Is the Presumption of Probable Cause Rebutted by Gottlieb's Alleged Misconduct with Respect to T.S.'s Identifications?

Plaintiff contends that the indictment was improperly secured by Gottlieb's fabrication of T.S.'s positive identification of Plaintiff, *i.e.*, by Gottlieb's recasting a tentative identification as positive and concealing an earlier failure to identify Plaintiff. "[A] police officer's fabrication and forwarding to prosecutors of known false evidence works an unacceptable 'corruption of the truth-seeking function of the trial process.'" *Ricciuti v. N.Y.C. Transit Authority*, 124 F.3d 123, 130 (2d Cir. 1997) (quoting *United States v. Agurs*, 427 U.S. 97, 104 (1976)). However, Plaintiff has not established that such a "corruption of the truth-seeking function of the trial process" occurred here. *Id.*

Plaintiff has not presented any evidence that T.S.'s identification in Photo Showing 3 was tentative. Plaintiff observes that the portion of the IAB report that recounts Gottlieb's statements concerning Photo Showing 3 states that: "Mrs. S[.] picked out photos of two (2) suspects who she stated resembled the perpetrator. These photos were actually two (2) different pictures of defendant Scott Fappiano." (Pl. Ex. 18, IAB Report ¶ 10.3.) Plaintiff suggests that this identification must have been tentative because Dunbar similarly told the IAB investigators that the person T.S. identified in Photo Showing 1 "resembled" her attacker. Plaintiff contends that, in light of the procedural posture of this motion, this Court must accept his characterization of the T.S.'s selection from Photo Showing 3 as tentative.

However, there is no evidence that the IAB report was verbatim and no evidence that the identification in Photo Showing 3 was tentative. Rather, all of the evidence in the record establishes that T.S.'s identification was tentative only because she selected two photographs,

and once she learned that she had selected two photographs of the same person, her hesitation

dissipated.  (Defs. SOF ¶¶ 91-94; Pl. Add'l SOF ¶ 34.)  Thus, because the police had a positive

identification by the victim, defendants have established that there was probable cause to arrest

and prosecute Plaintiff.  *Stansbury v. Wertman*, 721 F.3d 84, 90 (2d Cir. 2013) ("'[A]bsent

circumstances that raise doubts as to the victim's veracity,' a victim's identification is typically

sufficient to provide probable cause.") (quoting *Singer*, 63 F.3d at 119); *Vanderwoude v. City of

New York*, 12 CIV. 9046 KPF, 2014 WL 2592457, at *15 (S.D.N.Y. June 10, 2014) (positive

victim identifications, where plaintiff matched the description of the perpetrator, created

probable cause) (citing *Rodriguez v. State of New York,* No. 95 Civ. 3639(SHS), 1996 WL

197749, at *2 (S.D.N.Y. Apr. 23, 1996) ("[I]dentification of an individual as a perpetrator of a

crime by a putative victim of, or eyewitness to, the crime is in itself sufficient to establish

probable cause, as long as it is reasonable to believe that the putative victim or eyewitness is

telling the truth" (collecting cases)).

Likewise, the purported suppression of Photo Showings 1 and 2 does not rebut the

presumption of probable cause.  As a preliminary matter, there is no evidence that *Gottlieb*, as

opposed to Dunbar and Sciallo, who allegedly administered the photo showings, suppressed

Photo Showings 1 or 2, as discussed in more detail below.  In any event, the Government does

not have a "duty to present every item of arguably exculpatory evidence in seeking an

indictment."  *Poux v. County of Suffolk*, No. 09 CV 3081, 2012 WL 1020302, at *28 (E.D.N.Y.

Mar. 23, 2012) (quoting *Savino*, 331 F.3d at 75; *United States v. Williams*, 504 U.S. 36, 52

(1992) (declining to extend duty on prosecutors to present exculpatory evidence to the grand

jury)); *see also Parisi v. Suffolk County*, No. 04–CV–2187 (ENV)(ETB), 2009 WL 4405488, at

*10 (E.D.N.Y. Nov. 30, 2009) ("The simple act of not disclosing to the grand jury all evidence

that could potentially benefit the accused at a grand jury hearing does not necessarily rise to the level of bad faith, … "[T]he police and prosecutors cannot be said to have improperly concealed evidence every time the plaintiff is able to show that they could have done more or could have disclosed more. What is required is proof that the police conduct deviated egregiously from statutory requirements or accepted practices applicable in criminal cases.'") (citation omitted). At best, resolving all inferences in Plaintiff's favor, Photo Showings 1 and 2, taken together, could establish that before making a positive identification from a photo array, T.S. had failed, in the middle of the night, to identify Plaintiff from a different array.  Balanced against T.S.'s compelling positive identification, the suppression of Photo Showings 1 and 2 is not the type of egregious deviation from acceptable practices that strips an indictment of its presumptive force.

### B.  Did Probable Cause "Dissipate" After the Indictment Was Returned by the Grand Jury When Gottlieb Received the Serology Results?

Plaintiff contends, without citation, that probable cause was "independently vitiated" after the grand jury indictment by the exculpatory serology results.  This claim fails for two reasons.

First, even assuming that the presumption of probable cause can be rebutted by pointing to events that occurred *after* a grand jury indictment was returned,[10] as a factual matter, here, the

---

[10] There is language from the New York Court of Appeals suggesting that New York's presumption of probable cause cannot be vitiated by events that occurred *after* the grand jury Indictment was returned.  *Colon*, 60 N.Y.2d at 82-83.  In *Colon*, a seminal case on New York state malicious prosecution claims, the Court of Appeals explained that, generally:

> [o]nce a suspect has been indicted, … the Grand Jury action creates a presumption of probable cause.  The rule is founded upon the premise that the Grand Jury acts judicially and it may be presumed that it has acted regularly. The presumption may be overcome *only* by evidence establishing that the police witnesses have not made a complete and full statement of facts either to the Grand Jury or to the District Attorney, that they have misrepresented or falsified evidence, that they have withheld evidence or otherwise acted in bad faith.

serology results do not establish the "groundless nature of the charges." *Lowth v. Town of Cheektowaga*, 82 F.3d 563, 571 (2d Cir. 1996), *amended* (May 21, 1996) ("In order for probable cause to dissipate, the groundless nature of the charges must be made apparent by the discovery of some intervening fact."); *see also Sargent v. Cnty. of Nassau*, CIV.A.04-4274(DRH)(A, 2007 WL 778437, at *9 (E.D.N.Y. Mar. 13, 2007) (finding that "[w]hen viewed in the totality of the circumstances," the " new information that came to light subsequent to the grand jury indictment," — that the victim's boyfriend made an "unsworn statement" that he might have caused some of the injuries to the victim that were attributed to the plaintiff — "does not vitiate probable cause.").

The serology results merely established that Plaintiff was not the donor of the semen on the white towel or the saliva on the cigarette butts recovered from the scene. However, these ambiguous facts, alone, did not rebut the presumption of probable cause. The evidence was entirely consistent with the prosecution's theory that, as T.S. and F.S. testified, the type-A semen on the white towel was F.S.'s, and, as Gottlieb and Donohue testified, the ashtray at the crime scene was contaminated before the cigarettes smoked by the perpetrator could be collected. For the presumption of probable cause to be rebutted, intervening facts must establish "the groundless nature of the charges," not merely lend some support the criminal defendant's defense. *Lowth*, 82 F.3d at 571.

---

60 N.Y.2d at 82-83 (internal citations omitted, emphasis added). "[T]he trial court may not weigh the evidence upon which the police acted or which was before the Grand Jury *after* the indictment has issued. If plaintiff is to succeed in his malicious prosecution action after he has been indicted, he must establish that the indictment was produced by [misconduct.]" *Id.* (emphasis added). This Court need not reach whether probable cause can be dissipated by facts occurring after a grand jury indictment because, even assuming it can be, there is not sufficient evidence in the record to support Plaintiff's argument that probable cause was dissipated by the serology results. *See Wilson v. City of New York*, 480 F. App'x 592, 595 (2d Cir. 2012) (summary order) (stating that "[e]ven assuming arguendo that probable cause can 'dissipate' after the grand jury indictment has been filed," plaintiff's malicious prosecution claim failed for other reasons.)

Second, even if the serology results were compelling enough to dissipate probable cause, such a claim could not be asserted against Gottlieb, a police officer.  This is because, upon receiving an indictment, custody of the case is transferred from the police to prosecutors, and with it, all attendant responsibility.  In *Bernard v. United States*, the Second Circuit considered a malicious prosecution claim asserted against federal law enforcement officers for failing to investigate "several intervening facts … [which] occurred after [the plaintiff's] indictment."  25 F.3d 98, 104 (2d Cir. 1994).  The Second Circuit explained that "[o]nce the grand jury indicted [the plaintiff], control of the prosecution passed to the prosecutor and was no longer within the agent's authority."  *Id*.; *see also Wilson*, 480 F. App'x 592, 595 (rejecting plaintiff's argument "that probable cause—notwithstanding the grand-jury indictment—'dissipated' during the duration of the detention in light of new evidence" because, "[e]ven assuming arguendo that probable cause can 'dissipate' after the grand jury indictment has been filed, the decision to continue prosecution after the new evidence came to light was made by the assistant district attorney and the court, not by [officers] … none of whom had control over [the plaintiff's] case during the time in which the strength of the evidence against [the plaintiff] weakened.");  *see also King v. City of New York*, 12-CV-2344 NGG RER, 2013 WL 2285197, at *7 (E.D.N.Y. May 23, 2013) (same).  Here, it was the prosecutors' decision to press forward with the prosecution after receiving the serology results and interviewing, *inter alia*, T.S. and Gottlieb.

Accordingly, Defendants' motion for summary judgment as to Plaintiff's malicious prosecution claim is granted.

## II.    Section 1983 Fair Trial Claim

A Section 1983 "fair trial" claim is a claim for civil damages for violations of a criminal

defendant's due process rights. *Ramchair v. Conway*, 601 F.3d 66, 73 (2d Cir. 2010) (quoting *Cone v. Bell*, 556 U.S. 449, 451 (2009)) ("The right to a fair trial [is] guaranteed to state criminal defendants by the … Due Process Clauses [of the Fifth and Fourteen Amendments, defined]… largely through []several provisions of the Sixth Amendment.") (citations and quotation marks omitted). A § 1983 claim for a violation of the right to a fair trial lies, *inter alia*, where a police officer "creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Ricciuti*, 124 F.3d at 130. Such a fair trial claim can be sustained "even if the officer had probable cause to arrest in the first place." *Abreu v. City of New York*, 04 CV 1721 JBW, 2006 WL 401651, at *6 (E.D.N.Y. Feb. 22, 2006) (citing *Jocks v. Tavernier*, 316 F.3d 128, 138 (2d Cir. 2007)). A fair trial claim can also arise where police or prosecutors "withhold evidence that is 'material' to a criminal defendant's guilt or punishment." *McCaffrey*, 2013 WL 494025, at *10 (citing *Brady v. Maryland*, 373 U.S. 83, 87 (1963)). In effect, this type of fair trial claim allows for monetary recovery for *Brady* violations.

Plaintiff asserts that he was deprived of his right to a fair trial when (1) Defendants Dunbar and Gottlieb allegedly concealed Photo Showings 1 and 2 from prosecutors (and thus the defense); (2) Defendant Gottlieb allegedly tampered with T.S. and F.S.'s identifications of Plaintiff; (3) Defendants Gottlieb and Donohue allegedly testified falsely that the crime scene was contaminated; and (4) Defendant Gottlieb allegedly coerced T.S. and F.S. to lie, both about how they used the white towel recovered from the crime scene and about how the attacker held his pants up during the rape.

### A. Dunbar's and Gottlieb's Failure to Disclose Photo Showings 1 and 2

Plaintiff argues that he was deprived of a fair trial because Dunbar and Gottlieb concealed Photo Showings 1 and 2 in violation of the rule set out in *Brady*, 373 U.S. 83, and its

progeny. A "true *Brady* violation" has three components: (1) the material "evidence at issue must be favorable to the accused, either because it is exculpatory or because it is impeaching," (2) "that evidence must have been suppressed by the State, either willfully or inadvertently," and (3) "prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999). To constitute a *Brady* violation, the suppressed evidence must have been material, that is, "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Id.* at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "[T]he question in addressing a purported *Brady* claim is 'not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *McCaffrey*, 2013 WL 494025, at *11 (citing *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)). In other words, there is no *Brady* violation unless "a reasonable probability" exists that the favorable evidence could have reasonably "undermine[d] confidence in the outcome of the trial." *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 678). Additionally, when, as here, the defendants are police officers, "the scope of possible liability [for a *Brady* violation] is necessarily more limited because police officers satisfy their obligation under *Brady* when they turn over exculpatory information to prosecutors, unless there is some indication that the police have suppressed evidence." *McCaffrey*, 2013 WL 494025, at *12.

Here, Plaintiff cannot establish that he was denied a fair trial as a result of the failure of Police Officers Dunbar and Gottlieb to disclose Photo Showing 1. It is undisputed that the array did not include a photograph of Plaintiff and that T.S. did not positively identify her attacker from that array. (Pl. Ex. 18, IAB Report at ¶ 20.) Rather, she observed that one of the men in the photos "resembled" her attacker. (*Id.*) Thus, Photo Showing 1 had no exculpatory value for

the defense. *See King v. Greiner*, 210 F. Supp. 2d 177, 184 (E.D.N.Y. 2002) ("[P]hotographs were not evidence favorable to the defendant under *Brady* because [the witness] did not identify the men in the photographs as the perpetrator; he merely said that they resembled the perpetrator."); *Dawkins v. New York*, 08-CV-2441 NGG, 2011 WL 3625150, at *6 (E.D.N.Y. Aug. 16, 2011) (finding no *Brady* violation where, "before identifying [the accused] in a photo array, [the witness] looked through several other photos[, which were not disclosed,] without making any identification."); *Mitchell v. Goldsmith*, 878 F.2d 319, 322 (9th Cir. 1989) (finding no *Brady* violation where the prosecution suppressed photographs of a lineup, not including the accused, "[b]ecause the victim failed to identify anyone in the lineup[,thus] the lost evidence was irrelevant").

Likewise, contrary to Plaintiff's speculation that Photo Showing 1 might have been used to impeach T.S.'s statement that the first time she remembered seeing any photographs was during Photo Showing 3, given the strength of T.S.'s identification, Photo Showing 1 does not represent material impeachment evidence. (Defs. Add'l SOF ¶ 67.); *See Bagley*, 473 U.S. at 676 ("T[he Supreme] Court has rejected any ... distinction between impeachment evidence and exculpatory evidence [in the *Brady* context]"); *see also Giglio v. United States*, 405 U.S. 150, 154 (1972). The rape occurred sometime after midnight, in the early morning hours of December 1, 1983. (1985 Tr. at 175:5-13.) Immediately afterwards, T.S. was taken to the hospital, (*id.* at 164:3-7), and then interviewed and, *inter alia*, shown photographs by Dunbar and Sciallo, (Pl. Ex. 18, IAB Report ¶¶ 20, 24.1). Around 8:00 a.m., Gottlieb interviewed T.S. and showed her photographs — of which she selected two photos of the same person, Plaintiff. (1985 Tr. at 175:5-13.) Cross examination into whether T.S. viewed photos at some point in the middle of the night, would have, at best, impeached her recollection of the minute details of the

early investigation.  But T.S. testified that, in effect, the early hours of the investigation were a

blur — it was a "zoo" and fifty police officers were "yelling" questions at her, "asking, how tall,

what he looked like, how tall. What color hair[?]" (*Id.* at 163:6-164:2, 166:6-12.)  By contrast,

she testified that she saw her attacker's face for a period of around 45 minutes, including in a

"well lit" kitchen and bathroom, and when she identified Plaintiff at trial, she was "absolutely

positive" that he was the man who raped her and testified that she would "never" forget his face.

(*Id*. at 165:22-166:2, 144:4-8, 155:16-19, 201:9-14.)  Thus, in light of T.S.'s compelling

identification testimony and the minimal impeachment value of Photo Showing 1, Plaintiff has

not met his burden of demonstrating that officers Dunbar and Gottlieb withheld *material*

impeachment evidence.[11]  *See May v. Hoke*, 711 F. Supp. 703, 712 (E.D.N.Y. 1988) *aff'd*, 875

F.2d 857 (2d Cir. 1989) (finding "in light of overwhelming evidence of guilt, there simply was

no 'reasonable probability' that collateral impeachment of [an investigating police officer] would

have resulted in a different verdict"); *see also People v. Garrett*, 23 N.Y.3d 878, 892, 994

N.Y.S.2d 22, 34 (2014) (finding no *Brady* violation where the prosecution withheld the fact that

---

[11] Plaintiff asks the Court to draw an adverse inference — "that the photograph T.S. selected, which constitutes her most complete description of the perpetrator as of several hours after the rape, was favorable to [Plaintiff's] defense" — against Dunbar for failing to preserve the photograph that T.S. selected during Photo Showing 1.  (Pl. Opp'n at 34.)  "Adverse inferences are appropriate where (1) relevant evidence is destroyed; (2) with culpability; (3) when the defendant was under a duty to preserve the evidence."  *Burgos v. Satiety, Inc.*, 10-CV-2680 MKB, 2013 WL 801729, at *5 (E.D.N.Y. Mar. 5, 2013) (citations and quotation marks omitted).  This Court declines to draw such an inference because Plaintiff has offered no evidence suggesting that Dunbar acted with a "culpable state of mind," *i.e.*, that he "intentional[ly] or grossly negligent[ly]" failed to preserve the photo T.S. selected, or that he had any duty to preserve a photograph that a victim identified only tentatively as *resembling* her attacker.  *Residential Funding Corp. v. DeGeorge Fin. Corp.*, 306 F.3d 99, 108-110 (2d Cir. 2002).  In any event, given the strength of T.S.'s identification testimony, such an inference would not alter the result of this Court's analysis.  *See Burgos*, 2013 WL 801729, at *7 (collecting cases standing for the proposition that an inference based on "destruction of evidence, standing alone, is [not] enough to allow a party who has produced no evidence—or utterly inadequate evidence—in support of a given claim to survive summary judgment on that claim") (quoting *Kronisch v. United States*, 150 F.3d 112, 128 (2d Cir. 1998)).

a police officer involved in plaintiff's confession was the subject of an unrelated civil rights lawsuit, since such impeachment material "concerned a collateral issue that was only tangentially relevant to defendant's prosecution" and "the value of the undisclosed information … would have been, at best, minimal" (citation and quotation marks omitted)).

Plaintiff also asserts, relying on an expert on mistaken identifications, that the mere fact that T.S. viewed photographs prior to making a positive identification should have been disclosed because it undermined her subsequent identifications and may have contributed to the misidentification. The Second Circuit Court of Appeals has lamented the "vagaries of human memory and the inherent suggestibility of many identification procedures," and acknowledged the fact that "false identification rates increase, and accuracy on the whole decreases, when there are multiple identification procedures." *Young v. Conway*, 698 F.3d 69, 78 (2d Cir. 2012) (internal quotations and citations omitted). Nonetheless, "police may use more than one identification procedure to identify suspects as long as the procedures utilized are fair and not [unduly] suggestive." *Taylor v. Kuhlmann*, 36 F. Supp. 2d 534, 551 (E.D.N.Y. 1999) (concluding that it was not improper for a witness to view two photo arrays a few weeks before the lineup where procedures used were not unduly suggestive); *see also Ragunauth v. Ercole*, 07 CV 1692 (NG), 2008 WL 5401586, at *9 (E.D.N.Y. Dec. 23, 2008) (finding "the witness viewing petitioner two times in a photo array did not taint the subsequent lineup"); *Perez v. Smith*, 791 F. Supp. 2d 291, 315 (E.D.N.Y. 2011) (photo arrays that were not unduly suggestive would not taint pretrial lineups and trial identifications). The mere fact that a witness viewed photographs on multiple occasions is not the type of material impeachment evidence that gives rise to a *Brady*-based fair trial claim. Since there is no allegation that Photo Showing 1 was impermissibly suggestive and this Court has already determined that it was not otherwise *Brady*

material (*i.e.*, material exculpatory or impeachment evidence), there can be no constitutional violation on this basis.

With regard to Photo Showing 2, shortly before trial, Sciallo disclosed to ADA Nathan that he showed T.S. a photographic array which included a photograph of Plaintiff, and that T.S. did not identify her attacker from that array. (Pl. Ex. 18, IAB Report ¶ 24.1 (Sciallo "said [to investigators that] Scott Fappiano's picture was included in these photos…. [He] asked her how she made out. She answered, 'Nothing.'").) This Court need not reach whether this photographic lineup constitutes *Brady* material, because Sciallo fulfilled his *Brady* obligations and revealed the lineup to ADA Nathan. (*Id.* at ¶ 24.4); *Collins v. City of New York*, 923 F. Supp. 2d 462, 476 n.6 (E.D.N.Y. 2013) (a police officer's "constitutional obligation [is] to disclose exculpatory evidence … to the prosecutor"). ADA Nathan, in turn, independently decided not to disclose the results of Photo Showing 2 to defense counsel. (Pl. Ex. 19, Nathan Dep. at 90:6-91:22; *see also* Pl. Ex. 18, IAB Report ¶¶ 2-3.)[12] Plaintiff has not named ADA Nathan as a defendant in this action, but instead seeks to hold Dunbar responsible for failing to turn over this potentially exculpatory information. However, any harm that was caused by Dunbar's failure to disclose Photo Showing 2 was proximately caused by ADA Nathan's intervening decision to withhold that information from the defense — a decision that was not reasonably foreseeable, given that prosecutors have a legal duty to turn over potentially

---

[12] The wisdom of ADA Nathan's decision not to disclose Photo Showing 2 is not before this Court because ADA Nathan is not named as a defendant in this action.

exculpatory information to the defense.[13] *Wray v. City of New York*, 490 F.3d 189, 193 (2d Cir. 2007) ("Our analysis of constitutional torts-like any other tort-is guided by common-law principles of tort," including causation); *Zahrey v. Coffey*, 221 F.3d 342, 351 & n.7 (2d Cir. 2000) (explaining that a reasonably unforeseeable superseding cause breaks "but for" causation); *see also Townes v. City of New York*, 176 F.3d 138, 147 (2d Cir. 1999) ("It is well settled that the chain of causation between a police officer's unlawful arrest and a subsequent conviction and incarceration is broken by the intervening exercise of independent judgment[,] … in the absence of evidence that the police officer misled or pressured the official who could be expected to exercise independent judgment"). Plaintiff suffered no prejudice as a result of Dunbar's failure to disclose Photo Showing 2, given that ADA Nathan was fully aware of Photo Showing 2 and its results.

### B. *Gottlieb's Alleged Pre-Arrest Tampering with F.S.'s and T.S.'s Identifications of Plaintiff*

Plaintiff alleges that Gottlieb impermissibly influenced and attempted to improperly bolster F.S. and T.S.'s identifications of Plaintiff. Specifically, Plaintiff alleges that Gottlieb (1) unduly influenced F.S. to make a positive identification of Plaintiff in Photo Showing 4 and attempted to unduly influence him to make an additional positive identification of Plaintiff at the lineup (Pl. Opp'n 29-31); and (2) recast T.S.'s tentative identification in Photo Showing 3 as positive and unduly influenced her to make an additional positive identification of Plaintiff at the lineup (Pl. Opp'n 31-32). In support of this argument, Plaintiff points to F.S.'s altered lineup card, and asks this Court to infer that Gottlieb told F.S. that his wife had selected the person

---

[13] Additionally, Plaintiff argues that had Dunbar disclosed Photo Showing 1 to ADA Nathan, ADA Nathan might not have doubted Sciallo's credibility about Photo Showing 2 and thus disclosed the results of Photo Showing 2 to the defense. However, given that Photo Showing 1 was not exculpatory, Dunbar was under no duty to disclose it to ADA Nathan and cannot be held liable for ADA Nathan's independent decision not to reveal Photo Showing 2 to the defense.

seated in position 4, and further asks this Court to infer that Gottlieb altered the card to conceal her unsuccessful attempt to manufacture a positive identification by F.S., when unbeknownst to Gottlieb, Plaintiff changed seats between the lineup viewing.  Plaintiff also submits the expert opinion of Steven Penrod, who opines that it would be very unusual for an eyewitness to be able to identify a person in a photograph but then be unable to identify that same person in a lineup the next day.  Finally, Plaintiff asks this Court to draw an adverse inference against Gottlieb for destroying her notes from her initial interview with T.S. and for failing to preserve the audiotape from F.S.'s lineup.   Plaintiff asks this Court to infer that, if Gottlieb was prepared to exert influence over F.S.'s identifications, she must have been just as willing to improperly influence T.S.

Given that Plaintiff's argument simply piles impermissible inference upon impermissible inference, the Court finds that Plaintiff has not adduced sufficient evidence to avoid summary judgment on this ground.  *Hicks*, 593 F.3d at 166 ("[A] party may not rely on mere speculation or conjecture … to overcome a motion for summary judgment," and "[m]ere conclusory allegations or denials ... cannot by themselves create a genuine issue of material fact where none would otherwise exist.") (citation and quotation marks omitted).  With regard to T.S., there is simply no evidence of witness tampering.[14]   As explained above, all of the evidence suggests that

_____

[14] This Court declines to draw an adverse inference against Gottlieb from failing to preserve her initial interview notes from 1983 until this lawsuit.  Although Plaintiff contends that Gottlieb destroyed her notes "in direct violation of NYPD policy that detective notes be filed in the case folder at the conclusion of an investigation," (Pl. Opp'n at 34), Plaintiff offers no support for this proposition.  Gottlieb testified at her deposition that in 1983, her practice was to throw away her handwritten notes after she reduced them to a DD5.  Included as exhibit 16 to Plaintiff's submission are excerpts of Gottlieb's deposition transcript.  However, that transcript includes pages 70-71, and then 74-81, omitting the two pages in between where Gottlieb explains that "[i]n those days after you transcribed [interview notes] … you just threw them in the garbage.  You transposed it and … there was [*sic*] no Photostat machines.  There was [*sic*] no cell phones, no Internet.  Everything was on standard typewriter so you ripped –" at which point Plaintiff's counsel interrupted the witness, "Gotcha, gotcha." (Defs. Ex. RR at 72-73.)  Plaintiff

T.S. made a positive identification of Plaintiff at Photo Showing 3, and any initial hesitation T.S. expressed arose out of the fact that she chose two photographs, each of which she believed was her assailant.  Moreover, after making an in-court identification, she testified that she was certain that Plaintiff was her attacker.  All of Gottlieb's contemporaneous reports are entirely consistent with her testimony on T.S.'s identifications.  There is simply nothing from which a reasonable jury could infer that T.S.'s identification resulted from unduly suggestive identification procedures.

With regard to F.S., Plaintiff cannot make out a cognizable fair trial claim based on unduly suggestive identification procedures because F.S.'s identification did not reach the jury. *See Zahrey*, 221 F.3d at 348 (explaining that there is "no constitutional violation" based on evidence fabrication, "*in and of itself*" because the violation occurs when the fabricated evidence "result[s] in a deprivation of … liberty" (emphasis in original)) (citing, *inter alia*, *Buckley v. Fitzsimmons*, 20 F.3d 789, 795 (7th Cir. 1994) (observing that if a prosecutor tortured a witness to obtain a statement implicating defendant and put that statement "in a drawer, or framed it and hung it on the wall *but took no other step,*" no constitutional right of defendant would be violated) (emphasis added)).  F.S. did not make a positive identification at the lineup and Photo

---

has offered no evidence that Gottlieb had a duty to preserve her notes or destroyed them with a "culpable state of mind."  *Residential Funding Corp.*, 306 F.3d at 108-110.  Accordingly, he is not entitled to an adverse inference on this issue.  Plaintiff relies on *Manganiello*, in which the Second Circuit affirmed the trial court's jury instruction advising jurors that they could draw an adverse inference against an officer for losing the entire homicide file at some point in 2001 for the case at issue.  612 F.3d at 166.  The Court explained that because officers' DD5s were inconsistent, "handwritten notes made prior to the preparation of the various DD5s may have contained clarifying information that was not incorporated in the DD5s."  *Id*.  First, contrary to Plaintiff's contention, *Manganiello* does not suggest that officers had a duty, in 1983, to preserve their original handwritten notes.  Second, unlike in *Manganiello*, there are no inconsistencies between various officers' DD5s suggesting that the DD5s are incomplete.  While this Court is loath to hold "the prejudiced party to too strict a standard of proof regarding the likely contents of the destroyed evidence," in this case, there is nothing suggesting that Gottlieb's handwritten notes contained anything that was not in Gottlieb's DD5s.  *Kronisch*, 150 F.3d at 128.

Showing 4 was not introduced to the jury.[15]  As a result of F.S.'s inability to identify the assailant, F.S.'s testimony was not central to the prosecution's case against Plaintiff and was primarily used to establish that the crime occurred, not that Plaintiff committed it.  Indeed, at Plaintiff's first trial, the presiding judge precluded the ADA from asking F.S. whether he knows who raped his wife and instructed the jury that "[F.S.] is unable to make an identification. … He may think he knows something in his mind.  He cannot – there is no evidentiary value to anything he says as to who raped his wife. … His testimony with respect to that is valueless." (1984 Tr. at 117:11-118:7.)[16]

In any event, even if a fair trial claim could be based on an unsuccessful attempt at witness tampering, Plaintiff has not adduced enough evidence from which a reasonable jury

---

[15] Indeed, the jury learned that F.S.'s opportunity to view the assailant was extremely limited and that he selected someone other than Plaintiff from a lineup.  The jury learned that immediately after the attack, F.S. asked his wife, "what did he look like…?" before he ran out of the house to chase the assailant.  (Defs. SOF ¶ 35; Pl. SOF ¶ 35).  F.S. testified at Plaintiff's first trial that he never saw the assailant's face; F.S. was asleep until the assailant woke him and the assailant immediately bound him and forced him, at gun-point, to face a wall.  After the first trial resulted in a hung jury, F.S. testified at Plaintiff's second trial that he saw the assailant's face for approximately five seconds.  (Defs. SOF ¶¶ 101-02; Pl. SOF ¶ 102).  F.S. admitted at Plaintiff's second trial that he could not have identified the assailant based on his own observations and memory, so in the days before the lineup and Photo Showing 4, he "drilled [T.S.] … about what [the assailant] looked like.  What he was like.  Everything about him," so that he could make an identification "based on the things [his] wife had told [him,]" because he "wanted to be more help."  (1985 Tr. at 632:5-21.)

[16] Plaintiff argues that had the jury been privy to Gottlieb's alleged attempts to manufacture F.S.'s identification, it "could reasonably have found such blatant police misconduct discredited her entire police investigation and all the evidence it produced – including … the identification made by T.S. at the very same lineup."  (Pl. Opp. at 30.) However, even if the evidence in the record could support the inference that Gottlieb unduly influenced F.S.'s identification of Plaintiff, Plaintiff's theory of harm is too speculative.  As explained above, there is not a scintilla of evidence suggesting that Gottlieb tampered with T.S.'s pre-arrest identifications of Plaintiff.

could infer that F.S.'s allegedly false testimony was tampered with *by Gottlieb*.[17]  Plaintiff asks this Court to draw a conclusion of witness tampering from the altered lineup card.  However, the mere fact that the lineup card was altered does not, on its own, support the inference that it was nefariously altered to conceal a failed attempt at witness tampering.  Indeed, the coincidence of husband and wife both selecting position number four from a lineup of six similar looking participants is hardly the kind of damning evidence that one would expect to trigger a covered up.  Plaintiff's speculative theory is simply unsupported by any evidence in the record.

### C. Gottlieb and Donohue's Alleged Perjury

Plaintiff alleges that after he was arrested, Gottlieb was convinced of his guilt.  He alleges that upon receiving exculpatory serology results from the tests that were run on the cigarette butts,[18] faced with cracks in her theory, Gottlieb fabricated a story of crime scene contamination to inoculate the case from the allegedly incontrovertible evidence of Plaintiff's innocence.  Plaintiff also brings claims against Donohue for the allegedly fabricated contamination story.  In support of his allegations, Plaintiff points out that although Gottlieb

---

[17] Plaintiff asks this Court to draw an adverse inference against Gottlieb from her failure to preserve the tape recording of F.S.'s lineup viewing.  However, ADA Bohdan Ozaruk testified at the *Wade* hearing that it was generally the ADAs who were responsible for tape recording lineups, and he was in charge of tape recording Plaintiff's lineup.  (*Wade* Tr. at 168:3-5.)  He testified that F.S.'s lineup viewing was not recorded because he did not turn the tape recorder back on after T.S.'s identification.  (*Id.* at 167:18-22 (stating that the tape recorder was turned off during F.S.'s identification at the lineup)).  Consistent with ADA Ozaruk's testimony, F.S. testified at the *Wade* hearing that present at the lineup were Gottlieb and ADAs Melendez and Ozaruk, and that ADA Ozaruk was holding a tape recorder.  (*Id.* at 177:11-19.)  In light of ADA Ozaruk's testimony that it was he, and not Gottlieb, who was responsible for recording the lineup, and that he failed to make the recording, the Court finds that Plaintiff has not established that a tape was ever destroyed, let alone destroyed by Gottlieb.  Accordingly, this Court declines to draw an adverse inference against Gottlieb based on the lack of the lineup tape.

[18] Five cigarette butts were collected from the crime scene.  (*Id.* at ¶¶ 120, 124.)  ABO testing on those cigarettes indicated that all five had been smoked by a blood-type A secretor, consistent with the blood-type of F.S. and not with that of Plaintiff, who is a blood-type O secretor.  (Pl. Add'l SOF ¶¶ 86, 95.)

"dotted all [her] I's and crossed all [her] T's," (Pl. Ex. 16, Gottlieb Dep. 70:24-71:15), and, although NYPD policy required that officers document any possible contamination or other concerns about the integrity of the evidence, (Pl. Add'l SOF ¶ 121), neither Gottlieb nor Donohue made any contemporaneous records of the alleged contamination. (Pl. Add'l SOF ¶¶ 106, 113, 122; 1985 Tr. at 811:3-6; 812:19-813:5 (Donohue testifying that he told Gottlieb about the contamination on the day he collected the cigarettes, but did not contemporaneously document the contamination or tell the prosecutor about it until preparing for the first trial)). Plaintiff also notes that when Gottlieb debriefed ADA Melendez prior to the case being presented to the grand jury (and prior to receiving the serology results), she told ADA Melendez about the cigarette butts and did not mention any concerns with this evidence. (Pl. Add'l SOF ¶ 106.) Based on conversations with Gottlieb, ADA Melendez introduced the cigarette butts before the grand jury. Moreover, Plaintiff notes that the timing is suspect — the contamination story did not emerge until after the serology results came back.

Plaintiff's speculative theory is not supported by the record.[19] In any event, testimonial immunity is a barrier to Plaintiff's fair trial claims premised on the officers' perjury. A claim for denial of a fair trial based on fabrication of evidence or false testimony arises if a police officer

---

[19] Plaintiff supports this argument only with mischaracterizations of the record. Plaintiff asserts that despite Gottlieb's testimony at his trial that she knew the crime scene was contaminated upon her arrival at the scene on the afternoon of the rapes, she "admitted in [her] 2009 [deposition] that she never had any concerns about crime scene contamination." (Pl. Opp. at 24.) However, at her deposition, Gottlieb stated only that in 2009 she could no longer recall whether she ever thought the crime scene was contaminated. (*See* Pl. Ex. 16 ("Gottlieb Dep.") at 439 ("Q. At that time on the first day you were there on that day . . . do you remember having any concerns about the fact that the crime scene was contaminated? A. I don't remember. I don't remember. I really don't remember.").) Similarly, Plaintiff inaccurately asserts that Gottlieb admitted that had she actually had any concerns about contamination at the time she collected evidence from the crime scene, she would have noted it in her police reports. In fact, Gottlieb testified only that, as she sat at her deposition in 2009, she believed such information would be "important" to include in a report, (*see id*. at 439-40), but made no indication as to whether in 1983 she would have included such information in her report. (*Id*.)

creates false information likely to influence a jury's decision and then forwards that information to prosecutors. *Ricciuti*, 124 F.3d at 130; *see also Myers v. Cnty. of Nassau*, 825 F. Supp. 2d 359, 367 (E.D.N.Y. 2011). However, where, as here, a plaintiff's claim is premised on perjury by police officers, the plaintiff's ability to recover for violations of his right to a fair trial is hindered by the common law doctrine that shields witnesses, including officers, in a cloak of absolute immunity for their testimony in judicial proceedings. *See Briscoe v. LaHue*, 460 U.S. 325, 335-336 (1983); *see also Rehberg v. Paulk*, — U.S. —, 132 S.Ct. 1497, 1505 (2012). In *Briscoe*, the Supreme Court held, in no uncertain terms, that "the common law provide[s] absolute immunity from subsequent damages liability for all persons — governmental or otherwise — who were integral parts of the judicial process." *Briscoe*, 460 U.S. at 335. The Court acknowledged that "[t]here is, of course, the possibility that, despite the truth-finding safeguards of the judicial process, some defendants might indeed be unjustly convicted on the basis of knowingly false testimony by police officers[,]" however, it nevertheless concluded that "the alternative of limiting the official's immunity would disserve the broader public interest." *Id.* at 345.

Where a fabricated story reaches a jury only through perjured testimony, a criminal defendant has no claim under § 1983. *Jovanovic v. City of New York*, 486 F. App'x 149, 152 (2d Cir. 2012) (summary order) (affirming grant of summary judgment where "the only avenue by which the [allegedly fabricated] testimony could reach the jury was through [a police officer's] testimony, for which he enjoys absolute immunity."). A plaintiff cannot circumvent an officer's immunity by recasting his claim as one directed at preparatory activity, such as telling a prosecutor the same lies that would ultimately reach the jury through perjured testimony. This is because testimonial immunity extends to "preparatory activity, such as a preliminary discussion

in which the witness relates the substance of his intended testimony [to the prosecutor.]" *Rehberg*, 132 S. Ct. at 1507; *see also Franklin v. Terr*, 201 F.3d 1098, 1101-02 (9th Cir. 2000) (explaining that testimonial immunity also extends back in time from the trial to encompass the defendant's "conspiratorial" behavior of conferring with another witness to ensure the consistency of their respective testimony).

That said, "a defendant cannot use *Briscoe*'s rule of absolute immunity as a shield to protect a whole course of conduct merely because, at some point, the defendant was linked to testimony given in a judicial proceeding." *Mitchell v. City of Boston*, 130 F. Supp. 2d 201, 212 (D. Mass. 2001); *McCaffrey*, 2013 WL 494025, at *4 ("[A]lthough a police officer's actions in suppressing exculpatory evidence and influencing witnesses may be relevant to a fair trial claim, *Rehberg*'s holding is clear that that police officer is still entitled to absolute immunity for claims based on his actual *testimony*.") (emphasis in original). For example, in *Mitchell*, the plaintiff, who was later exonerated by DNA evidence, was convicted of the rape of an eleven year old girl, purportedly as a result of the misconduct of two police officers. 130 F. Supp. 2d at 213. According to the plaintiff's "version of events," one police officer fabricated a case against the defendant-turned-plaintiff after serology results showed that he was not a match for semen taken from the victim's clothes. According to the plaintiff, after that officer's testimony was held to be inadmissible, the officer "convinced his then-partner to fabricate [a story that the plaintiff had spontaneously confessed to wearing an outfit matching the description given by the victim] … to cast the circumstances of the confession in a light that would ensure its admissibility at trial." *Id.* The plaintiff denied ever giving the statement and pointed out that there were no contemporaneous records of this purported statement, although such records were required. In resolving the defendant officers' summary judgment motion, the court found that the officer

whose total involvement was allegedly testifying falsely was immune under *Briscoe*, while the other officer, who was "the mastermind of the plot to fabricate evidence," was not immune because he did more than falsely testify – he fabricated a case against the defendant-turned-plaintiff by taking "it upon himself to fill the gaps in his story by soliciting false testimony from [his partner]." *Id.* The Court explained that these pre-trial acts "were not inextricably tied to his role in the judicial proceedings," and while his false testimony "cannot provide the basis for [the plaintiff's] claim," "the extra-judicial course of conduct taken on [the officer's] part to secure the conviction of [the plaintiff] with a fabricated story of a police station confession," could support a fair trial claim. *Id.*

Here, Gottlieb testified at Plaintiff's trial that she knew the crime scene was contaminated as soon as she arrived on the scene. (Defs. SOF ¶ 133; Pl. Add'l SOF ¶¶ 89-90.) Donohue, who collected the cigarette butts, also testified that he believed that the crime scene was contaminated and recounted a heated discussion with a senior officer about collecting cigarette butts. (Pl. Add'l SOF ¶ 110.) He testified at Plaintiff's second trial that although he never expressly reported that the scene was contaminated, he made a notation on the crime scene folder that the scene had not been "safeguarded." (1985 Tr. at 810:11-18, 816:4-11.) The jury heard about the contamination only from Gottlieb and Donohue. There is no allegation that Gottlieb caused Donohue to falsely testify. Because the officers are immune from liability for their testimony and the only route by which the allegedly false contamination story reached the jury was through that testimony, Plaintiff's fair trial claim based on the cigarette butts fails.

### D. Gottlieb's Alleged Post-Arrest Witness Tampering

Plaintiff also alleges that, facing cracks in her case, Gottlieb tampered with (1) T.S. and F.S.'s testimony regarding the white towel to inoculate the case from exculpatory serology

results and (2) T.S.'s testimony regarding the perpetrator's peculiar manner of holding up his pants during the rape to explain why T.S. did not report seeing Plaintiff's distinctive tattoos.

### 1. T.S.'s and F.S.'s Alleged Perjury Regarding the White Towel

Plaintiff argues that Gottlieb improperly fabricated false evidence by suborning T.S. and F.S. to commit perjury regarding the origins of the semen on the white towel. Gottlieb removed the white towel from the crime scene and sent it for serological testing. Before receiving test results indicating that the white towel was saturated with type-A semen — which excluded Plaintiff who has type-O blood and was consistent with F.S.'s blood type — there was no mention that the white towel was unrelated to the rape. (Pl. Add'l SOF ¶ 98.) During Plaintiff's first trial, T.S. testified that she had told Gottlieb that the towel had nothing to do with the case, that the semen on it was her husband's, and that the towel should not have been removed from her apartment. Gottlieb made no contemporaneous records of this conversation, and never testified that it occurred. During Plaintiff's second trial, T.S. denied having a conversation with Gottlieb about the white towel, but again testified that the towel had her husband's semen on it. Plaintiff speculates that T.S. committed perjury when she testified regarding the origin of the sperm on the white towel, that Gottlieb persuaded her to do so, and that this perjury led to his wrongful conviction.

In order to survive summary judgment on a witness tampering claim, a plaintiff must offer some proof of witness tampering. In many cases, this proof comes in the form of a recantation from a tampered-with witness.[20] However, a plaintiff is not required to present direct

---

[20] For example, in *McCaffrey*, the plaintiff, who spent two years in prison for a rape he did not commit, sought to hold officers liable for allegedly tampering with a witness to conceal the fact that the alleged rape-victim had been involved in an altercation with her friends on the night that she was allegedly raped. One of the victim's friends who was involved in the altercation testified at her deposition that she told officers about the fight but they instructed her that "it wasn't important to bring ... up[ ] because that could probably affect the case."

evidence of witness tampering; he can defeat summary judgment by pointing to circumstantial evidence from which a reasonable jury could infer that a witness was tampered with by a defendant. *Cf. Drummond v. Cunningham*, 08 -CV-4290 KAM, 2010 WL 5583116, at *7 (E.D.N.Y. Dec. 13, 2010) *report and recommendation adopted*, 2011 WL 132379 (Jan. 17, 2011) (noting, in reviewing a petition for habeas corpus, that "[i]ndirect or circumstantial evidence may suffice to establish witness tampering"); *United States v. Brown*, 236 F.2d 403, 405 (2d Cir. 1956) ("This Circuit … has unequivocally rejected the view that circumstantial evidence is probatively inferior to direct evidence and that its sufficiency is, therefore, to be determined by a different, more stringent test, than is applied to direct proof.").

Courts have denied summary judgment where circumstantial evidence suggests that a witness testified falsely and that the defendant officials were involved in suborning the false testimony. *See, e.g.*, *Zahrey v. City of New York*, CIV.A. 98-4546 DCP JCF, 2009 WL 54495, at *10 (S.D.N.Y. Jan. 7, 2009) *amended on reconsideration in part*, 2009 WL 1024261 (Apr. 15, 2009) (denying summary judgment, based on inconsistencies in witness's testimony and evidence that officers promised witness leniency in exchange for his testimony); *Manganiello v. City of New York*, 07 CIV. 3644 HB, 2008 WL 2358922, at *6-7 (S.D.N.Y. June 10, 2008)

---

*McCaffrey*, 2013 WL 494025, at *6. The Court denied the defendant officers' motion for summary judgment because this deposition testimony created "genuine issues of material fact as to whether [the officers] fabricated or suppressed evidence relating to the purported altercation." *Id.* at *13. *See also Knox v. Cnty. of Putnam*, 10 CIV. 1671 ER, 2012 WL 4462011, at *4 (S.D.N.Y. Sept. 27, 2012) (denying defendant's motion for summary judgment as to witness tampering claims, based on a witness's deposition testimony that the defendant police officer repeatedly threatened her and pressured her to lie to implicate the plaintiff); *Doswell v. City of Pittsburgh*, CIV.A. 07-0761, 2009 WL 1734199, at *9 (W.D. Pa. June 16, 2009) (denying defendant's motion for summary judgment where a witness, who, had identified the defendant at trial, "stated in an affidavit that [the officer] coerced and threatened her into identifying Doswell as the assailant, both before and during the trial"); *Blake v. Race*, 487 F. Supp. 2d 187 (E.D.N.Y. 2007) (denying defendant's motion for summary judgment where a police informant who had tied the plaintiff to a crime testified in his deposition that he had been pressured by police officers to falsely implicate the plaintiff).

(denying summary judgment based on officer's admission that he would have investigated witness for illegal gambling had the witness not "told [the officer] what he wanted, *i.e.*, that Plaintiff had asked him if he had a [gun]").

For example, in *Stinson v. Milwaukee*, Stinson brought an action against police officers involved in his arrest after serving 23 years in prison for a murder he did not commit. 09-C-1033, 2013 WL 5447916, at *1 (E.D. Wis. Sept. 30, 2013), *appeal pending*, Nos. 13-3343, -3346, -3347 (7th Cir.). He was tied to the crime only by the testimony of two odontologists, who worked together and testified that the plaintiff's teeth matched a bite mark on the victim's breast. *Id.* With the benefit of hindsight and a DNA exoneration, it was evident that the witnesses testified falsely. *Id.* at *18. In support of his fair trial claim, Stinson argued that, because he was missing part of a tooth that was visible in the bite mark, no odontologist could have believed that he caused the bite mark on the victim and thus, the testifying odontologists must have been pressured by a police officer to concoct a false theory to explain away this inconsistent evidence. *Id.* The Court found that the plaintiff had "sufficient evidence to get to trial" because a reasonable jury could infer both (1) that the expert witnesses knew they were lying from the fact that they "had to have known that [the plaintiff] was excluded from causing the bite marks on [the victim] because of obvious differences between [the plaintiff's] teeth and the bite mark patterns" and (2) that the officer knew and was involved in the odontologists' perjury from the fact that the officer "was cognizant of [the witnesses'] shifting view of which tooth was missing" and "was fully aware of the contents of his conversations with [the witnesses]." *Id*. at *18-20.

In this case, Plaintiff has not presented the Court with any direct or circumstantial evidence of witness tampering. No witness has come forward and recanted his or her testimony. Likewise, there is no evidence from which a reasonable jury could infer that Gottlieb was in any

way connected to any alleged perjury. Thus, even if, T.S.'s testimony was not entirely consistent as to some minor details, there is simply no evidence that suggests that Gottlieb was in any manner involved in suborning perjury. Gottlieb's testimony was entirely consistent. Plaintiff cites to Gottlieb's failure to immediately record doubts about the usefulness of the towel as circumstantial evidence suggesting her wrongdoing. But, these facts suggest only that Gottlieb initially believed that the white towel may have contained the rapist's semen. This is entirely consistent with Gottlieb's trial testimony that, during the second crime scene run, she "got on [her ]hands and knees to look under the bed and found a white towel … two feet" under the bed. (1985 Tr. at 377:18-378:14.) Since Gottlieb's testimony and actions throughout the investigation were entirely consistent, there is no evidence from which a reasonable jury could infer that Gottlieb was aware of any alleged perjury regarding the white towel, let alone evidence that Gottlieb was involved in the alleged perjury.

2. T.S.'s Alleged Perjury about the Rapist's Manner of Holding up his Pants

In her initial interview of T.S., Gottlieb would have asked T.S. whether she observed any distinctive marks, such as tattoos, on her perpetrator. T.S. did not recall any such tattoos. Plaintiff has color tattoos approximately ten to twelve inches in size on both of his legs. (Pl. Add'l SOF ¶ 69.) Alice Santimays, Gottlieb's partner, had been the arresting officer in a previous rape investigation involving Plaintiff, in which Plaintiff had been acquitted after he dramatically revealed his tattoos to the victim. (Id. at ¶¶ 74-76.) It is undisputed that Santimays was aware of Plaintiff's tattoos and, although she was off duty for a day or two after T.S. was raped, she became involved in the case by December 3, 1983, when she returned to work. (Pl. Ex. 16, Gottlieb Dep. 22:8-12; Pl. Ex. 32, 12/3/83 DD5 (stating "[Gottlieb], along with Detective Alice Santimays also of B.S.C.S. [interviewed neighbors]"); Pl. Ex. 4, 12/6/83 DD5 (stating

"[Gottlieb with, *inter alia*,] Santimays and Shevlin also of B.S.C.S. did respond to the residence of [Plaintiff]. The above named perpetrator did voluntarily respond to the B.S.C.S. … [where] a line-up was conducted….").  T.S. later reported to prosecutors, and testified at trial, that she would not have been able to observe any tattoos on the rapist's legs because he held his pants just below his waist during each of the sexual assaults.  (*Id*. at ¶ 71; Pl. SOF ¶ 163.)  At trial, T.S. testified that the rapist "shimmie[d]" his pants … right to the top of his legs" and "inch[ed] his pants down below his hips."  (Pl. Add'l SOF ¶ 71).  The prosecution argued that this behavior was evidence of Plaintiff's attempt to hide his distinctive tattoos.  (*Id*.)

Even if, as Plaintiff asserts, Gottlieb learned about Plaintiff's tattoos from her partner, there is simply nothing from which a jury could infer that Gottlieb told T.S. about the tattoos or pressured her to lie about the perpetrator's *modus operandi*.  In opposing summary judgment, Plaintiff relies on the fact that Gottlieb's DD5s documenting her early discussions with T.S. do not describe the perpetrator's *modus operandi*.  However, those DD5s are entirely consistent with T.S.'s trial testimony that the perpetrator did not take his pants off.  According to Gottlieb's contemporaneous DD5, T.S. reported that the rapist "pulled his pants down" and that "[e]very time after every sex act, [the assailant] would zipper his pants up and then unzip them.  There were a lot of keys jingling on the left side of his pants."  (Defs. SOF ¶ 87; Pl. SOF ¶ 87; Pl. Ex. 31, 12/1/83 DD5 at 2.)  The fact that there are no contemporaneous records documenting Plaintiff's *modus operandi* does not support the inference that T.S.'s testimony was false — the purported absence of contemporaneous evidence is not evidence of anything.  *See Knox*, 2012 WL 4462011, at *6 (granting summary judgment on plaintiff's fair trial claims, where the plaintiff argued that "the falsity of [the officer]'s testimony can be inferred from the fact that there are no contemporaneous notes or photographs corroborating [his] trial testimony, and from

[another officer]'s inability to recall the subject of his conversation" because "these facts, which essentially amount to a purported absence of evidence, are not evidence of anything."). Thus, Defendant's motion for summary judgment on these grounds is granted.

## III.    Section 1983 Conspiracy Claim

Plaintiff additionally asserts conspiracy claims against Gottlieb, Dunbar and Donohue. He argues that there were two separate conspiracies: first, that Gottlieb and Dunbar conspired to violate his rights by attempting to ensure that T.S. and F.S. identified Plaintiff, and second, that Gottlieb and Donohue conspired to violate his rights by fabricating a story about contamination at the crime scene to inoculate certain exculpatory evidence at his trial. These conspiracy claims essentially recast Plaintiff's fabrication of evidence claims into conspiracy claims, and therefore fail for the same reasons.

The purported Gottlieb-Dunbar conspiracy is predicated on Plaintiff's assertion that both Gottlieb and Dunbar fabricated evidence against Plaintiff by attempting to improperly influence T.S. and F.S. This claim fails because, as discussed above, the record does not support Plaintiff's claims that Gottlieb or Dunbar fabricated evidence.

The purported Gottlieb-Donohue conspiracy is predicated on Plaintiff's claim that Gottlieb and Donohue committed perjury and conspired to commit perjury by falsely testifying that the crime scene was contaminated. *See* Pl. Opp. at 41 (arguing that Gottlieb and Donohue "spoke the first day of trial and then both reported parallel stories of contamination to the prosecution"). As discussed above, Gottlieb and Donohue are immune from liability based on their testimony, and their preparation for testimony. *See Rehberg*, 132 S. Ct. at 1507. In *Rehberg* the Supreme Court held that a witness' testimonial immunity "may not be circumvented by claiming that [the] witness conspired to present false testimony or by using evidence of the

witness' testimony to support any other § 1983 claim concerning the initiation or maintenance of a prosecution." *Id.* at 1506; *see also id.* at 1507 ("[t]o allow liability to be predicated on [an] alleged conspiracy [to give false testimony], … would be to permit through the back door what is prohibited through the front" (quotations and citations omitted)).[21] Thus, Plaintiff's Gottlieb-Donohue conspiracy claim is also barred by testimonial immunity.[22]

Accordingly, Defendants are granted summary judgment with regard to Plaintiff's conspiracy claims.

**IV.    Withholding and Destruction of Material Exculpatory Evidence**

When Masin tested the Vitullo kit in 1983, he followed the City's policy governing acid phosphate tests and fully-immersed the swabs in the testing reagent.  This immersion destroyed the samples, preventing Dr. Shaler from conducting further ABO testing on them.  Plaintiff asserts §1983 claims against the City and Masin, arguing that the full-immersion of the swabs from the Vitullo kit destroyed potentially exculpatory evidence in violation of the Government's obligations under *Brady*.[23]

Under *Brady*, the police cannot suppress exculpatory evidence.  However, it is well settled that the "police do not have a constitutional duty to perform any particular tests," *Arizona v. Youngblood*, 488 U.S. 51, 59 (1988), or "to create exculpatory material that does not exist,"

---

[21] *Rehberg* overruled the Second Circuit's decision in *San Filippo v. U.S. Trust Co.*, 737 F.2d 246, 255 (2d Cir. 1984), which had previously allowed plaintiffs to assert § 1983 claims against testifying witnesses who conspired to commit perjury.

[22] To the extent Plaintiff alleges an additional conspiracy involving T.S. and F.S., "[u]nsubstantiated allegations of purported collaboration between a state actor and a private party are insufficient to defeat a motion for summary judgment."  *Daly v. Ragona*, 11-CV-3836 JFB WDW, 2013 WL 3428185, at *9 (E.D.N.Y. July 9, 2013) (citing *Scotto v. Almenas*, 143 F.3d 105, 115 (2d Cir. 1998)).

[23] Plaintiff's claim is based on the pretrial destruction of evidence, not a post-conviction denial of access to DNA testing.  (Pl. Opp'n at 46 n.24.)

*Caswell v. Racetti*, 11-CV-0153 MAT, 2012 WL 1029457, at *11 (W.D.N.Y. Mar. 26, 2012) (quotation and citations omitted, collecting cases).

In *Youngblood*, the police collected a rape victim's clothing and a sample of the rapist's semen but neglected to refrigerate the clothing and sample, rendering them useless for subsequent testing. 488 U.S. at 54. Youngblood appealed from his criminal conviction for the rape, arguing that the police violated the due process clause of the Fourteenth Amendment by failing to preserve the evidence, which could have exculpated him. The Supreme Court rejected this argument, explaining that while *Brady* "makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence[,] … the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it *could* have been subjected to tests, the results of which *might* have exonerated the defendant." *Id.* at 58 (emphasis added). The Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id.*; *see also Illinois v. Fisher*, 540 U.S. 544, 547-48 (2004) (per curiam) (explaining that "a due process violation occurs whenever [material exculpatory] evidence is withheld … [while] the failure to preserve … 'potentially useful evidence' does not violate due process '*unless a criminal defendant can show bad faith on the part of the police.*'" (emphasis in original, citations omitted)). The Supreme Court found that Youngblood had not established a constitutional violation because the "failure of the police to refrigerate the clothing and to perform tests on the semen samples can at worst be described as negligent … [and] there was no suggestion of bad faith on the part of the police." *Youngblood*, 488 U.S. at 58.

Plaintiff argues that *Youngblood* does not apply. He argues that *Youngblood* applies only to *possibly* exculpatory evidence, and is therefore inapplicable to his case because subsequent DNA testing has conclusively established that the rape kit contained someone other than Plaintiff's semen. Plaintiff argues that instead of applying *Youngblood*, this Court should analyze his claims under *Brady*, which does not require a showing of bad faith.[24] This argument is patently meritless, because it was only in 2006 — decades after Masin immersed the swabs — that the Government learned that the rape kit contained exculpatory evidence. In *Youngblood*, the Supreme Court stated that in order for destruction of evidence to qualify as a *Brady* violation, the "exculpatory value of the evidence must [have been] apparent *before* the evidence was destroyed." *Id.* at 56, n.* (quotation omitted; emphasis in original). Thus, the Supreme Court held that "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence *at the time it was lost or destroyed*." *Id.* (emphasis added). Because Youngblood could not show that "the police knew the semen samples would have exculpated him *when they failed to perform certain tests or to refrigerate the boy's clothing*[,] this evidence was simply an avenue of investigation that might have led in any number of directions." *Id.* (emphasis added). Here, there is no allegation that Masin *knew* that subsequent ABO testing would exonerate Plaintiff at

---

[24] In arguing that *Brady*, rather than *Youngblood*, governs the pretrial testing of the Vitullo kit, Plaintiff relies primarily on a footnote in Judge Scheindlin's opinion in *Newton v. City of New York*, 681 F. Supp. 2d 473, 491 n.131 (S.D.N.Y. 2010) ("*Newton I*"), declining to follow *Youngblood*. The *Newton* case, however, is inapplicable since it concerned a defendant's *post-conviction* access to physical evidence, whereas this case, *Brady*, and *Youngblood* concern *pretrial* access to evidence. In any event, the *Newton I* opinion that Plaintiff relies on was vacated on reconsideration. *See Newton v. City of New York*, 784 F. Supp. 2d 470, 478 (S.D.N.Y. 2011) ("*Newton II*") (explaining that the court's previous decision was overruled by a subsequent Second Circuit decision and holding that "a failure to provide [post-conviction access to DNA], as a result of negligence but not of any intentional act, does not rise to the level of a constitutional violation").

the time he conducted his tests and submerged the samples in reagent.  Thus, *Youngblood* applies.

*Youngblood* teaches that in order to prevail on his claims against Masin and the City, Plaintiff must establish that evidence which was potentially exculpatory was destroyed in bad faith.  *Id.*  Plaintiff cannot make that showing because the Second Circuit, subsequent to Plaintiff's conviction in the criminal case, held that the same acid phosphatase methodology utilized by the same defendant did not amount to the destruction of evidence under *Youngblood*. In *Colon v. Kuhlman*, (a pre-*Youngblood* decision) the Southern District of New York considered a similar argument that Detective Masin had destroyed evidence by "[f]ollowing standard procedure in [the] laboratory" and " immers[ing] … [an] entire vaginal slide [in a differential stain, making it] impossible to perform further serological tests on the material found on it."  87 CIV. 2980 (MGC), 1988 WL 61822, at *2, *4-5 (S.D.N.Y. June 3, 1988).  The court rejected this argument holding that "[e]ven if Detective Masin could have tested the slides in a different manner, he cannot be said to have destroyed evidence when all he did was to follow the usual procedure at the New York City Police Laboratory for testing slides."  *Id*. at *5.  The court explained that a criminal defendant does not have a constitutional right to dictate that the "state … conduct its investigation in any particular way or perform tests on raw data in any particular order."  *Id*. (citation omitted).  On appeal, the Second Circuit – applying *Youngblood*, which was decided during the pendency of the appeal – expressly affirmed the district court judge's reasoning "that conducting the test for sperm on the slide did not amount to destroying evidence."  *Colon v. Kuhlmann*, 865 F.2d 29, 30 (2d Cir. 1988).  Masin's conduct in this case was identical to the conduct challenged in *Colon*.  Since it is settled law in this Circuit that the full-immersion of swabs does not constitute bad faith destruction of evidence under *Youngblood*,

this Court grants summary judgment as to Plaintiff's claims against Masin and the City for pre-trial destruction of evidence.

## V.        State Law Claims

Plaintiff alleges two state law claims against Defendants: (1) malicious prosecution against various police officers and (2) negligence/negligent misrepresentation against the City of New York in connection with post-conviction loss of evidence.

### A.  *Malicious Prosecution*

"The elements of … malicious prosecution under § 1983 are 'substantially the same' as the elements under New York law." *Boyd*, 336 F.3d at 75 (citing *Hygh v. Jacobs*, 961 F.2d 359, 366 (2d Cir. 1992)); *see also supra* at n.7. "Therefore, the analysis of the state and the federal claims is identical. The pivotal issue … is the presence, or absence, of probable cause…" *Id*. For the same reasons that Defendants are entitled to summary judgment on Plaintiff's § 1983 malicious prosecution claim, Defendants' motion for summary judgment on Plaintiff's state law malicious prosecution claim is also granted.

### B.  *Negligence*

Title 28 U.S.C. § 1367(c)(3) "permits a district court in its discretion, to decline to exercise supplemental jurisdiction over state law claims if it has dismissed all federal claims." *Tops Markets, Inc. v. Quality Markets, Inc.*, 142 F.3d 90, 103 (2d Cir. 1998). "The court must 'consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction' over the pendent claim." *Raucii v. Town of Rotterdam*, 902 F.2d 1050, 1055 (2d Cir. 1990) (quoting *Carnegie–Mellon University v. Cohill*, 484 U.S. 343, 350 (1988)). "[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors ... will point

toward declining to exercise jurisdiction over the remaining state-law claims." *Cohill*, 484 U.S. at 350 n. 7. Given that Plaintiff's federal claims against Defendants have all been dismissed, the court declines to exercise jurisdiction over his state law negligence claims. Accordingly, these claims are dismissed without prejudice.

### Conclusion

For the reasons set forth above, Defendants' motion for summary judgment is granted, except as to Plaintiff's state law negligence claims, over which this Court declines to exercise supplemental jurisdiction. The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

**SO ORDERED.**

_____S/_____
SANDRA L. TOWNES
United States District Judge

Dated: December 31, 2014
       Brooklyn, New York